# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

FEDERAL TRADE COMMISSION,                    )
                                             )
                Plaintiff,                   )        Case No.: 2:12-cv-00536-GMN-VCF
                                             )
        vs.                                  )
                                             )        **ORDER**
AMG SERVICES, INC., *et al.*,                )
                                             )
                Defendants.                  )
_____)

Pending before the Court is a Motion for Preliminary Injunction (ECF No. 780) filed by

The Federal Trade Commission (the "FTC"). Defendants Park 269, LLC and Kim C. Tucker

(the "Relief Defendants") and Defendants AMG Capital Management, LLC ("AMG"); Level 5

Motorsports, LLC; LeadFlash Consulting LLC; Black Creek Capital Corporation; Broadmoor

Capital Partners; Scott A. Tucker; Nereyda M. Tucker, as Executor of the Estate of Blaine A.

Tucker (the "Tucker Defendants") (collectively "Defendants") filed their respective Responses

in Opposition (ECF Nos. 796 and 797) on May 26, 2015, one day after the deadline to Respond

to the FTC's motion.[1]  The FTC subsequently filed a timely Joint Reply (ECF No. 803) to both

Responses.[2]

---

[1] Both the Relief Defendants and the Tucker Defendants filed Motions for Extension of Time (ECF Nos. 786 and 792) requesting permission to extend the Response deadline by two weeks until June 9, 2015. However, the FTC opposed both these motions and neither group of defendants filed a Response after May 26, 2015. As a matter of equity, the Court will consider as timely the defendants' Responses that were filed one day past the deadline. Further, because the Court will consider the Responses filed by the defendants and no later responses were filed prior to the requested extended deadline, the Court finds as moot the Motions for Extension of Time.

[2] Along with its 34-page Reply, the FTC filed a Motion for Leave to File Excess Pages (ECF No. 804) requesting permission to exceed the 20-page limit for replies set out in Nevada Local Rule 7-4 in light of its need to reply to both groups of defendants' Response briefs. This motion was granted by the Court. (Order, ECF No. 807). The Tucker Defendants subsequently filed a Motion to Reconsider (ECF No. 808) asking the Court to reverse this decision. However, "[g]iven the district court's inherent power to control their dockets, whether to grant leave to exceed the page limits set forth in the Civil Local Rules appears to be at the full discretion of the Court." *Traylor Bros. v. San Diego Unified Port Dist.*, No. 08-CV-1019-L WVG, 2012 WL 1019966, at *2 (S.D. Cal. Mar. 26, 2012) (citing *United States v. W.R. Grace*, 526 F.3d 499, 509 (9th Cir. 2008) (en banc) (noting also that "judges

1    I.    **BACKGROUND**

2        This action was brought by the FTC, asserting that the "high-fee, short-term payday

3    loans" offered by Defendants AMG, SFS, Inc., Red Cedar Services, Inc., and former Defendant

4    MNE Services, Inc. ("Lending Defendants")[3] violated section 5 of the Federal Trade

5    Commission Act of 1914, 15 § U.S.C. 45(a)(1), the Truth in Lending Act of 1968, 15 U.S.C.

6    § 1601(a), and Regulation Z, 12 C.F.R. § 1026(a). (Am. Compl. 15:1–20:6, ECF No. 386).

7        On December 27, 2012, the Court signed an Order entering the parties' joint stipulation

8    for preliminary injunction and bifurcation. (ECF No. 296). The Bifurcation Order divided the

9    litigation into two phases: a liability phase and a relief phase. (*Id.* 9:1–10:23). During Phase I

10   of the proceedings, the Court would adjudicate the merits of the FTC's claims for violations of

11   the FTC Act, TILA, and EFTA. (*Id.* 9:1–24). During Phase II of the proceedings, the Court

12   would adjudicate the remaining issues, including the individual liability of the various

13   Defendants. (*Id.* 10:119). On May 28, 2014, this Court entered an Order (ECF No. 584)

14   adopting a Report and Recommendation entered by Judge Ferenbach and granting summary

15   judgment in favor of the FTC on two of its four causes of action. Accordingly, the litigation is

16   now in Phase II of the proceedings.

17

18   exercise substantial discretion over what happens inside the courtroom")). Moreover, the Tucker Defendants'
     motion fails to present any evidence that the grounds for granting a motion to reconsider exist in this case. *See*
19   *Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) ("Reconsideration is
     appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the
20   initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law."). Accordingly,
     the Motion to Reconsider is denied.
21

22   The FTC also filed a Motion to Unseal (ECF No. 810) four documents (ECF Nos. 803-7, 803-8, 803-9, 803-10)
     attached to its Reply as Exhibits, and the Tucker Defendants filed a Response (ECF No. 823). In their Response,
23   the Tucker Defendants only oppose unsealing Blaine Tucker's Living Trust (ECF No. 803-7). Because the
     Tucker Defendants have demonstrated that compelling reasons exist to maintain that document under seal, the
     Court denies FTC's motion in regard to Blaine Tucker's Living Trust and grants the Motion in regard to the
24   remaining documents.

25   [3] Because the FTC's Motion requests a preliminary injunction exclusively against the Tucker Defendants and the
     Relief Defendants, SFS, Inc. and Red Cedar Services, Inc. are not affected by this Order.

1    In the instant Motion, the FTC seeks a preliminary injunction against the Tucker
2  Defendants and the Relief Defendants in the form of an asset freeze and accounting "[i]n light
3  of mounting evidence that Defendants have been engaged in a continuous improper dissipation
4  of and concealment of assets." (Mot. for Prelim. Inj. 1:2–4, ECF No. 780). For the reasons set
5  forth below, the Court grants the Motion for Preliminary Injunction.

6  ## II.    LEGAL STANDARD

7    Under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), the Court may
8  grant the FTC a preliminary injunction "[u]pon a proper showing that, weighing the equities
9  and considering the Commission's likelihood of ultimate success, such action would be in the
10  public interest." 15 U.S.C. § 53(b). Section 13(b) of the FTC Act, therefore, "places a lighter
11  burden on the Commission than that imposed on private litigants by the traditional equity
12  standard." *F.T.C. v. Warner Commc'n, Inc.*, 742 F.2d 1156, 1159 (9th Cir. 1984). Under this
13  more lenient standard, the FTC need not show irreparable harm; instead, it must only
14  demonstrate (1) that it is likely to succeed on the merits and (2) that the equities weigh in favor
15  of an injunction. *Id.* at 1160; *see also F.T.C. v. World Wide Factors*, 882 F.2d 344, 346 (9th
16  Cir. 1989).

17    A court's authority to grant injunctive relief under Section 13(b) includes "all the
18  inherent equitable powers . . . for the proper and complete exercise" of the court's equity
19  jurisdiction. *F.T.C. v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112 (9th Cir. 1982) (citations
20  omitted). One such power is the authority to freeze a defendant's assets. *Id.* at 1113; *F.T.C. v.
21  Evans Prods. Co.*, 775 F.2d 1084, 1088–89 (9th Cir. 1985). As the Ninth Circuit emphasized in
22  *H.N. Singer*, an order freezing assets is a form of "ancillary relief" rather than a primary
23  remedy. *See* 668 F.2d at 1112–13. "Courts have inherent equitable powers to grant ancillary
24  relief, other than a preliminary injunction restraining future violations of the law, when there is
25  no likelihood of recurrence." *Evans Prods.*, 775 F.2d at 1088. "A party seeking an asset freeze

1   must show a likelihood of dissipation of the claimed assets, or other inability to recover

2   monetary damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th

3   Cir. 2009).

## III.   DISCUSSION

### A.   Likelihood of Success on the Merits

6   "[T]he burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v.*

7   *O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). Thus, the burden

8   is on the FTC to demonstrate that it is likely to prevail on its claims that: (1) Scott Tucker and

9   Blaine Tucker are individually liable; (2) a common enterprise existed among the lenders and

10  their entities; and (3) the Relief Defendants are liable. "Because irreparable injury must be

11  presumed in a statutory enforcement action, the district court need only . . . find some chance of

12  probable success on the merits." *World Wide Factors*, 882 F.2d at 347 (internal quotation

13  marks omitted).

14  The Court finds that the FTC has satisfied its burden of demonstrating probable success

15  on the merits of its claims, and considers each claim in turn.

16  *1.*   *Scott Tucker and Blaine Tucker are Personally Liable for Violations of the FTC*

17  *Act*

18  Personal liability for violations of the FTC Act fall into two categories: liability for

19  injunctive relief and liability for monetary relief. Individuals are liable for injunctive relief if

20  they directly participate in the deceptive acts or have the authority to control them. *F.T.C. v.*

21  *Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997); *F.T.C. v. Stefanchik*, 559

22  F.3d 924, 931 (9th Cir. 2009). To subject an individual to monetary liability, the FTC must

23  show that the individual had knowledge of the misrepresentations, was recklessly indifferent to

24  the truth or falsity of the misrepresentation, or was aware of a high probability of fraud and

25  intentionally avoided the truth. *Publ'g Clearing House*, 104 F.3d at 1171; *Stefanchik*, 559 F.3d

1    at 931. "[T]he extent of an individual's involvement in a fraudulent scheme alone is sufficient
2    to establish the requisite knowledge for personal restitutionary liability." *F.T.C. v. Affordable*
3    *Media*, 179 F.3d 1228, 1235 (9th Cir. 1999).

4    The evidence produced by the FTC demonstrates that Scott Tucker and Blaine Tucker
5    acted with reckless indifference to the truth or falsity or an awareness of a high probability of
6    fraud and an intentional avoidance of the truth. Specifically, Scott Tucker, as AMG's
7    president, directed all lending and collection activities, approved lending policies, drafted and
8    reviewed loan disclosures and website content, and interacted and entered into agreements with
9    third party servicers. (See *e.g.*, Grote Dep. 165:21–166:8, ECF No. 781-28). For his part as
10   AMG's vice-president, Blaine Tucker edited and approved loan disclosures, reviewed content
11   appearing on the Lending Defendants' websites, and had the authority to modify and approve
12   consumer call scripts and other lending policies implemented by the loan companies. (See *e.g.*,
13   AMG Resp. to Interrog. No. 9, ECF No. 781-29). Further, both Scott Tucker and Blaine
14   Tucker received periodic reports tracking consumer complaints and were aware that AMG's
15   customers often did not understand the Lending Defendants' process of renewals and
16   paydowns. (See, *e.g.*, Ex. 30 to Singhvi Decl., ECF No. 781-36). This evidence is sufficient to
17   support a preliminary conclusion that Scott Tucker and Blaine Tucker were recklessly
18   indifferent to or intentionally avoided the possibility of their representations being false or
19   fraudulent.

20    ### 2. *Lenders Engaged in a Common Enterprise*

21    "[E]ntities constitute a common enterprise when they exhibit either vertical or horizontal
22   commonality—qualities that may be demonstrated by a showing of strongly interdependent
23   economic interests or the pooling of assets and revenues." *F.T.C. v. Network Servs. Depot, Inc.*,
24   617 F.3d 1127, 1142–43 (9th Cir. 2010). In deciding whether a common enterprise exists,
25   courts may consider such factors as whether the companies were under common ownership and

1   control; whether they pooled resources and staff; whether they shared phone numbers,
2   employees, and email systems; and whether they jointly participated in a "common venture" in
3   which they benefited from a shared business scheme or referred customers to one another. *Id.* at
4   1243.

5        In support of its claim that the Tucker Defendants engaged in a common enterprise, the
6   FTC points out that "[t]he Tucker Corporate Defendants, wholly owned and controlled by Scott
7   Tucker and Blaine Tucker, shared office space with each other and shared employees with
8   AMG."[4] (Mot. for Prelim. Inj. 24:13–14; *see also* Ex. 57 to Singhvi Decl., ECF No. 57; Cert. of
9   Int. Parties, ECF No. 58; Tucker Defs.' Am. Ans. ¶¶ 10–12, 15, ECF No. 397). Further, the
10  FTC also demonstrates that the Tucker Corporate Defendants and the Lending Defendants
11  commingled corporate funds through "thousands of exorbitant and seemingly random payments
12  made by the [Lending Defendants] to the Tucker Corporate Defendants." (Mot. for Prelim. Inj.
13  24:13–14; *see also* Ex. 5 to Singhvi Decl. at 5–7, 22–25, 45, 53, 57, 67–70, ECF No. 781-11).

14       While the Tucker Defendants acknowledge that "[t]he bulk of the Motion [for
15  Preliminary Injunction] is devoted to trying to establish that Scott and Blaine Tucker were
16  members of the alleged common enterprise," they neither discuss nor refute the FTC's evidence
17  that the lenders engaged in a common enterprise. (Tucker Defs.' Resp. 21:10–11, ECF No.
18  797). Accordingly, based on FTC's evidence indicating that a common enterprise existed, and
19  the Tucker Defendants' tacit agreement to this claim by failing to refute it, the Court finds that
20  the FTC is likely to succeed in proving that the Tucker Defendants engaged in a common
21  enterprise.

22

23

24  _____

25  [4] The "Tucker Corporate Defendants" are: AMG; Level 5 Motorsports, LLC; LeadFlash Consulting LLC; Black
    Creek Capital Corporation; and Broadmoor Capital Partners.

3.    *The Relief Defendants are Liable*

District courts are given broad authority under the FTC Act to fashion equitable remedies to the extent necessary to ensure effective relief. *Network Servs. Depot*, 617 F.3d at 1141–42. "The broad equitable powers of the federal courts can be employed to recover ill gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong." *S.E.C. v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998). "The creditor plaintiff must show that the [relief] defendant has received ill gotten funds *and* that he does not have a legitimate claim to those funds." *Id.* at 677. Upon such a showing, the remedy is an equitable monetary judgment in the amount of the funds that the relief defendant received. *See id.*; *see also S.E.C. v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000) ("[D]isgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset.").

The Relief Defendants received funds derived from the fraudulent activities of the other defendants. Kim Tucker received at least $19 million in non-salary payments, usually orchestrated by Scott Tucker, originating from a Lending Defendant or a member of the common enterprise. (*See, e.g.*, Ex. 109 to Singhvi Decl., ECF No. 781-115). Park 269, wholly owned by Kim Tucker and nominal owner of an $8 million mansion in Aspen, Colorado, also received payments arranged by Scott Tucker for the property's purchase, mortgage, property taxes, furnishing, maintenance, and housekeeping. (*See, e.g.*, Ex. 118 to Singhvi Decl., ECF No. 781-124). Based on this evidence of commingling of funds, and considering that the Court has preliminarily found Scott Tucker to be personally liable for violations of the FTC Act, the Court finds that the FTC has demonstrated a likelihood of success that it will recover from the Relief Defendants.

**B.    Balancing of the Public and Private Interests**

In balancing the equities, public equities receive far greater weight than private equities. *Affordable Media*, 179 F.3d at 1236. Public equities include economic benefits and competitive advantages for consumers, and effective relief for the FTC. *See Warner Commc'n*, 742 F.2d at 1165. "[W]hen a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight." *World Wide Factors*, 882 F.2d at 347. If the FTC demonstrates a likelihood of success on the merits, "a countershowing of private equities alone does not justify denial of a preliminary injunction." *Warner Commc'n*, 742 F.2d at 1165.

The Court finds that the public equities are substantial and outweigh the private equities in this case. As discussed below, the FTC has established that its ability to provide restitution to consumers will be severely impaired by the denial of an injunction. While the Tucker Defendants insist that living expenses and attorneys' fees must be excluded from the asset freeze, the Court has discretion to impose limited allowances for normal living expenses and attorneys' fees. *See, e.g., F.T.C. v. Ideal Fin. Sols., Inc.*, No. 2:13-CV-00143-JAD-GW, 2014 WL 4541191, at *2 (D. Nev. Sept. 9, 2014) ("The Ninth Circuit recognizes district courts' discretion in civil cases to 'forbid or limit payment of attorney fees out of frozen assets.'") (quoting *Commodity Futures Trading Com'n v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995)). Therefore, the balance of equities favors the FTC.

**C.    Asset Freeze**

Congress has given district courts equitable authority to order the freezing of assets under § 13(b) of the FTCA. *H.N. Singer*, 668 F.2d at 1113. An asset freeze is proper to ensure that adequate funds will be available to compensate defrauded consumers. *Id.* "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson*, 572 F.3d at 1085. The Court

1    must also consider whether the freezing of assets "under certain circumstances . . . might thwart

2    the goal of compensating investors if the freeze were to cause such disruption of defendants'

3    business affairs that they would be financially destroyed." *Id.* (quoting *S.E.C. v. Manor Nursing*

4    *Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972)).

5          The FTC has presented sufficient evidence to justify an asset freeze. Not only has it

6    shown that the Tucker Defendants are likely to conceal and dissipate assets, but it has also

7    shown that a monetary award against the Tucker Defendants exceeds their ability to pay.

8    Regarding dissipation and concealment of assets, the evidence demonstrates that the Tucker

9    Defendants dissipated funds by writing thousands of checks to their wholly owned companies

10    and using corporate assets for personal expenditures, including jet travel, luxury automobiles, a

11    vacation home, and personal credit card expenses. (Ex. 66 to Singhvi Decl., ECF No. 781-72;

12    Ex. 38 to Singhvi Decl., ECF No. 781-44). Further, between March 2013 and late 2014, the

13    Tucker Defendants' total assets shuffled through numerous financial institutions and ultimately

14    decreased by $90 million. (*See, e.g.*, Budich Decl. ¶ 8, ECF No. 782; Ex. 45 to Singhvi Decl.,

15    ECF No. 781-51).

16          Next, regarding the Tucker Defendants' abilities to pay a monetary reward, the FTC

17    estimates that it may recover the following amounts: $340 million to $1.3 billion against the

18    Tucker Defendants based on consumer restitution; $400 million against the Tucker Defendants

19    if the Court awards disgorgement; and $27 million against the Relief Defendants based on the

20    value of unearned payments made to them.[5] (Mot. for Prelim. Inj. 27:23–27). Because the total

21

22   [5] The FTC's consumer harm calculations are based on an analysis of defendants' consumer loan data and
summarized in the Declaration of Elizabeth Miles ("Miles Declaration") pursuant to Federal Rule of Evidence

23   1006. (Mot. for Prelim. Inj. 2:20–21; Miles Decl., ECF No. 781-1). The Tucker Defendants argue that the Miles
Declaration is inadmissible under Rule 1006 because "summaries such as those set forth in the Declaration must

24   be authenticated by an expert." (Tucker Defs.' Resp. 14:8–9). Further, the Tucker Defendants complain that they
"have never been provided [the software used to generate the summaries and] have not been allowed to examine
any of the 'scripts' [written] for this software." (*Id.* 14:17–18). However, Rule 1006 merely requires that the

25   "underlying records for which the summaries are made be admissible in evidence, and available to the opposing
party for inspection." *United States v. Rizk*, 660 F.3d 1125, 1130–31 (9th Cir. 2011). This standard does not

1   assets currently held by the Tucker Defendants and the Relief Defendants do not exceed $125

2   million, it is likely that the Court's judgment would greatly exceed Defendants' abilities to pay.

3   (*See* Budich Decl. ¶ 8). Finally, an asset freeze would not disrupt Defendants' businesses as

4   they have ceased operations. *See H.N. Singer*, 668 F.2d at 1113 (finding that "there is no danger

5   that the freeze will disrupt the defendants' business affairs [because] . . . [t]hey are out of

6   business").

7       While the Tucker Defendants do not dispute any of these facts, they nevertheless

8   maintain that "[t]he FTC has failed to demonstrate the likelihood of dissipation or concealment

9   of assets." (Tucker Defs.' Resp. 21:8). Principally, the Tucker Defendants argue that the FTC's

10  evidence of dissipation is "'substantially outdated' and 'stale.'" (*Id.* 21:14) (quoting *F.T.C. v.*

11  *Merch. Servs. Direct, LLC*, No. 13-CV-0279-TOR, 2013 WL 4094394, at *3 (E.D. Wash. Aug.

12  13, 2013)).[6] In addition, the Tucker Defendants suggest that no dissipation occurred with

13  regard to "[t]he $90 million difference in assets from March to the latter part of 2014 [because

14  those funds reflect] tax payments made by or on behalf of the Tucker Defendants." (Tucker

15  Defs.' Resp. 23:1–3).

16      However, each of the Tucker Defendants' arguments are misplaced. Indeed, evidence of

17  past dissipation is relevant to and probative of the likelihood of future dissipation. *See, e.g.,*

18  require expert testimony, nor does it require the proponent of the summary to provide its software or disclose the
    exact keystrokes used to perform the calculations. *See Richardson v. Cheshier & Fuller, L.L.P.*, No. 6:07-CV-
19  256, 2008 WL 5122122, at *4 (E.D. Tex. Dec. 3, 2008) ("[Witness's] testimony described the contents of a
    summary of voluminous business records and the methods she used to create the summary, the admissibility of
20  which neither party disputes. Such testimony is not considered expert testimony."). Because the Tucker
    Defendants do not argue that the evidence upon which the Miles Declaration was generated is inadmissible or
21  unavailable to them, the Tucker Defendants' complaints under Rule 1006 are without merit. The Court further
    finds the Tucker Defendants' additional attacks on the Miles Declaration unpersuasive and unfounded.
22

23  [6] The Tucker Defendants fail to clarify that the court in *Merchant Services* discussed the relevance of "stale"
    evidence in the context of a permanent injunction against future violations of the FTC Act, not—as relevant
24  here—ancillary relief. *Merch. Servs.*, 2013 WL 4094394, at *3. The *Merchant Services* court ultimately did
    decline to enter ancillary relief in the form of an asset freeze, but based its decision on other grounds. *Id.* at *4.
25  This apparent misunderstanding of the difference between an injunction against future violations and ancillary
    relief pervades both the Tucker Defendants' and the Relief Defendants' Responses to the instant Motion. *See,*
    *e.g., Evans Prods.*, 775 F.2d at 1088.

1  *Affordable Media*, 179 F.3d at 1236–37 (noting defendants' history of concealing and
2  dissipating assets supported likelihood of dissipation finding).  In addition, the Tucker
3  Defendants cite no case law to support the proposition that funds obtained from deceived
4  consumers to reduce their own income tax liability mitigates against a finding of dissipation.
5  *C.f. F.T.C. v. Crittendon*, 823 F. Supp. 699, 704 (C.D. Cal. 1993) *aff'd* 19 F.3d 26 (9th Cir.
6  1994) (funds derived from deception are held in constructive trust for deceived consumers, and
7  are not to be used to pay defendant's taxes).  Moreover, as the FTC points out, "if the Tucker
8  Defendants' paid $100 million in income taxes, where are the earnings upon which those taxes
9  were assessed?" (Mot. for Prelim. Inj. 24:8–9).  Given that the Tucker Defendants appear to
10 have had just $212.6 million in assets by the end of March 2013, FTC's question renders
11 Defendants' explanations doubtful. (*See* Budich Decl. ¶ 7).

12      Accordingly, the Tucker Defendants' conduct establishes a likelihood that in the absence
13 of an asset freeze and accounting, asset dissipation and concealment will continue.[7] *See, e.g.*,
14 *Johnson*, 572 F.3d at 1085 (defendant's past of diverting more than $35 million in company
15 assets to his personal bank account created a likelihood of asset dissipation).  The Court
16 therefore finds that it is necessary to freeze their assets and orders an accounting "to preserve
17 the possibility of effective relief." *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552,
18 560 (9th Cir. 1992).

19      Based the forgoing, the Court shall issue a preliminary injunction consistent with the
20 definitions set forth below.

21 **IV.   DEFINITIONS**

22      1.  **"Asset"** means any legal or equitable interest in, right to, or claim to, any real,
23 personal, or intellectual property including, but not limited to, chattel, goods, instruments,

---

25 [7] The Tucker Defendants cite no authority to support their contention that the proposed accounting is unjustified "mandatory relief." (Tucker Defs.' Resp. 30:6–13).  Instead, the Court recognizes that accountings are frequently and routinely ordered in conjunction with an asset freeze. *See, e.g., Johnson*, 572 F.3d at 1085.

1   equipment, fixtures, general intangibles, effects, leaseholds, contracts, mail or other deliveries,

2   shares of stock, securities, inventory, checks, notes, accounts, credits, receivables (as those

3   terms are defined in the Uniform Commercial Code), cash, trusts, including but not limited to

4   asset protection trusts, and reserve funds or other accounts associated with any payments

5   processed on behalf of any Defendant, including, but not limited to, such reserve funds held by

6   a payment processor, credit card processor, or bank.

7       2. **"Defendants"** means (a) each Tucker Defendant and (b) each Relief Defendant.

8   Furthermore, any person insofar as he or she is acting in the capacity of an officer, agent,

9   servant, employee, or attorney of any Tucker Defendant or any Relief Defendant, and any

10  person or entity in active concert or participation with any of the foregoing who receives actual

11  notice of this Order by personal service or otherwise, is bound to comply with this Order, *see*

12  Fed.R.Civ.P. 65(d), whether these persons or entities are acting directly or through a trust,

13  corporation, subsidiary, division, or other device.

14      3. **"Document"** is synonymous in meaning and equal in scope to the usage of the term

15  in the Federal Rules of Civil Procedure 34(a), and includes writing, drawings, graphs, charts,

16  Internet sites, Web pages, Web sites, electronic correspondence, including email and instant

17  messages, photographs, audio and video recordings, contracts, accounting data, advertisements

18  (including, but not limited to, advertisements placed on the World Wide Web), FTP Logs,

19  Server Access Logs, USENET Newsgroup postings, World Wide Web pages, books, written or

20  printed records, handwritten notes, telephone logs, telephone scripts, receipt books, ledgers,

21  personal and business canceled checks and check registers, bank statements, appointment

22  books, computer records, and other data compilations from which information can be obtained

23  and translated, if necessary, through detection devices into reasonably usable form. A draft or

24  non-identical copy is a separate document within the meaning of the term.

25

4. **"Person"** means a natural person, organization, or other legal entity, including a corporation, partnership, proprietorship, association, cooperative, government or governmental subdivision or agency, or any other group or combination acting as an entity.

5. **"Plaintiff" or "Commission" or "FTC"** means the Federal Trade Commission.

6. **"Relief Defendants"** means Kim Tucker, Park 269, LLC, and their successors, assigns, affiliates, or subsidiaries.

7. **"Representatives"** means Defendants' officers, agents, servants, employees, and attorneys, and any other person or entity in active concert or participation with them who receives actual notice of this Order by personal service or otherwise.

8. **"Tucker Defendants"** means Scott A. Tucker, AMG Capital Management, LLC, Level 5 Motorsports, LLC, Black Creek Capital Corporation, LeadFlash Consulting LLC, Broadmoor Capital Partners, LLC, and Nereyda M. Tucker, as Executor of the Estate of Blaine A. Tucker, and their successors, entities, assigns, affiliates, or subsidiaries.

## V.   CONCLUSION

**IT IS HEREBY ORDERED** that the Tucker Defendants' Motion for Extension of Time (ECF No. 786) and the Relief Defendants' Motion for Extension of Time (ECF No. 792) are **DENIED as moot**.

**IT IS FURTHER ORDERED** that the Tucker Defendants' Motion to Reconsider (ECF No. 808) is **DENIED**.

**IT IS FURTHER ORDERED** that the FTC's Motion to Unseal (ECF No. 810) is **GRANTED in part** and **DENIED in part**. The Clerk is ordered to **UNSEAL** the following documents: Declaration of Natalie C. Dempsey (ECF No. 803-8); OneClickCash Traning Manual (ECF No. 803-9); and UCL Team Meeting Minutes (ECF No. 803-10). Blaine Tucker's Living Trust (ECF No. 803-7) will remain filed under **SEAL**.

**IT IS FURTHER ORDERED** that the FTC's Motion for Preliminary Injunction (ECF No. 780) is **GRANTED** pursuant to the following terms:

## I.

## ASSET FREEZE

**IT IS HEREBY ORDERED** that Defendants and their Representatives, whether acting directly or through any entity, corporation, subsidiary, division, director, manager, member, affiliate, independent contractor, accountant, financial advisor, or other device, are hereby preliminarily restrained and enjoined from:

A.      Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, relinquishing, spending, withdrawing, granting a lien or security interest in, or otherwise disposing of any funds, real or personal property, accounts, contracts, shares of stock, lists of consumer names, or other assets, wherever located, including outside the United States, that are:

       1.      owned or controlled, in whole or in part, by any Defendant;

       2.      held for the benefit of, directly or indirectly, any Defendant, in whole or in part;

       3.      in the actual or constructive possession of any Defendant;

       4.      held by an agent of any Defendant as a retainer for the agent's provision of services to Defendants;

       5.      owned or controlled by, or in the actual or constructive possession of or otherwise held for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed, controlled by any of the Defendants, or of which any Defendant is an officer, director, member, or manager. This includes, but is not limited to, any assets held by, for, or subject to access by, any of the

Defendants at any bank or savings and loan institution, or with any broker-dealer, escrow agent, title company, commodity trading company, precious metal dealer, or other financial institution or depository of any kind; or

6.     held in any account for which any Defendant is an authorized signer.

B.     Opening or causing to be opened, unless accompanied by counsel for the Commission, any safe deposit boxes titled in the name of any Defendant, either individually or jointly, or subject to access by any Defendant;

C.     Obtaining a personal or secured loan encumbering the assets of any Defendant, or subject to access by any Defendant;

D.     Incurring liens or other encumbrances on real property, personal property, or other assets in the name, singly or jointly, of any Defendant or of any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Defendant; or

E.     Incurring charges or cash advances on any credit or bank card issued in the name, individually or jointly, of any Defendant, or any corporation, partnership, or other entity irectly or indirectly owned, managed, or controlled by any Defendant or of which any Defendant is an officer, director, member, or manager. This includes, but is not limited to, any corporate bank or credit card account for which any Defendant is an authorized signer.

**IT IS FURTHER ORDERED** that the assets affected by this Section shall include assets (a) existing as of the date this Order was entered, or (b) acquired by any Defendant following entry of this Order, if such assets are derived from the conduct alleged in the Commission's Complaint.

**IT IS FURTHER ORDERED** that Defendant Scott A. Tucker and Relief Defendant Kim Tucker may retain access to $75,000 (collectively) for attorneys' fees and living expenses for two months following the date of this Order and that Defendant Nereyda M. Tucker may retain $25,000 for attorneys' fees and living expenses for two months following the date of this

1   Order. After the end of this two-month period, the FTC, Scott A. Tucker, Kim Tucker, and

2   Nereyda M. Tucker shall confer regarding future allowances for attorneys' fees and living

3   expenses.

## II.

## DUTIES OF ASSET HOLDERS

6       **IT IS FURTHER ORDERED** that any financial or brokerage institution, credit card

7   processing company, payment processor, merchant bank, acquiring bank, business entity, or

8   person who receives actual notice of this Order (by personal service or otherwise) that (a)

9   holds, controls, or maintains custody of any account or asset of any Defendant, (b) holds,

10  controls, or maintains custody of any asset associated with credit or debit card charges made on

11  behalf of any Defendant, including but not limited to, reserve funds held by payment

12  processors, or (c) has held, controlled, or maintained custody of any such account or asset at

13  any time since the date of entry of this Order shall:

14      A.      Hold and retain within its control and prohibit the withdrawal, removal,

15  assignment, transfer, pledge, encumbrance, disbursement, dissipation, relinquishing,

16  conversion, sale, or other disposal of any such asset except by further order of this Court;

17      B.      Deny any person access to any safe deposit box that is:

18              1.      titled in the name of any Defendant, either individually or jointly; or

19              2.      otherwise subject to access by any Defendant;

20      C.      Provide the FTC's counsel, within three (3) business days of receiving a copy of

21  this Order, a sworn statement setting forth:

22              1.      the identification number of each account or asset:

23                      a.      titled in the name, individually or jointly, of any of the Defendants;

24                      b.      held on behalf of, or for the benefit of, any of the Defendants; or

25

              c.     associated with credit or debit card charges made on behalf of any of the Defendants;

     2.    the balance of each such account, or a description of the nature and value of each such asset as of the close of business on the day on which this Order is served, and, if the account or other asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, and the name of the person or entity to whom such account or other asset was remitted; and

     3.    the identification of any safe deposit box that is either titled in the name, individually or jointly, of any of the Defendants, or is otherwise subject to access by any of the Defendants; and

D.    Upon the request of the FTC, promptly provide the FTC with copies of all records or other documentation pertaining to such account or asset, including, but not limited to, originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, including wire transfers and wire transfer instructions, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs.

## III.

## FINANCIAL STATEMENTS

**IT IS FURTHER ORDERED** that each Defendant, within five (5) days of service of this Order upon them, shall prepare and deliver to counsel for the Commission completed financial statements on the forms attached to this Order as **Attachment A** (Financial Statement of Individual Defendant) for themselves individually, and **Attachment B** (Financial Statement of Corporate Defendant) for each business entity under which they conduct business or of which they are an officer, and for each trust for which any Defendant is a trustee. The financial

1  statements shall be accurate as of the date of entry of this Order. Each Defendant shall include
2  in the financial statements a full accounting of all funds and assets, whether located inside or
3  outside of the United States, that are: (a) titled in the name of such Defendant, jointly,
4  severally, or individually; (b) held by any person or entity for the benefit of such Defendant; or
5  (c) under the direct or indirect control of such Defendant.

## IV.

## REPATRIATION OF ASSETS AND DOCUMENTS

**IT IS FURTHER ORDERED** that within three (3) days following the service of this
Order, each Defendant shall:

A.     Provide the Commission with a full accounting of all funds, documents, and
assets outside of the United States which are: (1) titled in the name, individually or jointly, of
any Defendant; or (2) held by any person or entity for the benefit of any Defendant; or (3)
under the direct or indirect control, whether jointly or singly, of any Defendant; and

B.     Transfer to the territory of the United States all funds, documents, and assets
located in foreign countries which are: (1) titled in the name individually or jointly of any
Defendant; or (2) held by any person or entity, for the benefit of any Defendant; or (3) under
the direct or indirect control of any Defendant, whether jointly or singly.

## V.

## NONINTERFERENCE WITH REPATRIATION

**IT IS FURTHER ORDERED** that Defendants and their Representatives, whether
acting directly or through any entity, corporation, subsidiary, division, director, manager,
member, affiliate, independent contractor, accountant, financial advisor, or other device, are
hereby restrained and enjoined from taking any action, directly or indirectly, which may result
in the encumbrance or dissipation of foreign assets, or in the hindrance of the repatriation
required by Section IV of this Order, including, but not limited to:

A.    Sending any statement, letter, fax, e-mail or wire transmission, or telephoning or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time that all assets have been fully repatriated pursuant to Section IV of this Order; or

B.    Notifying any trustee, protector or other agent of any foreign trust or other related entities of either the existence of this Order, or of the fact that repatriation is required pursuant to a court order, until such time that all assets have been fully repatriated pursuant to Section IV of this Order.

## VI.

## ACKNOWLEDGEMENT AND DISTRIBUTION OF ORDER BY DEFENDANTS

**IT IS FURTHER ORDERED** that Defendants obtain acknowledgments of receipt of this Order:

A.    Each Defendant, within three (3) days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.    Defendants shall immediately provide a copy of this Order to each officer, director, employee, agent, attorney, or other representative of any Defendant, who has the ability to dispose of or manage the Assets of any Defendant. Defendants shall, within ten (10) days from the date of entry of this Order, provide the FTC with a sworn statement that Defendants have complied with this provision of the Order, which statement shall include the names and addresses of each such person or entity who received a copy of this Order. Furthermore, Defendants shall not take any action that would encourage those who receive this Order to disregard it or believe that they are not bound by its provisions.

## VII.

## SERVICE ON FINANCIAL INSTITUTIONS,

## ENTITIES, OR PERSONS

**IT IS FURTHER ORDERED** that copies of this Order may be served by any means, including facsimile transmission, e-mail, and overnight delivery service, upon any financial institution or other entity or person that may have possession, custody, or control of any documents or assets of any Defendant, or that may otherwise be subject to any provision of this Order. Service upon any branch or office of any financial institution shall effect service upon the entire financial institution.

## VIII.

## GENERAL SERVICE OF ORDER

**IT IS FURTHER ORDERED** that pursuant to Rule 4(c)(2), Fed. R. Civ. P., this Order and the initial papers filed in this matter may be served on Defendants, upon the business premises of Defendants, and upon any financial institution or other entity or person that may have possession, custody or control of any documents or assets of any Defendant, or that may be subject to any provision of this Order, by employees of the FTC, by employees of any other law enforcement agency, by any agent of Plaintiff, or by any agent of any process service retained by Plaintiff.

## IX.

## CORRESPONDENCE

**IT IS FURTHER ORDERED** that, for the purpose of this Order, all correspondence and service of pleadings on Plaintiff shall be addressed to:

> Nikhil Singhvi
> Jason D. Schall
> Ioana Rusu
> Federal Trade Commission
> 600 Pennsylvania Avenue NW, CC-10232

Page 20 of 21

Washington, DC 20580
FAX: 202-326-3768
Email: nsinghvi@ftc.gov, jschall@ftc.gov, irusu@ftc.gov

## X.

### RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for

all purposes.

**DATED** this __31__ day of March, 2016.

_____
Gloria M. Navarro, Chief Judge
United States District Judge