UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

                Plaintiff,                        16-CR-091 (PKC)

    -against-                                  MOTION AND
                                                              MEMORANDUM
SCOTT TUCKER and                               <u>IN SUPPORT</u>
TIMOTHY MUIR,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**TIMOTHY MUIR'S MOTION TO STRIKE SURPLUSAGE
<u>FROM THE INDICTMENT AND MEMORANDUM IN SUPPORT</u>**

        **COMES NOW**, Timothy Muir, by and through counsel, Thomas J. Bath, Jr. and Marc Agnifilo and hereby moves this court for an order pursuant to Rule 7(d) of the Federal Rules of Criminal Procedure, striking surplusage from the Indictment. In support of this motion, Mr. Muir offers the following:

**<u>INTRODUCTION</u>**

        The indictment charges Scott Tucker and Timothy Muir with three different federal crimes spanning 16 years (1997-2013). Count 1 charges a RICO conspiracy to collect unlawful debts, Counts 2 through 4 allege collection of unlawful debt and Counts 5 through 9 allege false TILA (Truth In Lending Act) disclosures. The indictment provides several pages of "Background" and "Overview" as well as a section on the "Means and Methods of the Conspiracy" in its route to setting forth the charges against Mr. Tucker and Mr. Muir. Rather than simply setting forth the allegations in the words of the applicable law, the indictment is

composed as something of a persuasive speech, filled with rhetoric which is both prejudicial and irrelevant.

**ARGUMENT**

Federal Rule of Criminal Procedure 7(d) authorizes the court, upon a motion by a defendant, to "strike surplusage from the indictment or information." Mr. Muir is aware of the established policy of courts within the Southern District to "refrain from tampering with indictments." United States v. Tomero, 496 F. Supp. 2d 253, 255 (S.D.N.Y. 2007). Moreover, Mr. Muir is familiar with various Southern District decisions wherein the court has adopted the position that a decision on a motion to strike surplusage is best made after presentation of the government's evidence. United States v. Ahmed, 2011 WL 5041456 (S.D.N.Y. Oct. 21, 2011). Much of the language (set forth below) that Mr. Muir now challenges, however, is very clearly not relevant and intended only to inflame and prejudice the jury. The court need not await evidence to determine that the language should be stricken. Where "it is clear that the allegations are not relevant to the crime charged, and are inflammatory and prejudicial," the court should strike the language as surplusage pursuant to a motion under Rule 7(d). United States v. DePalma, 461 F.Supp. 778, 797 (S.D.N.Y. 1978).

**SURPLUSAGE**

**Prejudicial naming of the businesses and the "enterprise(s)"**

Count 1 of the indictment alleges that from 1997 through 2013 Mr. Tucker "owned and operated a group of payday lending businesses" engaged in short term lending to consumers located throughout the United States. In paragraph 1, the indictment confers upon these businesses the name "Tucker Payday Lenders." This phrase is carried throughout the

remainder of the indictment. Similarly, in paragraph 28, the indictment (which actually combines two alleged "enterprises," one of which existed from 1997-2003 and another from 2003 forward) dubs these "enterprises" the "Tucker Payday Lending Organization." This phrase is used throughout the remainder of the indictment.

In United States v. Vastola, 899 F.2d 211 (3rd Cir. 1990), *cert. granted, judgment vacated on other grounds,* 497 U.S. 1001, 110 S. Ct. 3233, 111 L. Ed. 2d 744 (1990), the court addressed an appellant's complaint that in the indictment as well as during closing argument, the government had referred to the criminal enterprise as the "Vastola Organization." The defendant had objected at trial, though he did not apparently file a Rule 7(d) motion to strike. He argued, as is also the case here, that no one called the group by this name and the government presented no evidence that the group was known by this name before the indictment. The District Court had overruled his objection. Id. at 231. On appeal, he argued that he was prejudiced by the government's use of his surname to name the alleged criminal enterprise and, as a result, denied a fair trial. The appellate court found that he "raised some very legitimate concerns." Id.

The court likened the case to a situation "where defendants have sought to have aliases struck from indictments or to have reference to them precluded at trial," stating:

> In those cases, the courts have held that the inclusion of an alias in an indictment, even one with strong negative connotations, is *permissible if it is needed* to connect the accused to the acts charged. (citation omitted). Still, as Vastola asserts, the government normally has been required to prove that the defendant was known by the alleged alias.

Vastola at 231-2. (emphasis supplied).

Ultimately, the Vastola court concluded that the defendant had failed to object to the use of the term in closing and that under these facts, he was not prejudiced by the use of the term. The court did "recognize that in the RICO context, the government's naming of the

3

enterprise after one of the defendants carries similar potential for prejudice as does identification of the defendant by a damaging alias." Id. And, while finding that allowing this language was at most harmless error, the Court cautioned that the "district court's safest course of action may have been to issue a cautionary instruction." Id.

"Tucker Payday Lenders" and "Tucker Payday Lending Organization" are both phrases that have been wholly made up by the government. While the government might suggest that the terms are used for the ease of identifying the business involved, there is no reason to call them the "Tucker Payday Lenders" rather than simply the "Payday Lenders." Likewise, the "enterprise" could have been called just that or the "Payday Lending Organization." The use of Mr. Tucker's name is not necessary to connect either of the accused to the acts charged and, importantly, the businesses were never known by that name. Similarly, there will be no evidence that the companies that made these loans were known by anyone as the "Tucker Payday Lending Organization." The government simply conjured up these terms to add dramatic, organized-crime flair to its allegations. Where the terms do not have a legitimate evidentiary purpose, their inclusion in the indictment is prejudicial surplusage. *See* United States v. Scarpa, 913 F.2d 993, 1011-13 (2nd Cir. 1990).

### Prejudicial statements regarding length of involvement

Paragraph 4 of the indictment alleges that Mr. Muir was involved in the offense conduct "from at least in or about 1997 up to and including or about August 2013." The indictment also alleges, at paragraph 3, that "at times relevant to this indictment, Mr. Muir was an attorney license to practice law in the State of Kansas." Mr. Muir did not graduate law school until 2004 and did not directly provide legal representation on behalf of Scott Tucker or any business owned or operated by him or allegedly owned or operated by him until 2006.

4

Therefore, Mr. Muir was not involved in any of the activities alleged in the indictment covering the initial 9 of the 16 years of criminal conduct.

The government has been investigating this case for almost four years and should be well aware that they will not be able to produce any evidence of Mr. Muir's involvement with any Scott Tucker-related company prior to 2006. If this court is inclined to wait for evidence before striking this surplusage, it should instead order the government to proffer its evidence regarding the timeline of Mr. Muir's involvement. The evidence will not meet the challenged language and is instead included merely to prejudice Mr. Muir. Mr. Muir asks the court for this unusual order for proffer, because the challenged surplusage regarding the timeline of his involvement pervades the indictment:

> Paragraph 4—Begins "From at least in or about 1997 up to and including in or about August 2013" and alleges that during that time: Tucker and Muir "systematically exploited" borrowers; Tucker and Muir "extended loans to these individuals at usurious rates"; and Tucker and Muir "forced many of these individuals into cycles of debt.";

> Paragraph 5—Alleges that "[T]hroughout their existence, as Scott Tucker and Timothy Muir, the defendants, well knew, the Tucker Payday Lenders received complaints";

> Paragraph 17—Alleges that "from the inception of Tucker's operation" customers complained and that "the defendants, well knew" this. The paragraph goes on to allege that when these customers complained, "the Tucker Payday Lenders, at Tucker's and Muir's direction" simply stopped taking money from the customers' accounts and cancelled their remaining balances;

Paragraph 26—Alleges that Mr. Muir "served as an architect of the structure designed to mislead state authorities as to the true ownership and control of the Tucker Payday Lenders." While on its face, this language may not appear to overstate the duration of any proof the government has of Mr. Muir's involvement, it follows several paragraphs that discuss Mr. Tucker's creation of "sham business relationships" with Native American tribes. Paragraph 20 says that this began in 1997 with Tucker and CC1, not Mr. Muir, engaging in "deceit." Paragraph 22 alleges that "beginning in 2003" Mr. Tucker began engaging in additional "sham business relationships" "in order to thwart state authorities' enforcement effort." Mr. Muir cannot have served as the "architect of [this] structure" that began nine years before he began providing legal representation to Mr. Tucker and seven years before he graduated law school;

Paragraph 28—Alleges that "at all times relevant to this Indictment" Tucker and Muir "were members and associates of an internet payday lending enterprise ... whose members and associates engaged in crimes including the collection of unlawful debts." Again, with the relevant times being set forth as 1997-2013, this statement does not meet the evidence as it pertains to Mr. Muir and is therefore prejudicial surplusage;

Paragraph 33—Alleges that "from at least in or about 1997 through in or about August 2013 … Scott Tucker and Timothy Muir" were persons "employed by and associated with" the Tucker Payday Lending Organization and that they conspired to participate "in the affairs of that enterprise through the collection of unlawful debt, as set forth above." This is a charging paragraph;

Paragraph 36—This charging paragraph for Count 2 alleges that "from at least in or about 2003 … Scott Tucker and Timothy Muir" were persons "employed by and associated with" the Tucker Payday Lending Organization and thereby participated in the collection of unlawful debt. This paragraph is preceded by paragraph 35, which incorporates paragraphs 1-32 by reference. Once again, the government will have no evidence that Mr. Muir was providing legal representation to Mr. Tucker prior to 2006;

Paragraph 38—This charging paragraph for Count 3 alleges that "from at least in or about 2003…Scott Tucker and Timothy Muir" were persons "employed by and associated with" the Tucker Payday Lending Organization and thereby participated in the collection of unlawful debt. This paragraph is preceded by paragraph 38, which incorporates paragraphs 1-32 by reference;

Paragraph 42—This charging paragraph for Count 4 alleges that "from at least in or about 2005…Scott Tucker and Timothy Muir" were persons "employed by and associated with" the Tucker Payday Lending Organization and thereby participated in the collection of unlawful debt. This paragraph is preceded by paragraph 41, which incorporates paragraphs 1-32 by reference;

Paragraph 45—This charging paragraph for Counts 5-9 alleges that "from at least in or about 2004…Scott Tucker and Timothy Muir" gave false and inaccurate TILA information or failed to provide such information. This paragraph is preceded by

paragraph 44, which incorporates paragraphs 1-32 by reference. The government will have no evidence that Mr. Muir was involved in any alleged TILA violations prior to 2006, if ever.

Mr. Muir has previously acknowledged the courts' general reticence to strike language from an indictment, at least until the government has put on its evidence. However, the courts have recognized a difference between "means" paragraphs and "charging" paragraphs. *See* United States v. DePalma*,* 461 F.Supp. 778 798-99 (S.D.N.Y. 1978) (Striking the phrase "and other activities" from a charging paragraph because the phrase "adds nothing to the charges, gives the defendant no further information with respect to them, and creates the danger that the prosecutor at trial may impermissibly enlarge the charges in the indictment returned by the grand jury.") Mr. Muir submits that much of the surplasage related to the length of his participation in the offense conduct is contained in paragraphs that relate to charging and does not comport with the evidence against him but instead gravely overstates the length, and thereby depth, of his involvement in the offense conduct, prejudicing his defense.

**Prejudicial characterization of the status of the laws in various states**

In Paragraph 8 the government describes that some states "prohibit payday loans or have usury limits that *effectively* prohibit payday loans." (emphasis added). Despite acknowledging this distinction, the government goes on to label these states as "Prohibited Payday Loan States." Likewise, in paragraph 9, the indictment describes that "many other states" have laws which permit payday lenders under; some if licensed within the state and none apparently sharing the same restrictions. The government, however, again makes up a prejudicial label, calling these "Regulated Payday Loan States." Mr. Muir suggests that these

names inaccurately characterize or group the States and that such language is surplusage, unnecessary to the indictment and should be stricken.

### Inflammatory and prejudicial language about Mr. Tucker's spending

Paragraph 7 describes the amount of money the government believes that "Tucker Payday Lenders" generated between 2003 and 2012 and how much of that was earned by Mr. Tucker. The paragraph goes on to describe the amounts the government believes Mr. Tucker spent on "luxury homes and automobiles, jewelry, a private airplane, and the expenses of a professional auto racing team." The paragraph includes information that it says came from Mr. Tucker's racing team's website regarding driving in events in "France, Monaco, and Abu Dhabi." None of this language is relevant to the charges against Mr. Tucker, or more importantly, against Mr. Muir; it is included for the purposes of prejudicing the defendants, to attempt to highlight the government's position that while "four and half million working people … who were struggling to pay basic living expenses" (paragraph 4) were getting loans, and to suggest that he was living lavishly. This information is not a means of the conspiracy and is not necessary background. It certainly is not relevant to Mr. Muir's case, particularly in light of the fact that for a third of the time alleged in paragraph 7, Mr. Muir was not involved with Mr. Tucker in any way.

### Inflammatory and prejudicial language about the alleged victim's financial situations

Under the government's theory, the financial situations of the alleged victims is not relevant. However, as part of its effort to prejudice Mr. Tucker and Mr. Muir, the government has included surplusage indicating that many of those who applied for loans from the "Tucker Payday Lenders" were financially disadvantaged. Paragraph 18, for example, describes that Mr. Tucker and Mr. Muir "well knew" that their "low-income customers who had taken out loans to pay the expenses of daily living" were having difficulty paying their bills once repayment of the loans began and that their accounts were driven to "negative balances" and rendered "inoperable," forcing the customers to take out new loans. This entire paragraph is irrelevant and prejudicial. As noted above, similar language about the alleged victims is included at paragraph 4: "four and half million working people … who were struggling to pay basic living expenses."

### Prejudicial statements related to State court lawsuits

Beginning at paragraph 5, the indictment speaks of state lawsuits it claims were filed "to stop Tucker and the Tucker Payday Lenders from extending usurious and abusive loans to their citizens." The indictment goes on to describe that "beginning in approximately 2003" Mr. Tucker began entering into "sham business relationships" and that Mr. Tucker and Mr. Muir "submitted to courts materially false and misleading affidavits about the relationship between Tribes 1-3 and the Tucker Payday Lenders." The indictment alleges that state courts dismissed their lawsuits "in reliance on these materially false and misleading affidavits." While this, purely background information, makes interesting reading of the government's true crime novella that is their indictment, it is not a necessary part of the charge and is instead included only to prejudice the reader against Mr. Tucker and Mr. Muir and should be stricken as surplusage.

**<u>Prejudicial editorializing</u>**

Throughout, particularly the early pages of, the indictment, the allegations contain unnecessary, irrelevant, and prejudicial or inflammatory language. Several examples are:

Paragraph 4—Mr. Tucker and Mr. Muir "systematically exploited" the payday loan customers (who have been prejudicially described as addressed elsewhere in this motion); engaged in "loan sharking and abusive conduct"; and "forced" customers "into cycles of debt";

Paragraph 5—Mr. Tucker and Mr. Muir "well knew" followed by some allegation of bad conduct by Tucker or Muir or "the Tucker Payday Lenders." This editorial comment about what Mr. Tucker or Mr. Muir "well knew" is carried throughout the indictment, including in paragraphs alleging conduct when Mr. Muir had not yet begun providing legal representation to Mr. Tucker and would have known exactly nothing about Mr. Tucker's business practices. (Paragraphs 6, 15, 16, 17, 18, 23 [twice], 25 [twice], 27).

Paragraph 6—Mr. Tucker entered into "sham business relationships" (this "sham" language is repeated throughout the indictment, most often in paragraphs 19-27);

Paragraph 17—The indictment refers to customer loan balances as "so-called" remaining principal balances;

Paragraph 17—The indictment alleges that Mr. Tucker and Mr. Muir failed to "correct" the Tucker Payday Lenders' TILA Box disclosures "to accurately set forth the cost of the loans." This language begins with the premise that the disclosures were inaccurate and needed correcting and is therefore prejudicial;

Paragraph 26—Mr. Muir is described as "an architect of the structure designed to mislead state authorities." Mr. Muir has previously discussed herein that the context of this paragraph suggests that he was involved in "sham business relationships" that date back to 1997. Mr. Muir also includes the quoted language in this section of his brief, however, to point out that while it may be clever prose, it tells us nothing about what Mr. Muir is alleged to have done and adds nothing to the charges and is instead included as more of the inflammatory language, intended to prejudice Mr. Muir and should be stricken.

**CONCLUSION**

For the reasons set forth above, Mr. Muir respectfully requests that the Court grant each of his requests striking surplusage from the Indictment.

                                            Respectfully submitted,

                                            */s/ Thomas J. Bath, Jr.*

                                            _____
                                            Thomas J. Bath, Jr.            KS  12971
                                            BATH & EDMONDS, P.A.
                                            Historic Voigts Building
                                            7944 Santa Fe Drive
                                            Overland Park, Kansas  66204
                                            (913) 652-9800; Fax (913) 649-8494
                                            E-mail:  tom@bathedmonds.com

/s/ Marc A. Agnifilo

_____
Mark A. Agnifilo
BRAFMAN & ASSOCIATES, P.C.
767 Third Avenue, 26th Floor
New York, New York 10017-2023
(212) 750-7800; fax (212-750-3906
E-mail: magnifilo@braflaw.com

ATTORNEYS FOR MR. MUIR


**CERTIFICATE OF SERVICE**

    I hereby certify that on May 10, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to all parties of record herein.

/s/ Thomas J. Bath, Jr.

_____
Thomas J. Bath, Jr.      KS 12971