UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

                        Plaintiff,                    16-CR-091 (PKC)

                -against-                  MOTION AND MEMORANDUM
                                              IN SUPPORT TO DISMISS
SCOTT TUCKER and                    COUNTS 1-4 OF THE INDICTMENT
TIMOTHY MUIR,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


TIMOTHY MUIR'S MOTION AND MEMORANDUM IN SUPPORT OF HIS
MOTION TO DISMISS COUNTS 1-4 OF THE INDICTMENT FOR FAILURE TO
ESTABLISH AN "UNLAWFUL DEBT" AS REQUIRED BY 18 U.S.C. § 1961(6)

        **COMES NOW**, Timothy Muir, by and through counsel, Thomas J. Bath, Jr. and

Marc Agnifilo, and hereby moves this court for an order pursuant to 12(b) of the Federal Rules

of Criminal Procedure dismissing counts 1 through 4 of the indictment because each count fails

to state an offense regarding collection of an "unlawful debt," as that term is defined pursuant to

Title 18, United States Code, Section 1961(6).  As a matter of law, the debts the government

references in the indictment are not unlawful because they were all made subject to an

"enforceable rate" established by "Federal law," and thus they are not "usurious."  18 U.S.C. §

1961(6)(B).  That "Federal law" is the law of federally recognized Indian tribes, whose

sovereignty to enact such laws in the context of lending has its origins in the Constitution's

Indian Commerce Clause, and as confirmed controlling federal authority and Supreme Court

precedent, recent congressional actions, federal regulators' views, and the findings of 2 state

court judges.

With this indictment, the government draws this Court into unchartered waters churned by ongoing policy debates and novel questions of civil law that thus far have been decided in favor of federally recognized Indian tribal sovereignty. The government myopically seeks an unprecedented application of RICO in an attempt to criminalize tribal payday loans that, while not favored by some in the government, have never been pronounced illegal by a court. Indeed, in a parallel proceeding brought by a federal agency against Scott Tucker and the federally recognized Indian tribes implicated in this case, another federal court recognized the lawfulness of these tribal loans.

## INTRODUCTION

Payday loans have ignited a significant policy debate over the last two decades. Some argue they are predatory and should be all but abolished. See, e.g., Shane M. Mendenhall, Payday Loans: The Effects of Predatory Lending on Society and the Need for More State and Federal Regulation, 32 Okla. City. U. L. Rev. 299 (Summer, 2007). Proponents argue they provide a needed, alternative financial service to under-banked segments of society. See, e.g., Chad A. Cicconi, A Role for Payday Lenders, 123 Banking L.J. 235 (March 2006). The advent of federally recognized Indian tribes offering loans over the Internet introduced a new wrinkle, adding the elements of tribal sovereignty and desperately needed tribal economic development. Still, critics argue that federally recognized Indian tribes are unfairly using their sovereignty to evade state regulation. See, e.g., Heather L. Petrovich, Circumventing State Consumer Protection Laws: Tribal Immunity and Internet Payday Lending, 91 N.C. L. Rev. 326 (December 2012). Others decry such hyperbole and note that such exercise of sovereignty has long been commonplace by both tribes and states alike. See, e.g., Jennifer H. Weddle, Nothing

<u>Nefarious: The Federal Legal and Historical Predicate for Tribal Sovereign Lending</u>, 58, The Federal Lawyer (April 2014).[1] Undoubtedly, significant policy concerns are at play.

This policy debate is strikingly similar to another well-known fight between the states and Indian tribes—Indian tribal gaming. Although Indian gaming seems commonplace and uncontroversial today, there was a national furor over the matter in the early 1980s. State regulators and legislators argued state law prohibited tribal gaming operations and that consumer protection interests trumped any sovereignty interests of federally recognized Indian tribes. States brought civil lawsuits in both state and federal courts. The Supreme Court finally weighed in and rebuffed the states' efforts to regulate tribal gaming with a landmark decision, <u>California v. Cabazon Band of Mission Indians</u>, 480 U.S. 202 (1987). In <u>Cabazon</u>, the Supreme Court proclaimed that it has "consistently recognized" that "tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States." 480 U.S. at 207. It continued, recognizing the "overriding goal" of Congress to encourage "tribal self-sufficiency and economic development" as an "important" federal interest. <u>Id</u>., 480 U.S. at 216-17. Ultimately, <u>Cabazon</u> ended the states' efforts at regulating tribal gaming through litigation. So the states took their fight to Congress—the arm of the federal government to which the Constitution grants "plenary" authority over Indian tribes. U.S. CONST. art. I, § 8 cl. 3. In 1988, Congress passed the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 <u>et</u> <u>seq</u>.

Congress enacted IGRA at the states' urging and in direct response to <u>Cabazon</u>. <u>See</u> S. Rep. No. 446, 100th Cong., 2d Sess. (1988), <u>reprinted</u> <u>in</u> U.S. Code Cong. & Ad. News 3071. Importantly, IGRA did not "authorize" federally recognized Indian tribes to engage in gaming. Rather, IGRA was a significant abrogation by Congress of Indian tribal sovereignty, placing never before restrictions and limits on the manner in which Indian tribes could engage in

---

[1] *Available at* https://www.bestlawyers.com/Downloads/Articles/4218_1.pdf.

gaming for economic development. Such limits included, among other things, mandating that tribes engage in sovereign-to-sovereign negotiations with states and enter into state compacts regarding the distribution of revenue, limiting the terms of loans tribes could take in order to start their operations, and placing restrictions on the amounts tribes could pay outside managers to help manage the gaming operations. With the passage of IGRA, the battle over tribal gaming ended just as the founding fathers had envisioned, with Congress exercising its Constitutional grant of plenary power regarding commerce with Indian tribes.

A similar story—but thus far with a much different ending—is unfolding in regards to tribal online lending. In landmark litigation spanning nearly a decade, courts yet again refused to permit states to regulate Indian commerce. In accord with the Constitution and long-standing controlling authority, these courts specifically deferred to Congress to balance the policy interests at stake. Yet, Congress has not seen fit to pass legislation that would abrogate tribal sovereignty in the provision of financial services, for instance, by mandating the application of state laws to payday loans made by federally recognized Indian tribes over the Internet. And the most sweeping consumer finance legislation in decades just recently enacted expressly recognized sovereign Indian tribes and states as equals, neither one having regulatory power over the other.

States were losing the judicial fight; states were losing the legislative fight. And they were growing more and more frustrated once again. This became especially apparent when industry insiders predicted that the number of Indian tribes engaged in online lending could grow from dozens to hundreds in the near future. Indeed, tribal online lending was set to become the next great economic boom for federally recognized Indian tribes, especially for those that could not materially benefit from tribal gaming due to their geographical isolation. To those on the

opposite side of this policy debate, something had to be done—but this time, they did not want to wait for Congress to enact legislation.

Enter the executive branch. In a coordinated effort, the FDIC and the Department of Justice ("Department") began their attack on tribal online loans with "Operation Choke Point" in early 2013. This "Operation" was so titled because they wanted "to 'choke out' companies the Administration considered 'high risk' or otherwise objectionable, despite the fact that they are legal businesses." Key Findings, STAFF OF H. COMM. ON OVERSIGHT & GOV'T REFORM, 113TH CONG., REP. ON THE DEPARTMENT OF JUSTICE'S 'OPERATION CHOKE POINT": ILLEGALLY CHOKING OFF LEGITIMATE BUSINESSES?[2] The goal of the initiative was to deny tribal lending entities access to the banking and payments networks, something that every business needs to survive. Internal Department "memoranda on Operation Choke Point clearly demonstrate that the Department's primary target [was] the short-term lending industry—an indisputably lawful financial service." Id. at 5. After the House Oversight Committee issued its Report exposing "Operation Choke Point," the initiative was formally abandoned, with the FDIC taking the rare step of issuing a Financial Institution Letter (FIL-5-2015) representing its de facto retreat from the initiative. Todd Zywicki, *FDIC retreats on Operation Choke Point?*, The Washington Post, January 29, 2015.[3]

---

[2] *Available at* https://oversight.house.gov/wp-content/uploads/2014/05/Staff-Report-Operation-Choke-Point1.pdf.

[3] *Available at* https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/01/29/fdic-retreats-on-operation-choke-point/; see also FDIC Press Release, FDIC Encourages Institutions to Consider Customer Relationships on a Case-by-Case Basis (January 28, 2015), *available at* https://www.fdic.gov/news/news/press/2015/pr15009.html?utm_source=Financial+Services+Industry&utm_campaign=56a50fb018-20150129_Membership_FDICReleasesGuidance_FinServ&utm_medium=email&utm_term=0_ffb6fd1cce-56a50fb018-215843837.

While Operation Choke Point may have formally ended, the current administration's attack on the payday lending industry clearly continues.[4]  Accordingly, this indictment is about much more than Scott Tucker and Timothy Muir: it's about the executive branch usurping Congress' Constitutional authority over Indian tribes; it's about the current administration deciding it doesn't need Congress to weigh in on policy debates; and it's about the Department attempting to settle civil questions of law and enact federal policy through criminal indictments.

## BACKGROUND

### Federal law, Tribal Law and State Law

For more than 150 years, federal law has preempted state usury laws.  Congress prevented state regulation of and interference with national banks in 1864 when it passed the National Bank Act ("NBA") in order "to facilitate . . . a national banking system."  Marquette Nat'l Bank v. First of Omaha Serv. Corp., 439 U.S. 299, 315 (1978).  Since the passage of the NBA, the Supreme Court has "repeatedly made clear that federal control shields national banking from unduly burdensome and duplicative state regulation."  Wachovia Bank, N.A. v. Burke, 414 F.3d 305, 311 (2d Cir. 2005) (quoting 12 U.S.C. § 24).  In fact, "'the States can exercise no control over [national banks], nor in any wise affect their operation, except in so far as Congress may see proper to permit.  Anything beyond this is an abuse, because it is the usurpation of power which a single State cannot give.'"  Id. (quoting Farmers' and Mechanics' Nat. Bank v. Dearing, 91 U.S. 29, 34 (1875)).

---

[4] See Whitehouse Blog, *A Moral Case for Putting a Stop to Payday Lending Abuses*, *available at* https://www.whitehouse.gov/blog/2016/04/14/moral-case-putting-stop-payday-lending-abuses.

Even though the NBA had preempted state usury laws since 1864, a wave of litigation erupted in the 1980s as national banks located in states like South Dakota and Delaware took advantage of those states' relatively lax usury laws by making loans and issuing credit cards to customers living in other states. Indeed, in 1980 South Dakota and Delaware removed usury caps altogether in order to attract banks to their states for economic development.[5] Banks in other states sued these banks for extending credit from South Dakota and Delaware to residents in other states, arguing that the laws of the state where the borrower was located controlled the terms of the loans and credit cards issued by these national banks such that the interest rates these banks were offering violated the usury laws of the borrower's state.[6] Not surprisingly, these state law usury challenges were unsuccessful because the NBA permits a national bank to "'export' a favorable interest rate from its home state in transactions with borrowers from other states." Hill v. Chem. Bank, 799 F. Supp. 948, 951 (D. Minn. 1992) (citing Marquette National Bank, 439 U.S. 299). Accordingly, it is undisputed that the NBA "preempts actions challenging the lawfulness of the interest charged by a national bank." Phipps v. F.D.I.C., 417 F.3d 1006, 1011 (8th Cir. 2005) (citation omitted).

In much the same way that national banks are not subject to state usury laws with the loans that they make to residents of other states, so too are federally recognized Indian tribes entitled to "export" their interest rates on loans they make over the Internet pursuant to tribal laws without being subject to state usury laws. In both instances, Congress—to the exclusion of all 50 states—exclusively controls the ability of national banks and federally recognized Indian

---

[5] The Secret History of the Credit Card – Frontline Interview with Bill Janklow, *available at* http://www.pbs.org/wgbh/pages/frontline/shows/credit/interviews/janklow.html.

[6] Unremarkably, this lawful practice continues to this day. In fact, as recently as 2009, First Premier Bank of South Dakota was offering a credit card to New York residents with a 79.9% APR—an amount well in excess of twice the New York usury law.

tribes to engage in nationwide lending free from state regulation. A critical difference, however, is the legal basis under which national banks and federally recognized Indian tribes can "export" their interest rates. This distinction is perhaps best described as authorization (national banks) versus abrogation (Indian tribes). In the case of national banks, their power to "export" their interest rates is derived solely from the NBA. Congress granted national banks this power through the NBA by permitting national banks to export their interest rates. Since banks are creatures of statute, it follows that the only powers they possess are statutory, i.e, "authorization" from Congress.

In contrast, federally recognized Indian tribes derive their power to "export" their interest rates from their sovereignty, "an inherent, retained sovereignty that pre-dates European contact, the formation of the United States, the U.S. Constitution, and individual statehood." Cash Advance & Preferred Cash Loans v. State, 242 P.3d 1099, 1107 (Colo. 2010); see also United States v. Wheeler, 435 U.S. 313, 322 (1978) ("The powers of Indian tribes are, in general, '*inherent powers of a limited sovereignty which has never been extinguished.*'") (quoting Felix Cohen, HANDBOOK OF FEDERAL INDIAN LAW, 122 (1945) (emphasis in original)), *superseded by statute as recognized by* United States v. Lara, 541 U.S. 193, 194 (2004). The Supreme Court notably recognized tribal sovereignty 184 years ago in Worcester v. Georgia, when then-Chief Justice John Marshall declared that Indian tribes are "distinct, independent political communities, retaining their original natural rights, as the undisputed possessors of the soil, from time immemorial . . . ." 31 U.S. 515, 519 (1832), *abrogated as recognized by* Nevada v. Hicks, 533 U.S. 353, 361 (2001). Thus, federally recognized Indian tribes retain all inherent attributes of their sovereign rights unless the exercise of their sovereignty is limited by a superior sovereign, i.e., "abrogation" by Congress.

Another inherent sovereign power that federally recognized Indian tribes possess is the power to regulate transactions with non-tribal-members: "A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter <u>consensual relationships</u> with the tribe or its members, through <u>commercial dealing, contracts</u>, leases, or other arrangements." <u>Montana v. United States</u>, 450 U.S. 544, 565 (1981) (emphasis added). As a federal court analyzing this issue recently held, an online loan agreement is a "consensual" and "commercial dealing" with an Indian tribe. <u>F.T.C. v. Payday Financial, LLC</u>, 935 F. Supp. 2d 926, 936 (D.S.D. 2013) (concluding that an online short-term loan meets <u>Montana's</u> definition of a "'consensual relationship with the tribe or its members, through commercial dealing'") (quoting <u>Montana</u>, 450 U.S. at 565). This is true even if the non-Indian borrowers apply for the loans online, using the Internet, and never physically do business on an Indian reservation. <u>Id</u>. at 937-40 (rejecting the FTC's assertion that the borrower must physically be on the reservation for a tribe's inherent right to regulate Internet transactions with borrowers located elsewhere).

While the Constitution did not grant Indian tribes their sovereignty, it specifically provides who has power over them. The Constitution's Indian Commerce Clause expressly states that Congress shall "regulate Commerce . . . with the Indian Tribes." U.S. CONST. art. I, § 8 cl. 3. This grant of power to Congress is "plenary and exclusive." <u>Lara</u>, 541 U.S. at 200 (collecting scores of cases); <u>see also</u> <u>Lone Wolf v. Hitchcock</u>, 187 U.S. 553, 565 (1903) ("Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning . . . ."); <u>United States v. Kagama</u>, 118 U.S. 375, 382–83 (1886) (same); <u>Ex parte Crow Dog</u>, 109 U.S. 556, 562 (1883) (same). The term "'plenary' indicates the breadth of congressional power to legislate in the area of Indian affairs, and the term 'exclusive' refers to the supremacy of federal over state law in this area.'" COHEN'S HANDBOOK OF FEDERAL INDIAN

LAW §§ 5.02[1], 5.02[2], 1–5 (2005 ed.). All of this explains the long-standing federal policy of "leaving Indians free from state jurisdiction and control [which] is deeply rooted in this Nation's history." McClanahan v. State Tax Comm'n of Ariz., 411 U.S. 164, 168 (1973) (quotations omitted). Accordingly, "the relevant inquiry with respect to a tribe's exercise of its sovereignty is whether Congress, which exercises plenary power over Indian affairs, has limited that sovereignty in any way." Cash Advance, 242 P.3d at 1107 (internal citations omitted). In other words, "until Congress acts, the tribes retain their existing sovereign powers." Wheeler, 435 U.S. at 323. Therefore, unless and until Congress "abrogates" their sovereign right to do so— something Congress has not done—federally recognized Indian tribes retain the power to "export" their interest rates in loans they make over the Internet.

Any argument to the contrary ignores that Congress is aware of, and knows how to regulate, tribal involvement in commercial contexts. See Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 156 (1982) (declaring that it is neither the judiciary's "function nor [its] prerogative" to invade the plenary power of Congress, who "is well aware" of sovereign tribal enterprises); Cayuga Indian Nation v. Vill. of Union Springs, 317 F. Supp. 2d 128, 148 (N.D.N.Y. 2004) ("Moreover, Congress knows how to legislate to allow such [non-federal] regulation, but has failed to do so.") And if Congress wanted to abrogate tribal sovereignty and grant states the right to regulate the ability of Indian tribes to "export" their interest rates to all fifty states, Congress would pass legislation to do so, just like it did with tribal gaming when it passed IGRA. Importantly, Congress is well aware that federally recognized Indian tribes make loans over the Internet and it has not abrogated their inherent sovereign right to do so.

In 2013, Senator Jeff Merkley of Oregon (for himself, Senator Tom Udall of New Mexico, Senator Dick Durbin of Illinois, and Senator Richard Blumenthal of Connecticut)

introduced a bill, the "SAFE Lending Act of 2013" to "amend the Truth in Lending Act to address certain issues related to the extension of consumer credit, and for other purposes."  S. 172, 113th Cong. (2013).  Of import to this matter, Section 3 of this proposed bill specifically addressed loans made pursuant to "tribal law"—as well as loans made by national banks—and sought a "[c]onsistent application of law" for both:

### Sec 3. Consistent application of law for small-dollar lending

(a) Consistent application of State law for small-Dollar lending

The *Truth in Lending Act* (15 U.S.C. 1601 et seq.) is amended by inserting after section 109 the following:

110. Consistent application of law for small-dollar lending

(a)  In general.—

Notwithstanding any other provision of law, and except to the extent that Federal or <u>applicable tribal law</u> affords greater protection to the consumer, any small-dollar consumer credit transaction made over the Internet, telephone, facsimile, mail, electronic mail, or other electronic communication, and any small-dollar consumer credit transaction conducted by <u>a national bank shall comply with the laws of the State in which the consumer resides</u> with respect to annual percentage rates, interest, fees, charges, and such other similar or related matters as the Bureau may, by rule, determine.

<u>Id</u>. (emphasis added).

While this proposed bill never became legislation, it is notable for two (2) independent reasons: (1) it evidenced Congress' specific awareness of federally recognized Indian tribes offering online loans pursuant to tribal law to residents of other states; and (2) it evidenced that Congress viewed Indian tribal loans made pursuant to tribal law equivalent to loans made by national banks pursuant to the law of the state in which the bank is located, neither of which uniformly comport with the law of the state in which a consumer is located.

Furthermore, that this proposed bill uses the phrase "applicable tribal law" buttresses the core argument of this motion: the loans at issue in this case were made at an "enforceable rate" pursuant to tribal law, a recognized and legitimate law, and thus they are not unlawful.

Recently enacted legislation further confirms that Congress has purposely chosen not to place Indian tribes under the umbrella of state regulation in this context.  In 2010 Congress expressly recognized tribal sovereignty in the realm of financial services with the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank" or the "Act"). 12 U.S.C. § 5301 et seq.  Congress passed Dodd-Frank to "protect consumers from abusive financial services practices."  If Congress wanted to abrogate tribal sovereignty to prohibit tribal online lending, Dodd-Frank would have been the legislation to accomplish it.  But the Act contains no such limitations, and Congress also declined to delegate any regulatory authority over federally recognized Indian tribes to the states.  Instead, Congress included "any federally recognized Indian tribe" in the Act's definition of a "state."  12 U.S.C. § 5481(27).  Thus, in sweeping consumer protection legislation, Congress deemed states and federally recognized Indian tribes to be equals.  Furthermore, the Consumer Financial Protection Bureau ("CFPB") — the federal agency created by Dodd-Frank—is honoring and respecting federally recognized Indian tribes' sovereign right to make online loans pursuant to tribal law, as thus far it has hosted two (2) formal government-to-government consultations[7] for all 566 federally recognized Indian tribes regarding its upcoming proposed rules for small-dollar loans.[8]  Indeed, while testifying before Congress, the CFPB acknowledged the policy interests of both states and federally

---

[7]  See CONSUMER FINANCIAL PROTECTION BUREAU POLICY FOR CONSULTATION WITH TRIBAL GOVERNMENTS, *available at* http://files.consumerfinance.gov/f/201304_cfpb_consultations.pdf.

[8]  *February 11, 2016 Testimony of David Silberman, Acting Deputy Director and Associate Director of Research, Markets, and Regulations Consumer Financial Protection Bureau Before the H. Comm. on Fin. Servs. Subcomm. on Fin. Insts. and Consumer Credit,* at 9,  *available at* http://financialservices.house.gov/uploadedfiles/hhrg-114-ba15-wstate-dsilberman-20160211.pdf.

recognized tribal governments in small-dollar lending: "State policymakers have urged the [CFPB] to both protect consumers across all small dollar lending markets and to seek feedback from the states on their regulation of small dollar lending products. Tribal governments have urged the Bureau to consider the impact of any regulation on the revenue the tribes receive from these products." Id.

Clearly then, any attempt by a state to regulate tribal online lending would contravene recent congressional actions, federal regulators' views, controlling federal authority, but more importantly, the Indian Commerce Clause of the Constitution, which "vests the Federal Government with exclusive authority over relations with Indian tribes." Montana, 471 U.S. at 764; see also Miami Nation of Indians v. Dep't of the Interior, 255 F.3d 342, 345 (7th Cir. 2001) (only Congress may "regulate commerce with Indians"); Seminole Tribe v. Florida, 517 U.S. 44, 62 (1996) ("If anything, the Indian Commerce Clause accomplishes a greater transfer of power from the States to the Federal Government than does the Interstate Commerce Clause. This is clear enough from the fact that the States still exercise some authority over interstate trade but have been divested of virtually all authority over Indian commerce and Indian tribes.") This is why the Supreme Court has "consistently recognized" that "tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States," Cabazon, 480 U.S. at 207, and that "tribal sovereignty is privileged from diminution by the States." Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g, 476 U.S. 877, 891 (1986).

All of the foregoing is a prelude for one very important question with an emphasis on one important word: does tribal law or state law apply to loans made by an Indian tribe over the Internet? The position that tribal law applies is supported by centuries of controlling federal law and the Supreme Court. Senator Merkley's proposed SAFE Lending Act also answers this

question in favor of dismissing the indictment by its use of the phrase "applicable tribal law."

Even the government acknowledges the critical import of this question on page 5 of the

indictment with its use of "[a]pplicable" in a heading when referring to "State Usury Laws."

Regardless of its biased predilection for state law, however, the government cannot cite to any

case directly on point that tribal law is <u>not</u> applicable to the loans at issue in this case.  More

importantly for purposes of this motion, because the loans were made at "enforceable rate"

pursuant to formally enacted, federally recognized tribal law, the government cannot dispute that

they are lawful as a matter of law.

### Tribes Make Loans Pursuant Tribal Law

While the indictment does not identify them, Tribes 1-3 are much more than just

numbers—they are federally recognized Indian tribes[9], each respected and protected as

"domestic dependent nation with inherent sovereign authority independent of the United States .

. . ." <u>Miami Nation of Indians of Indiana, Inc. v. Babbitt</u>, 112 F. Supp. 2d 742, 745-56 (N.D. Ind.

2000) *aff'd*, 255 F.3d 342 (7th Cir. 2001) (citing <u>Cherokee Nation v. Georgia</u>, 30 U.S. 1, 17

(1831)).  Tribe 1 is the Miami Tribe of Oklahoma.  The Miami Tribe was organized pursuant to

the Oklahoma Indian Welfare Act of 1936.  As a sovereign tribal government, the Miami Tribe

has enacted tribal laws, including, of which the government is well aware, its Interest Rates and

Loans and Cash Advance Services statute.  All loans made by the Miami Tribe that are the

subject of this indictment were made under this tribal law: all loan agreements for loans made by

the Miami Tribe contained a choice-of-law provision whereby the borrower acknowledged and

agreed that the loan was made by the Miami Tribe pursuant to tribal law.

---

[9] The U.S. Department of The Interior, Indian Affairs 2015 Tribal Entities List, *available at* http://www.bia.gov/cs/groups/xraca/documents/text/idc1-033010.pdf.

Tribe 2 is the Santee Sioux Nation. The Santee Sioux was organized under Section 16 of the Indian Reorganization Act of 1934 and is governed by a Constitution that was approved by the Secretary of the Interior on August 30, 2002.  Again, as the government well knows, the Santee Sioux Nation made all of its loans that are the subject of this indictment pursuant to the Santee Sioux Nation Cash Advance Service Ordinance: all loan agreements for loans made by the Santee Sioux Nation also contained a choice-of-law provision whereby the borrower acknowledged and agreed that the loan was made by the Santee Sioux Nation pursuant to its tribal law.

And Tribe 3 is The Modoc Tribe of Oklahoma.  The Modoc Tribe is also organized under the Oklahoma Indian Welfare Act of 1936.  The Secretary of the Interior also approved its Constitution and By-Laws.  And, as the government also well knows, the Modoc Tribe codified its lending laws by enacting an Ordinance termed "Interest Loans and Debt Code."  Likewise, all loans made by The Modoc Tribe that are the subject of this indictment were made under its tribal law: all loan agreements for loans made by the Modoc Tribe contained a choice-of-law provision whereby the borrower acknowledged and agreed that the loan was made by the Modoc Tribe pursuant to its tribal law

### The States' Unsuccessful Attempt to Regulate the Tribes

For almost a decade the Miami Tribe of Oklahoma and the Santee Sioux Nation were engaged in seminal litigation brought by the states of Colorado and California regarding their online tribal loans.[10]  Both sides of the policy debate regarding tribal loans followed these

---

[10] The Modoc Tribe of Oklahoma was never a party to these cases.  Scott Tucker, however, was involved in both cases and his business relationships with both of these federally recognized Indian tribes was a major focus and heavily scrutinized in both cases.

cases closely.  Industry experts predicted that if the states could not regulate tribal lending it could be the next "casino boom" for as many as 400 Indian tribes.[11]

In February of 2012, Colorado's nine-year assault on tribal sovereignty ended when a Colorado trial judge dismissed the state's lawsuit, finding that the tribes' lending entities were immune from state action because tribal sovereign immunity.  In his dismissal order, the judge also foreshadowed the proper forum for states to address any perceived inequities surrounding federally recognized Indian tribes' ability to make tribal loans over the Internet:

> If <u>Congress does not want Indian nations hiring non-Indian operators to engage in the payday loan business, or does not want Indian nations in the payday loan business at all, it could limit or eliminate tribal immunity for such businesses tomorrow</u>…the paternalistic days when the law fretted about Indian nations being incapable of distinguishing between good and bad business opportunities are happily behind us.  The Miami and the Santee people are the ones we must trust, <u>as long as Congress lets us trust them</u>, to know what kinds of business relationships are in their best interests.  <u>They do not need the guidance of the State of Colorado, through either its law enforcement officials or its courts.</u>

<u>Colorado v. Cash Advance</u>, Case No. 05CV143, 2012 WL 3113527, at 23 (Colo. Dist. Ct., Amended Order, Feb. 18, 2012) (internal citations omitted) (emphasis added) (a copy of the Amended Order is attached hereto as Exhibit "DX A").

Mere months after the Colorado decision, a California trial judge similarly ruled in favor of the tribes and also dismissed that state's seven-year long enforcement action on the basis of tribal sovereign immunity.  California's arguments mirrored many of the Department's allegations in the indictment, including: that the tribal declarations were self-serving and contradicted by evidence in the record; that Scott Tucker controlled and operated the lending operations; and that Scott Tucker was the primary beneficiary of the operations, as evidenced by

---

[11] Jessica Silver-Greenberg, <u>Payday Lenders Join With Indian Tribes</u>, Feb. 10, 2011, *available at* http://www.wsj.com/articles/SB10001424052748703716904576134304155106320.

purchases of a jet and mansion.  With a strong focus on deference to tribal self-governance,

however, the judge rejected the state's arguments out of hand:

> Plaintiff's arguments go beyond governing structure and characteristics and seek a determination that sovereign immunity does not apply <u>because the Tribes have not exercised sufficient control of the Defendants or have allowed third parties to extract too much money (benefit) from the tribal entities</u>. However, these concerns are the Tribes' concerns.
>
> …
>
> It is not the province of this court to determine that, because the Tribes did not make a better deal with Defendants in which they secured a greater percentage of gross revenues, Indian tribal autonomy is no longer furthered. Such an interpretation would substitute this court's analysis of the Tribes' interests for the Tribes' own analysis of what is in their best interests. <u>That is not the test. Tribal immunity cannot be defeated simply because third parties who operate Tribe directed/controlled businesses also benefit substantially - even perhaps substantially more than the Tribes.</u>

<u>People of the State of California v. Ameriloan</u>, Case No. BC373536, 2012 WL 8969009, at *5,

(Cal. Super. Ct., Trial Order, May 10, 2012) (emphasis added) (a copy of the Rulings/Order is

attached hereto as Exhibit "DX B").

　　　　Both the California litigation and the Colorado litigation included multiple

appeals.  Not surprisingly, the appellate decisions that resulted in remands of the proceedings

back to the trial courts each contained narrow mandates that specifically confined the scope of

relevant determination at trial, i.e., whether each tribal entity that was making tribal loans was

acting as an "arm of the tribe," and thus entitled to the sovereign immunity of its respective

federally recognized Indian tribe.  In remanding its case, the Colorado Supreme Court stated

unequivocally:

> In making this determination, <u>the trial court shall consider the following factors, each of which focuses on the relationship between the tribal entities and the tribes</u>: (1) whether the tribes created the entities pursuant to tribal law; (2) whether the tribes own and operate the entities; and (3) whether the entities' immunity protects the tribes' sovereignty.

<u>Cash Advance & Preferred Cash Loans v. State</u>, 242 P.3d 1099, 1102 (Colo. 2010) (emphasis added).  Likewise, the California Court of Appeal issued the following mandate:

> [W]e remand the matter to the trial court to consider, after a hearing in which both sides may present all available relevant evidence, <u>whether the entities are sufficiently related to the tribe to benefit from the application of sovereign immunity</u>.

<u>Ameriloan v. Superior Court</u>, 169 Cal. App. 4th 81, 98, 86 Cal. Rptr. 3d 572, 585-86 (2008), *as modified* (Jan. 14, 2009) (internal citations omitted) (emphasis added).

Both of these narrow mandates provide crucial context to the allegations in the indictment regarding "materially false and misleading affidavits about the tribes' supposed substantive ownership and control" of the tribal lending entities (Paragraph 22), and that the tribes "played no substantive role in the ownership or operation" of the tribal lending entities (Paragraph 23).  Regardless of whatever "substantive" may mean to the Department, in following specific mandates from superior appellate courts, the trial courts certainly did not interpret it to mean that the tribes had to be involved in day-to-day business affairs to be determined to be "arms of their tribes."  Indeed, the Colorado trial court noted that the tribal lenders would still be entitled to the sovereign immunity of their respective tribes even if they contracted away the approval process for each and every payday loan issued:

> Finally, it is worth reiterating that the cases make it clear that tribes do not lose their immunity just by contracting for the special expertise of non-Indian operators; indeed, they are encouraged to do so. <u>Cabazon Band of Mission Indians v. Riverside Cty.</u>, *supra*, 783 F.2d at 901; <u>Native Am. Dist. v. Seneca-Cayuga Tobacco Co.</u>, *supra*, 546 F.3d at 1294. <u>Thus, even if every pertinent payday loan was approved by the non-Indian operators with no control or even input from the tribes, that would not be dispositive of</u> [whether the tribes owned and operated their businesses].

<u>Cash Advance</u>, 2012 WL 3113527, at 16 (emphasis added).

Similarly, as shown by the exchange between the trial judge in the California action and the tribes' lead counsel, Mr. John Nyhan, the court's determination did not depend on whether the tribes were involved in the day-to-day management of the lending businesses:

```
12        THE COURT:  WELL, THEY'RE NOT INVOLVED IN THE
13   DAY-TO-DAY MANAGEMENT?
14        MR. NYHAN:  CORRECT.
15        THE COURT:  I THINK FROM THE PAPERS, IT APPEARS YOU
16   BOTH AGREE THAT THEY'RE NOT INVOLVED IN THE DAY-TO-DAY
17   HANDS-ON MANAGEMENT.
18        MR. NYHAN:  THAT'S CORRECT.
```

Reporter's Transcript of Proceedings at 24, People v. Ameriloan (a copy of the Transcript is attached hereto as Exhibit "DX C"). Based on that undisputed evidence, the California trial court determined that the tribes controlled the tribal entities even though they were not directly involved in the day-to-day management of the lending businesses:

> [C]ontrol of [the lending business] does not mean control of business minutiae; the tribe can be enmeshed in the direction and control of the business without being involved in the actual management. The Tribes are clearly enmeshed in the direction and control of the businesses even if they do not have direct involvement in actual daily management.

People v. Ameriloan, 2012 WL 8969009, at *5. And the California Court of Appeal subsequently confirmed that a "substantive role in the ownership or operation" of a tribal business is not a requirement for tribal sovereignty, and a claimed lack thereof is not sufficient to abrogate such sovereignty:

> Neither third-party management of day-to-day operations nor retention of only a minimal percentage of the profits from the enterprise (however that may be defined) justifies judicial negation of that inherent element of tribal sovereignty.

People v. Miami Nation Enterprises, 223 Cal. App. 4th 21, 166 Cal. Rptr. 3d 800, 817, *review granted and opinion superseded*, 324 P.3d 834 (Cal. 2014).

        The government's suggestions and evidence of a sham is almost identical to Colorado's and California's suggestions and evidence in their ill-fated attempts to regulate the three federally recognized Indian tribes that made the tribal loans at issue in this case. Indeed, allegations about and references to Scott Tucker pervaded both of those cases, as well as incessant insinuations that the business relationships were shams. That two (2) courts over nearly a decade of litigation ultimately rejected such theories is not just notable—it's critical. Furthermore, fatal to the government's forth-coming rebuttal that the dismissals by the Colorado and California trial courts in those civil cases were the result of "materially false and misleading affidavits" is another highly-publicized civil case involving all three federally recognized Indian tribes' and the tribal loans at issue in this case—the Federal Trade Commission's ("FTC") case in the District of Nevada, Case No. 12-CV-536, FTC v. AMG Services, Inc., et al ("FTC Case").

### A Federal Agency and a Federal Court Allow
### The Collection of Debts From These Tribal Online Loans

        The FTC Case is the only case in which all three of the federally recognized Indian tribes implicated with this indictment were involved in litigation together regarding the tribal loans they made nation-wide over the Internet. [12] That civil case is critically important here for several reasons. First, the plaintiff was the FTC, a "bipartisan federal agency" that "collaborate[s] with law enforcement across the country" to "protect consumers by stopping unfair, deceptive or fraudulent practices."[13] The FTC was fully aware of the interest rate on the

---

[12] The FTC's civil case and this criminal case are undoubtedly parallel proceedings. Tellingly, the United States Attorney for the Southern District of New York thanked the FTC for its assistance in his press release announcing this indictment.

[13] FTC.gov, What We Do, https://www.ftc.gov/about-ftc/what-we-do.

subject loans, that federally recognized Indian tribes were making those loans, and that Scott Tucker was involved.[14]  At no point during the more than four (4) years that this civil case has been litigated, however, has the FTC ever suggested that any of these tribal loans are unenforceable or unlawful because they are made pursuant to tribal law.  In fact, the FTC has taken the opposite position.

Initially, in an effort to reach a compromise regarding the lending practices at issue,[15] the FTC entered into a Preliminary Injunction and Bifurcation Agreement ("Bifurcation Order") with these tribal entities.[16]  The FTC knew that the tribes were still making loans at an "enforceable rate" established by their tribal laws—and that they intended to continue doing so—when it entered into the agreement to bifurcate the proceedings.  On January 2, 2013, a mere 5 days after the court entered the Bifurcation Order, FTC counsel memorialized and provided further details of the parties' agreement regarding the preliminary injunction and bifurcation in a letter to the tribes' counsel.[17]  Importantly, the letter acknowledges that the tribal lending entities, which the FTC referred to as the "Lending Defendants," agreed to "modify their loan practices," and will "begin offering a new loan product . . . ."  There is no reference in that letter, however, to any requirement or agreement that the tribes change their loan product to comport with state usury laws.  And given the FTC's extensive monitoring for compliance, the FTC is well aware that after the entry of the Bifurcation Order these tribal entities continued to make loans at an enforceable rate set by their respective tribal laws that did not uniformly comply with state usury

---

[14] See FTC Press Release, available at https://www.ftc.gov/news-events/press-releases/2012/04/ftc-charges-payday-lending-scheme-piling-inflated-fees-borrowers.

[15] The FTC's concerns with the loans at issue involved the Truth-in-Lending Act, the FTC Act and the Electronic Funds Transfers Act.

[16] Doc. 296, ORDER ENTERING STIPULATED PRELIMINARY INJUNCTION AND BIFURCATION.

[17] Letter from Nikhil Singhvi, FTC lead counsel (January 2, 2013) (a copy of which is attached hereto as Exhibit "DX D").

laws. Importantly, the FTC has never suggested, intimated or alleged that these tribal loans were, or have even been, unlawful. Quite the opposite: the FTC settled with the tribal lenders in a manner that allowed them to collect on these tribal loans.

At the FTC's urging, Chief Judge Gloria M. Navarro entered three (3) separate orders in the FTC Case blessing the settlements the FTC reached with each of the three federally recognized Indian tribes. Her orders further added to the lawfulness of these tribal loans the government now alleges are unlawful in this criminal case. On January 23, 2015, the FTC settled the FTC Case with the Miami Tribe of Oklahoma with a "Stipulated Order for Permanent Injunction and Judgment." (Doc. 727.) For purposes of the instant motion, the critical section of this order is Section V, "CERTAIN CONSUMER DEBTS EXTINGUISHED." This section stated:

> **IT IS FURTHER ORDERED** that consumer Debt for loans issued by [the Miami Tribe's lending entity] d/b/a Ameriloan, United Cash Loans, US Fast Cash, Advantage Cash Services, and Star Cash Processing before the December 27, 2012 preliminary injunction issued in this case is hereby extinguished <u>to the extent that such claimed indebtedness exceeds the amount financed plus one finance charge</u> (the "Extinguished Debt"). The [tribal lending entity] shall forgive [and] shall not collect upon or make any attempt to collect upon . . . any Extinguished Debt.

Id. (underlined emphasis added). On November 25, 2015, the FTC also settled with the Santee Sioux Nation with a "Stipulated Order for Permanent Injunction and Judgment." (Doc. 889.) Once again, the critical section is Section V, "CERTAIN CONSUMER DEBTS EXTINGUISHED":

> **IT IS FURTHER ORDERED** that consumer Debt for loans issued by [the Santee Sioux Nation's lending entity] d/b/a OneClickCash before the December 27, 2012 preliminary injunction issued in this case is hereby extinguished <u>to the extent that such claimed indebtedness exceeds the amount financed plus one finance charge</u> (the "Extinguished Debt"). The [tribal lending entity] shall forgive [and] shall not collect upon or make any attempt to collect upon . . . any Extinguished Debt.

Id. (underlined emphasis added).  Also on November 25, 2015, the FTC settled with the Modoc

Tribe of Oklahoma through another "Stipulated Order for Permanent Injunction and Judgment."

(Doc. 888.)  Section V, "CERTAIN CONSUMER DEBTS EXTINGUISHED" contained the

crucial language:

> **IT IS FURTHER ORDERED** that consumer Debt for loans issued by
> [the Modoc Tribe's lending entity] d/b/a 500FastCash before the
> December 27, 2012 preliminary injunction issued in this case is hereby
> extinguished to the extent that such claimed indebtedness exceeds the
> amount financed plus one finance charge (the "Extinguished Debt").  The
> [tribal lending entity] shall forgive [and] shall not collect upon or make
> any attempt to collect upon . . . any Extinguished Debt.

Id. (underlined emphasis added).

When Judge Navarro entered each "Stipulated Order for Permanent Injunction

and Judgment" at the request of the FTC, she very clearly did not extinguish all of the

indebtedness for the tribal loans at issue in this case.  Rather, she allowed as a lawful debt "the

amount financed plus one finance charge," thereby permitting the collection of debts that had

been incurred from these tribal loans made at an "enforceable rate" established by tribal law.

Moreover, that Section VI of each Stipulated Order for Permanent Injunction and Judgment

permits the tribal lending entities to "sell, transfer, or assign any consumer Debt that is not

Extinguished Debt, and shall provide a copy of this Order to any such purchaser, transferee, or

assignee" further cements that Judge Navarro—as well as the FTC—deem these tribal loans

made at an "enforceable rate" established by tribal law lawful.

Therefore, the Department's suggestion in the indictment that the debt arising out

of these tribal loans is an "unlawful debt" is contravened by the Constitution's Indian Commerce

Clause, controlling federal authority and Supreme Court precedent, recent congressional actions,

federal regulators' views, and the findings of 2 state court judges and a federal judge.

## CONCLUSION

If the federal government wants to establish that loans made by federally recognized Indian tribes must uniformly comport with state usury laws, it can do so by statute (Congress), perhaps by regulation (the CFPB or the FTC), or maybe even by providing some sort of federal guidance. But what the government cannot do is what it is attempting to do here: unconstitutionally change federal policy with criminal indictments. The Ninth Circuit weighed in on this point, albeit in a case with no constitutional implications at stake, but in a matter also involving an untested theory of criminal liability. Then Ninth Circuit Chief Judge Alex Kozinski in a separate concurrence, in hoping "that the government will be more cautious in the future," stated:

> This is just one of a string of recent cases in which courts have found that federal prosecutors overreached by trying to stretch criminal law beyond its proper bounds. This is not the way criminal law is supposed to work. Civil law often covers conduct that falls in a gray area of arguable legality. But criminal law should clearly separate conduct that is criminal from conduct that is legal.

United States v. Goyal, 629 F.3d 912, 922 (9th Cir. 2010) (concurring) (internal citations omitted).


Respectfully submitted:

/s/ Thomas J. Bath, Jr.
_____
Thomas J. Bath, Jr.          KS  12971
BATH & EDMONDS, P.A.
Historic Voigts Building
7944 Santa Fe Drive
Overland Park, Kansas  66204
(913) 652-9800; Fax (913) 649-8494
E-mail:  tom@bathedmonds.com

/s/ Marc A. Agnifilo
_____

Mark A. Agnifilo
BRAFMAN & ASSOCIATES, P.C.
767 Third Avenue, 26th Floor
New York, New York  10017-2023
(212) 750-7800; fax  (212-750-3906
E-mail:  magnifilo@braflaw.com
**ATTORNEYS FOR MR. MUIR**

### CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to all parties of record herein.

/s/ Thomas J. Bath, Jr.
_____

Thomas J. Bath, Jr.          KS  12971