UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

                                      :

UNITED STATES OF AMERICA

                                      :

        -v-

                                      :

SCOTT TUCKER and
TIMOTHY MUIR,                         :

            Defendants.               :

- - - - - - - - - - - - - - - - - x

# ORIGINAL

**SUPERSEDING**
**INDICTMENT**

S1 16 Cr. 091 (PKC)

## COUNT ONE
**(Conspiracy To Collect Unlawful Debts:**
**Tucker Payday Lending Organization)**

The Grand Jury charges:

### BACKGROUND

1.    At all times relevant to this Indictment, SCOTT
TUCKER, the defendant, owned and operated a group of payday
lending businesses (the "Tucker Payday Lenders") that issued
small, short-term, high-interest, unsecured loans, commonly
referred to as "payday loans," to customers across the country.
Although other people and entities were listed as the Tucker
Payday Lenders' owners on certain documents, in truth and in
fact, at all relevant times, TUCKER was the source of the funds
lent to customers by the Tucker Payday Lenders, and TUCKER bore
the risk of non-repayment of the loans.  In addition, TUCKER
controlled the Tucker Payday Lenders' day-to-day operations,
finances, lending decisions, distribution of profits, hiring and

termination of employees, advertising and solicitation of customers, and banking and other third-party relationships.

2. At all times relevant to this Indictment, the Tucker Payday Lenders held themselves out as separate businesses known as Ameriloan, f/k/a Cash Advance ("Ameriloan"), One Click Cash, f/k/a Preferred Cash Loans ("OCC"), United Cash Loans, US FastCash, 500 FastCash, Advantage Cash Services and Star Cash Processing. However, while each of the Tucker Payday Lenders issued a distinct portfolio of loans, the Tucker Payday Lenders shared the employees, computer systems and other operating costs and infrastructure of a single lending business located in Overland Park, Kansas. That business, known as AMG Services, Inc., f/k/a CLK Management, f/k/a National Money Service, Inc. ("AMG"), was at all relevant times directly or beneficially owned and operated by SCOTT TUCKER, the defendant. At times, under TUCKER's direction and control, AMG employed over 600 individuals to operate the Tucker Payday Lenders.

3. At times relevant to this Indictment, TIMOTHY MUIR, the defendant, was an attorney admitted to practice in the State of Kansas. Beginning in or about 2006, MUIR acted as the general counsel for AMG.

**OVERVIEW OF THE UNLAWFUL SCHEME**

4. From at least in or about 1997 up to and including in

2

or about August 2013, through the Tucker Payday Lenders, SCOTT
TUCKER and TIMOTHY MUIR, the defendants, systematically
exploited over four and a half million working people throughout
the United States who were struggling to pay basic living
expenses, including for food and housing.  TUCKER and MUIR,
through the Tucker Payday Lenders, extended loans to these
individuals at usurious interest rates as high as 700% or more
using deceptive and misleading communications and contracts, and
in violation of the usury laws of numerous states, including New
York State, that were designed to protect residents from such
loan sharking and abusive conduct.  In doing so, TUCKER and MUIR
forced many of these individuals into cycles of debt in which
they incurred new usurious payday loans – including from the
Tucker Payday Lenders – in order to pay off their existing debt.

     5.     Throughout their existence, as SCOTT TUCKER and
TIMOTHY MUIR, the defendants, well knew, the Tucker Payday
Lenders received complaints from thousands of customers across
the country, and numerous state regulators and consumer
protection groups, about the lenders' deceptive, misleading, and
usurious practices.  Beginning in 2003, several states filed
lawsuits to stop TUCKER and the Tucker Payday Lenders from
extending usurious and abusive loans to their citizens in
violation of their respective laws.

6. Also beginning in approximately 2003, to defeat the state lawsuits, to attempt to avoid future civil and criminal liability for his conduct, and to enable the Tucker Payday Lenders to persist in extending usurious loans contrary to state laws, SCOTT TUCKER, the defendant, entered into sham business relationships with certain Native American tribes (collectively, "Tribes 1-3") and thereafter claimed that the Tucker Payday Lenders could not be sued because they were entitled to the protection of "tribal sovereign immunity," a legal doctrine that generally prevents states from enforcing their laws against Native American tribes. In particular, to defeat the state lawsuits, attorneys for TUCKER, including TIMOTHY MUIR, the defendant, prepared and submitted to courts materially false and misleading affidavits about the relationship between Tribes 1-3 and the Tucker Payday Lenders to create the false impression that Tribes 1-3 played a substantive role in the ownership and operation of the Tucker Payday Lenders. In truth and in fact, as TUCKER and MUIR well knew and privately admitted, Tribes 1-3 played no such role, and were instead deliberately used by TUCKER and MUIR as mere conduits for TUCKER's unlawful business. In reliance on these materially false and misleading affidavits, state courts dismissed certain state lawsuits on "tribal sovereign immunity" grounds.

4

7. The Tucker Payday Lenders generated enormous revenues and profits. In particular, from approximately 2003 to 2012, the Tucker Payday Lenders generated over $2 billion in revenues, from which SCOTT TUCKER, the defendant, received hundreds of millions of dollars in profits. Of those unlawful proceeds, TUCKER spent over $100 million on personal expenses such as luxury homes and automobiles, jewelry, a private airplane, and the expenses of a professional auto racing team which, according to its web site, races Ferraris in "marquee" events throughout the world including in France, Monaco, and Abu Dhabi. In many cases, TUCKER paid for these personal expenses with funds taken directly from bank accounts nominally in the names of Tribes 1-3 but in fact controlled entirely by TUCKER.

## Applicable State Usury Laws, and States in Which the Tucker Payday Lenders Operated

8. Fourteen states, including New York State, and the District of Columbia prohibit payday loans or have usury limits that effectively prohibit payday loans within their jurisdictions (collectively, the "Prohibited Payday Loan States"). For example, in relevant part, New York's civil usury law prohibits charging more than 16% interest on a loan annually, and New York's criminal usury law makes it a crime to knowingly charge more than 25% interest on a loan annually.

5

Arizona, Arkansas, Connecticut, the District of Columbia, Georgia, Maryland, Massachusetts, Montana, New Hampshire, New Jersey, North Carolina, Ohio, Pennsylvania, Vermont, and West Virginia similarly have laws which set interest limits that effectively prohibit payday lending. While the lawful maximum interest rate varies in the Prohibited Payday Loan States, the highest permissible annual interest rate in any of these states is 36%. With the exception of Georgia, West Virginia and (after July 1, 2010) Arizona, the Tucker Payday Lenders did business in all of the Prohibited Payday Loan States, while charging annual interest rates many times higher than the rates allowed in these states.

9.    The Tucker Payday Lenders also violated the usury laws of many other states, which permit payday lenders, typically if licensed in the state, to extend high-interest payday loans (collectively, the "Regulated Payday Loan States"). Regulated Payday Loan States include, among others, California, Florida, Indiana, Iowa, Kentucky, Maine, Michigan, Minnesota, Nebraska, Oklahoma, Oregon, South Carolina, Tennessee and Washington. The highest lawful interest that may be charged under these states' laws varies by state. The Tucker Payday Lenders violated the usury laws of the Regulated Payday Loan States variously by failing to obtain a license to operate within any of the states

6

in which licenses were required, and by extending loans at interest well in excess of what is allowed under the laws of these states.

10. The Tucker Payday Lenders extended loans to millions of consumers across the country in violation of the laws of the Prohibited Payday Loan States and the Regulated Payday Loan States. In New York, for example, between approximately 2008 and 2012, the Tucker Payday Lenders extended loans to hundreds of thousands of individuals including, as to each Tucker Payday Lender, individuals in the Southern District of New York.

## The Truth in Lending Act ("TILA")

11. TILA is a federal statute intended to ensure that credit terms are disclosed to consumers in a clear and meaningful way, both to protect customers against inaccurate and unfair credit practices, and to enable them to compare credit terms readily and knowledgeably. Among other things, TILA and its implementing regulations require lenders, including payday lenders like the Tucker Payday Lenders, to accurately, clearly and conspicuously disclose, before any credit is extended, the finance charge, the annual percentage rate, and the total of payments that reflect the legal obligation between the parties to the loan.

7

## MEANS AND METHODS OF THE CONSPIRACY

12. At all times relevant to this Indictment, to procure customers, the Tucker Payday Lenders relied primarily on the services of a Nevada-based "lead generator" (the "Lead Generator"). The Lead Generator, which was owned by SCOTT TUCKER, the defendant, until in or about 2007, relied at all relevant times on the Tucker Payday Lenders for at least half of its revenues. To procure customers, the Lead Generator ran nationwide television advertisements featuring a celebrity spokesperson who encouraged people to visit the Lead Generator's website to obtain a short-term lending tool "that will help fix your financial problems." Once visitors to the Lead Generator's website provided, through the website, their employer, income, and bank account information, the Lead Generator connected them immediately with the website of a payday lender, typically one of the Tucker Payday Lenders, which operated through websites including ameriloan.com, 500fastcash.com, oneclickcash.com, unitedcashloans.com and usfastcash.com.

### The Deceptive and Misleading Loan Term Disclosures

13. The websites of the Tucker Payday Lenders informed the potential customers of the loan amount they could receive, which was based in part on the potential customers' claimed income and employment. The websites then required the potential customers

8

electronically to indicate that they had read certain documents on the website, including a "Loan Note and Disclosure," and that they preauthorized electronic funds withdrawals from their accounts by the Tucker Payday Lenders to repay the loan. Thereafter, the Tucker Payday Lenders made the loan amounts available by electronic deposit as soon as the next day.

14. The Tucker Payday Lenders' Loan Note and Disclosure prominently featured, in a large, bold box, a "Disclosure of Credit Terms" (the "TILA Box") that purported to state in clear and simple terms, as required by TILA, the cost of the loan to the borrower. For example, for a loan of $500, the TILA Box provided that the "FINANCE CHARGE" - meaning the "dollar amount the credit will cost you" - would be $150, and that the "Total of Payments" - meaning the "amount you will have paid after you have made the scheduled payment" - would be $650. Thus, in substance, the TILA Box stated that a $500 loan to the customer would cost $650 to repay. In addition, the TILA Box also set forth the annualized interest rate of such a loan namely, 782.14%. While the amounts set forth in the Tucker Payday Lenders' TILA Box varied according to the terms of particular customers' loans, they reflected, in substance, that the borrower would pay $30 in interest for every $100 borrowed.

15. In truth and in fact, and as SCOTT TUCKER and TIMOTHY

9

MUIR, the defendants, well knew, the Tucker Payday Lenders' TILA boxes were materially deceptive and misleading. While the TILA Box suggested the borrower would pay $30 in interest for every $100 borrowed, in truth and in fact, through at least 2012, TUCKER and his co-conspirators structured the repayment schedule of the loans such that, on the borrower's payday, the Tucker Payday Lenders automatically withdrew the entire interest payment due on the loan but left the principal balance untouched so that, on the borrower's next payday, they could again automatically withdraw an amount equaling the entire interest payment due (and already paid) on the loan. With TUCKER's approval, the Tucker Payday Lenders proceeded automatically to withdraw such "finance charges" payday after payday (typically every two weeks), applying none of the money toward repayment of principal, until at least the fifth payday, when they began to withdraw an additional $50 per payday to apply to the principal balance of the loan. Even then, the Tucker Payday Lenders continued to assess and automatically withdraw the entire interest payment calculated on the remaining principal balance until the entire principal amount was repaid. Accordingly, as TUCKER and MUIR well knew, the Tucker Payday Lenders' TILA box materially understated the amount the loan would cost, including the total of payments that would be taken from the borrower's

10

bank account.

16. Specifically, for a customer who borrowed $500, contrary to the TILA Box disclosure stating that the finance charge would be $150, amounting to $650 in total payments by the borrower, in truth and in fact, and as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, the finance charge was $1425, amounting to $1925 in total payments by the borrower. The Tucker Payday Lenders' actual, automatic repayment schedule for such a loan was as follows:

| Payday | Funds Taken from Customer by Tucker Payday Lenders | Amount Applied to "Finance Charge" | Amount Applied to Pay Down Principal | Principal Balance Remaining |
|---|---|---|---|---|
| 1 | $150 | $150 | $0 | $500 |
| 2 | $150 | $150 | $0 | $500 |
| 3 | $150 | $150 | $0 | $500 |
| 4 | $150 | $150 | $0 | $500 |
| 5 | $200 | $150 | $50 | $450 |
| 6 | $185 | $135 | $50 | $400 |
| 7 | $170 | $120 | $50 | $350 |
| 8 | $155 | $105 | $50 | $300 |
| 9 | $140 | $90 | $50 | $250 |
| 10 | $125 | $75 | $50 | $200 |
| 11 | $110 | $60 | $50 | $150 |

11

| 12 | $95 | $45 | $50 | $100 |
| 13 | $80 | $30 | $50 | $50 |
| 14 | $65 | $15 | $50 | $0 |
| **TOTAL** | **$1925** | **$1425** | **$500** | |

Nowhere did the Loan Note and Disclosure provide these accurate figures to borrowers.

17. As SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, from the inception of TUCKER's operation of the Tucker Payday Lenders, many customers who had repaid the loan amounts set forth in the Tucker Payday Lenders' TILA Box expressed surprise and confusion at the amounts the Tucker Payday Lenders were continuing to withdraw from their bank accounts, and complained that they had been misled as to the cost of the loans. Thousands of customers complained directly to the Tucker Payday Lenders, to their banks, to consumer protection groups, and to regulators across the country that the Tucker Payday Lenders' loans were materially deceptive, misleading and usurious. When customers complained to state regulators, or threatened to sue, the Tucker Payday Lenders, at TUCKER's and MUIR's direction, often simply stopped withdrawing additional money from the customers' bank accounts and cancelled the customers' so-called remaining principal balances. At no

12

relevant time did TUCKER or MUIR correct the Tucker Payday Lenders' TILA Box disclosures to accurately set forth the cost of the loans.

18. Imposing finance charges far in excess of the finance charges disclosed by the TILA Box was instrumental to the profits the Tucker Payday Lenders reaped for SCOTT TUCKER and TIMOTHY MUIR, the defendants. For that reason, TUCKER and MUIR, through their employees and associates, sought to prevent their customers from understanding the true finance charges that they would incur under the actual terms of their loans. That is, customers were led to believe that they were repaying their loans on the schedule disclosed by the TILA Box rather than the Tucker Payday Lenders' actual, automatic repayment schedule that resulted in far greater finance charges.

19. Also as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, low-income customers who had taken out the loans to pay the expenses of daily living told the Tucker Payday Lenders that the amounts being automatically withdrawn from their accounts, which were far in excess of the amounts set forth in the TILA Box, were making it impossible for them to pay their bills. Further, as many explained, the Tucker Payday Lenders' automatic withdrawals from their accounts caused those accounts to incur negative balances, forcing the customers to

13

reimburse their banks and incur additional bank fees and expenses or, for those who could not afford such payments, rendering their accounts inoperable. As a result, many of these customers were forced to take out new usurious loans – including from the Tucker Payday Lenders – to pay their bills, to cover the unexpected additional "finance charges" on the Tucker Payday Lenders' loans, and to pay additional costs that arose from those loans.

### The Sham Relationship with Tribes 1-3

20. In addition to receiving complaints from customers, the Tucker Payday Lenders received voluminous complaints from third parties, including numerous state regulators, for, among other things, deceiving customers and violating state usury caps and other consumer protection laws. Rather than take steps to comply with state laws or otherwise address the Tucker Payday Lenders' alleged abuse of their customers, SCOTT TUCKER, the defendant, entered into a series of sham business relationships to conceal his ownership and control of the Tucker Payday Lenders and to evade applicable state laws.

21. Beginning in or about 1997, SCOTT TUCKER, the defendant, in partnership with a co-conspirator not named herein ("CC-1"), offered his payday loans through a Delaware-chartered bank (the "Delaware Bank"), falsely representing in loan

documents that the Delaware Bank was the lender when, in truth
and in fact, as TUCKER and CC-1 well knew, it was TUCKER and CC-
1 who provided the funds for the loans and controlled the loan
approval process. TUCKER and CC-1 engaged in this deceit in
order to improperly avail themselves of laws which entitle banks
to "export" the interest rate of their home state, and thereby
to avoid usury laws that are more restrictive than those of
their home state. Eventually, after the Delaware Bank sought to
impose certain restrictions on TUCKER's payday lending
activities, TUCKER ended his relationship with the Delaware
Bank.

22. In 2003, the State of Kansas accused SCOTT TUCKER, the
defendant, and certain of the Tucker Payday Lenders of operating
unlicensed payday loan businesses in Kansas and of issuing
usurious loans to Kansas customers in violation of the state's
usury laws. Subsequently, authorities in other states,
including Colorado and California, filed lawsuits against the
Tucker Payday Lenders that made similar allegations, and that
sought to enjoin the Tucker Payday Lenders from making such
usurious loans to their residents.

23. In order to thwart state authorities' enforcement
efforts, beginning in 2003, SCOTT TUCKER, the defendant, entered
into additional sham business relationships, this time with

15

Tribes 1-3, and then claimed that "tribal sovereign immunity" prevented states and private citizens from taking any action against the Tucker Payday Lenders or him. Thereafter, in the lawsuits, TUCKER's lawyers, including TIMOTHY MUIR, the defendant, prepared and submitted materially false and misleading affidavits about the tribes' supposed substantive ownership and control of the Tucker Payday Lenders, whereupon courts eventually dismissed each state's lawsuit on "tribal sovereign immunity" grounds.

24. In truth and in fact, as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, while TUCKER and MUIR took steps to create the sham appearance of tribal ownership and control of the Tucker Payday Lenders, Tribes 1-3 played no substantive role in the ownership or operation of the Tucker Payday Lenders at any time. To create the sham appearance of ownership, TUCKER assigned nominal ownership of the Tucker Payday Lenders to Tribes 1-3 (that is, Ameriloan, United Cash Loans, US Fast Cash, Advantage Cash Services and Star Cash Processing were assigned to Tribe 1, One Click Cash was assigned to Tribe 2, and 500 Fast Cash was assigned to Tribe 3), and from time to time caused Tribes 1-3 to appear as the businesses' owners on certain corporate and financial documents. However, in truth and in fact, at all relevant times, and as TUCKER and

16

MUIR well knew, Tribes 1-3 had no power to make any decisions on behalf of any of the Tucker Payday Lenders, no control over the income or expenses of any of the Tucker Payday Lenders, and no entitlement to the Tucker Payday Lenders' profits.

25. Similarly, to create the sham appearance that Tribes 1-3 not only owned, but operated, the Tucker Payday Lenders, SCOTT TUCKER, the defendant, caused members of two of the tribes (Tribe 1 and Tribe 2) to have a tribal member press a key on a computer on a daily basis on tribal lands to purportedly "approve" the extension of credit on hundreds or thousands of loans that the Tucker Payday Lenders, through their approximately 600 employees in Kansas, had in fact already approved and agreed to provide to customers. TUCKER did not require a third tribe that purportedly owned and operated one of the Tucker Payday Lenders (Tribe 3) to engage in this sham participation in the operations of his business at all.

26. To further create the false appearance of tribal ownership and operation of the Tucker Payday Lenders, and as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, AMG employees falsely claimed to customers and others on the telephone that they were located in Oklahoma or Nebraska, where Tribes 1-3 were located. In addition, employees were provided with daily weather reports for these locations so that they

17

could more effectively dupe customers and others into believing they were located there, when in truth and in fact, and as TUCKER and MUIR well knew, they were located at all times at AMG's offices in Kansas.

27.   The sham relationships with Tribes 1-3 served not only to deceive state authorities, but, as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, to deceive the Tucker Payday Lenders' customers into paying more money to the Tucker Payday Lenders than was legally owed. The Tucker Payday Lenders accomplished this goal, in part, by claiming that their illegal interest rates were legally enforceable because the lenders were owned by Tribes 1-3 and operated from the reservations of Tribes 1-3, even though, as TUCKER and MUIR well knew, the Tucker Payday Lenders were in fact owned by TUCKER and operated from Overland Park, Kansas. Based on these and other misrepresentations about the sham relationships with Tribes 1-3, the Tucker Payday Lenders induced customers to pay additional money to the Tucker Payday Lenders in the form of interest that was in fact unlawful to charge and unenforceable in the customers' states.

28.   TIMOTHY MUIR, the defendant, served as an architect of the structure designed to mislead state authorities as to the true ownership and control of the Tucker Payday Lenders.   In

18

addition, to bolster the false appearance of tribal ownership and control of the Tucker Payday Lenders, and to obstruct state regulatory efforts, MUIR caused a sham lawsuit to be filed by SCOTT TUCKER, the defendant, against AMG, despite the fact that AMG was MUIR's client. MUIR further assisted in the execution of sham transactions which enabled TUCKER to funnel tens of millions of dollars from the Tucker Payday Lenders to TUCKER in a manner that concealed TUCKER's ownership and control of the Tucker Payday Lenders. MUIR undertook each of these actions with the encouragement and authorization of TUCKER.

29. Contrary to the sham appearance that the defendants created of tribal ownership and control of the Tucker Payday Lenders, at all times, as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, TUCKER remained the source of capital for the Tucker Payday Lenders, TUCKER bore the financial risk associated with the operation of the businesses, and TUCKER owned and controlled the Tucker Payday Lenders' profits. Further, TUCKER and/or other AMG employees at his direction, including at times MUIR, made the credit, strategic, and other material decisions, directed and carried out the servicing and collection of loan obligations, managed relationships with third parties (including banks and payment processors, among others), and performed the other substantive financial and operational

19

functions for the Tucker Payday Lenders.

## Statutory Allegations

### The Enterprise

30.   At all times relevant to this Indictment, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and other individuals and corporations known and unknown, were members and associates of an internet payday lending enterprise (the "Tucker Payday Lending Organization"), a criminal organization whose members and associates engaged in crimes including the collection of unlawful debts.

31.   The Tucker Payday Lending Organization, including its leadership, membership, and associates, constituted an "enterprise," as that term is defined in Title 18, United States Code, Section 1961(4) -- that is, a group of individuals and corporations associated in fact. This enterprise was engaged in, and its activities affected, interstate and foreign commerce. The Tucker Payday Lending Organization was an organized criminal group with leadership based in Overland Park, Kansas, and that operated throughout the United States, including in the Southern District of New York. The Tucker Payday Lending Organization constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

32. The Tucker Payday Lending Organization was owned, led and controlled by SCOTT TUCKER, the defendant. TIMOTHY MUIR, the defendant, was also a leader of the Tucker Payday Lending Organization.

33. The purpose of the enterprise was to enrich the leader, members and associates of the enterprise through the collection of unlawful debts.

34. The means and methods by which SCOTT TUCKER and TIMOTHY MUIR, the defendants, and their co-conspirators, and other members and associates, conducted and participated in the conduct of the affairs of the Tucker Payday Lending Organization were the operation of payday loan companies in the business of lending money at rates usurious under State law, where the usurious rates were at least twice the enforceable rate.

## The Unlawful Debt Conspiracy

35. From at least in or about 1997 through in or about August 2013, in the Southern District of New York and elsewhere, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, being persons employed by and associated with the enterprise described in paragraphs 1 through 34 above, namely, the Tucker Payday Lending Organization, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce, willfully and knowingly combined, conspired,

21

confederated, and agreed together and with each other to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through the collection of unlawful debt, as set forth below.

36. The collection of unlawful debt, as that term is defined in Title 18, United States Code, Section 1961(6), through which the defendants and their co-conspirators agreed to conduct and participate directly and indirectly in the conduct of the affairs of the enterprise, consisted of the collection of unlawful usurious debts, that is, debts which are unenforceable under the laws of the State of New York and other States in whole and in part as to principal and interest and which were incurred in connection with the business of lending money and a thing of value at rates usurious under the laws of the State of New York and other states, where the usurious rates were at least twice the enforceable rates. It was a part of the conspiracy that SCOTT TUCKER AND TIMOTHY MUIR, the defendants, and others known and unknown, agreed that a conspirator would commit at least one collection of unlawful debt in the conduct of the affairs of the enterprise.

(Title 18, United States Code, Section 1962(d).)

22

## COUNT TWO
### (Collection of Unlawful Debts –
### Ameriloan, United Cash Loans and US FastCash)

The Grand Jury further charges:

37. The allegations contained in paragraphs 1 through 34 above are hereby repeated, realleged, and incorporated by reference herein as though fully set forth herein.

38. From at least in or about 2003, up to and including in or about August 2013, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, in the Southern District of New York and elsewhere, being persons employed by and associated with the enterprise described in paragraphs 1 through 34 above, namely, the Tucker Payday Lending Organization, which enterprise was engaged in, and the activities of which affected interstate and foreign commerce, willfully and knowingly did conduct and participate, directly and indirectly, in the conduct of such enterprise's affairs through the collection of unlawful debt, as described in paragraph 36.

39. The collection of unlawful debt, as that term is defined in Title 18, United States Code, Section 1961(6), that is, a debt (A) which is unenforceable under the laws of the State of New York and other States in whole and in part as to principal and interest because of the laws relating to usury,

23

and (B) which was incurred in connection with the business of lending money and a thing of value at rates usurious under the laws of the State of New York and other States, where the usurious rates were at least twice the enforceable rates, through which SCOTT TUCKER and TIMOTHY MUIR, the defendants, did conduct and participate in the affairs of the enterprise, which was engaged in and the activities of which affected interstate commerce, consisted of collecting and attempting to collect an unlawful debt as follows:

a.     From at least in or about 2012, up to and including in or about 2013, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in the Bronx, New York ("Customer-1").

b.     In or about 2012, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in West Hempstead, New York ("Customer-2").

c.     In or about 2012, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in Bristol, New Hampshire ("Customer-3").

d. In or about 2012, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in Portland, Oregon ("Customer-4").

e. In or about 2012, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in Middletown, Connecticut ("Customer-5").

(Title 18, United States Code, Section 1962(c).)

## COUNT THREE
### (Collection of Unlawful Debts – 500 FastCash)

The Grand Jury further charges:

40. The allegations contained in paragraphs 1 through 34 above are hereby repeated, realleged, and incorporated by reference herein as though fully set forth herein.

41. From at least in or about 2003, up to and including in or about August 2013, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, in the Southern District of New York and elsewhere, being persons employed by and associated with the enterprise described in paragraphs 1 through 34 above, namely, the Tucker Payday Lending Organization, which enterprise was engaged in, and the activities of which affected interstate and foreign commerce,

25

willfully and knowingly did conduct and participate, directly and indirectly, in the conduct of such enterprise's affairs through the collection of unlawful debt, as described in paragraph 36.

42. The collection of unlawful debt, as that term is defined in Title 18, United States Code, Section 1961(6), that is, a debt (A) which is unenforceable under the laws of the State of New York and other States in whole and in part as to principal and interest because of the laws relating to usury, and (B) which was incurred in connection with the business of lending money and a thing of value at rates usurious under the laws of the State of New York and other States, where the usurious rates were at least twice the enforceable rates, through which SCOTT TUCKER and TIMOTHY MUIR, the defendants, did conduct and participate in the affairs of the enterprise, which was engaged in and the activities of which affected interstate commerce, consisted of collecting and attempting to collect an unlawful debt as follows:

a. From at least in or about 2010, up to and including in or about 2011, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in the Bronx, NY ("Customer-6").

b.    In or about 2012, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in San Ramon, California ("Customer-7").

c.    In or about 2011, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in Plattsburgh, New York ("Customer-8").

d.    From at least in or about 2012, up to and including in or about 2013, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in High Point, North Carolina ("Customer-9").

e.    From at least in or about 2012, up to and including in or about 2013, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in South Glens Falls, New York ("Customer-10").

(Title 18, United States Code, Section 1962(c).)

## COUNT FOUR
### (Collection of Unlawful Debts – One Click Cash)

The Grand Jury further charges:

43.    The allegations contained in paragraphs 1 through 34

27

above are hereby repeated, realleged, and incorporated by reference herein as though fully set forth herein.

44. From at least in or about 2005, up to and including in or about August 2013, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, in the Southern District of New York and elsewhere, being persons employed by and associated with the enterprise described in paragraphs 1 through 34 above, namely, the Tucker Payday Lending Organization, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce, willfully and knowingly did conduct and participate, directly and indirectly, in the conduct of such enterprise's affairs through the collection of unlawful debt, as described in paragraph 36.

45. The collection of unlawful debt, as that term is defined in Title 18, United States Code, Section 1961(6), that is, a debt (A) which is unenforceable under the laws of the State of New York and other States in whole and in part as to principal and interest because of the laws relating to usury, and (B) which was incurred in connection with the business of lending money and a thing of value at rates usurious under the laws of the State of New York and other States, where the usurious rates were at least twice the enforceable rates,

28

through which SCOTT TUCKER and TIMOTHY MUIR, the defendants, did conduct and participate in the affairs of the enterprise, which was engaged in and the activities of which affected interstate commerce, consisted of collecting and attempting to collect an unlawful debt as follows:

a.  From at least in or about 2009, up to and including in or about 2011, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in Stony Point, New York ("Customer-11").

b.  From at least in or about 2012, up to and including in or about 2013, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in Tamaqua, Pennsylvania ("Customer-12").

c.  In or about 2012, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in Wilson, North Carolina ("Customer-13").

d.  From at least in or about 2009, up to and including in or about 2011, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans

from a customer in Sacramento, California ("Customer-14").

e. From at least in or about 2012, up to and including in or about 2013, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in Elizabethtown, Kentucky ("Customer-15").

(Title 18, United States Code, Section 1962(c).)

## COUNT FIVE
### (Conspiracy to Commit Wire Fraud)

The Grand Jury further charges:

46. The allegations contained in paragraphs 1 through 34 above are hereby repeated, realleged, and incorporated by reference herein as though fully set forth herein.

47. From at least in or about 2004 up to and including in or about August 2013, in the Southern District of New York and elsewhere, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343, to wit, TUCKER and MUIR conspired to make material misrepresentations concerning the true cost of payday loans offered by the Tucker Payday Lenders and the identity of the lender offering the loans in order to induce customers to obtain

30