UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                      :

UNITED STATES OF AMERICA,      :

                                        :

            - v. -            :                S1 16 Cr. 91 (PKC)

                                        :

SCOTT TUCKER and            :
TIMOTHY MUIR,               :

                                        :

                Defendants.     :

------------------------------------------------------X

# MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
# IN SUPPORT OF ITS MOTIONS *IN LIMINE*

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States of America

Niketh Velamoor
Hagan Scotten
Sagar K. Ravi
Assistant United States Attorneys
*- Of Counsel -*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................ 1

ARGUMENT ..................................................................................................... 4

I.      Evidence of Tucker's Prior Investment and Bank Frauds and False Statements in a
        Bankruptcy Petition Are Admissible ……………...……………………....………….4

II.     Defendants Should Be Precluded from Admitting Evidence of Court Decisions and
        Orders Involving the Defendants and the Tucker Payday Lenders…………….....18

III.    The Government Should Be Permitted to Introduce Statements by a Coconspirator
        in Furtherance of Defendants' Conspiracy………………………………...……24

IV.     Defendants Should Be Prohibited From Offering or Eliciting Evidence Concerning
        Advice of Counsel…………………………………………………….………29

V.      This Court Should Instruct the Jury on the Relevant Elements of State Law……...33

VI.     The Defendants Should Be Precluded from Offering Evidence or Argument
        Concerning the Legality of or Policy Arguments Regarding Payday Lending…......35

VII.    Defendants Should Be Precluded from Introducing Evidence of Subjective Belief of
        Witnesses as to Legal Ownership …………………………………………....…..38

CONCLUSION .......................................................................................... ..39

# PRELIMINARY STATEMENT

The Government respectfully submits these motions *in limine* in advance of the trial of Scott Tucker and Timothy Muir (the "defendants") scheduled to begin on April 17, 2017. As set forth below, the Government seeks the following pretrial rulings from the Court: (1) to permit the Government to introduce evidence of Tucker's prior investment and bank frauds and false statements in a bankruptcy petition pursuant to Federal Rule of Evidence ("Rule") 404(b) and/or as direct evidence of the crimes charged in the Superseding Indictment (the "S1 Indictment"); (2) to preclude the defendants, pursuant to Rule 403, from admitting evidence of court decisions and orders in proceedings brought against Tucker and his payday lending businesses; (3) to permit the Government, pursuant to Rule 801, to introduce certain statements of a coconspirator in furtherance of the defendants' conspiracy; (4) to direct Tucker to produce to the Government all advice he received concerning the legality of his payday lending operation, including the advice on which he intends to rely as part of a planned advice of counsel defense, and prohibit Muir from introducing evidence concerning the legal advice of non-parties; (5) to have the Court issue instructions to the jury on the applicable state laws; (6) to preclude the defendants from offering evidence or argument to the jury concerning the legality of, or policy arguments in favor of, payday lending; and (7) to preclude the defendants from introducing evidence of the subjective beliefs of witnesses as to the ownership of various legal entities.

# BACKGROUND

The defendants are charged in the S1 Indictment with fourteen counts arising from their unlawful operation of a group of payday lending businesses owned and controlled by Tucker (the "Tucker Payday Lenders"). As alleged in the S1 Indictment, Tucker and Muir, acting through the Tucker Payday Lenders, (1) conspired to and did extend "payday" loans at interest rates far in excess of twice the allowable rates under state laws, including New York law, in violation of

Title 18, United States Code, Sections 1962(c) and 1962(d) (Counts One through Four, the "RICO Counts"); (2) conspired to and did make material misrepresentations concerning the true cost of the loans and the identity of the lender in order to induce customers to obtain the loans and make payments exceeding the amounts allowed under state law, in violation of Title 18, United States Code, Sections 1343 and 1349 (Counts Five and Six, the "Wire Fraud Counts"); (3) conspired to and did engage in financial transactions involving the proceeds of illegal payday loans in order to advertise and fund new illegal payday loans and to conceal the defendants' ownership and/or control of the Tucker Payday Lenders, their receipt of proceeds of the illegal loans, and the illegal nature and source of their ill-gotten gains, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i), (a)(1)(B)(i) and (h) (Counts Seven through Nine, the "Money Laundering Counts"); and (4) extended loans without the truthful and accurate disclosures required by the Truth in Lending Act ("TILA"), in violation of Title 15, United States Code, Section 1611 (Counts Ten through Fourteen, the "TILA Counts").

Tucker has been involved in payday lending since the late 1990s. (S1 Indictment ¶ 4.) His businesses have been involved in extending short-term "payday" loans in principal amounts ranging from approximately $300 to $1000 and typically charging $30 of interest for each $100 of principal extended. (*Id*. ¶¶ 14, 15.) Tucker structured his loans so that, on the borrower's pay day, the loan would be automatically "renewed," meaning that Tucker would withdraw only the interest or "finance charge" from the customer's account and extend the entire principal balance of the loan until the next payday. (*Id*. ¶ 15.) Tucker's loans operated so that the loans were automatically renewed five times before the customer's payments began to reduce his or her principal obligation in any way. (*Id*.) The result of loans with such high interest payments over such short time periods was applicable interest rates of several hundred percent and more—far in

in excess of twice the rates allowed under any state usury cap.  (*Id.* ¶¶ 4, 34.)  Many customers paid significantly more in interest charges than the principal amounts they initially borrowed.  (*Id.* ¶¶ 16, 17.)

For over a decade, Tucker entered into sham business relationships to conceal his ownership and control of the payday lending businesses and to evade applicable state laws that made lending on these terms illegal in numerous states, including New York.  (S1 Indictment ¶¶ 4, 20-29.)  Until approximately 2003, Tucker extended payday loans through a Delaware-chartered bank (the "Delaware Bank").  (*Id.* ¶ 21.)  Tucker falsely represented that the Delaware Bank was the lender in order to avail himself of laws that allow banks to "export" the lending laws of their home state and avoid more restrictive laws of other states where they are lending.  (*Id.*)  But the Delaware Bank eventually began to place restrictions on Tucker's lending activities, so Tucker ended the relationship.  (*Id.*)  In 2003, Tucker formed relationships with Indian tribes so that he could attempt to claim the protection of the tribes' sovereign immunity.  (*Id.* ¶ 23.)  Through these relationships, Tucker and Muir, who joined Tucker's enterprise, created the sham appearance of tribal ownership and control of the lenders.  (*Id.*)

Beyond creating tribal corporations that purported to own the various lending businesses, the tribes had no meaningful involvement in the operation of the loan business.  (S1 Indictment ¶¶ 23-24.)  Rather, the lending businesses were conducted by Tucker and Muir from Tucker's offices in Overland Park, Kansas.  (*Id.* ¶ 27.)  At those offices, Tucker and hundreds of his employees, including Muir, handled all aspects of the loan business, including making credit, strategic and other material decisions, servicing and collecting loan obligations, and managing relationships with third parties including banks and payment processors.  (*Id.* ¶ 29.)  Knowing that the tribes were playing no meaningful role in the businesses, the defendants took steps to

create the false impression that the businesses were actually located on tribal lands. Among other things, they engineered a sham process wherein officials from some of the tribes pretended to "approve" the extension of payday loans from tribal lands. (*Id.* ¶ 25.) And with the defendants' knowledge, Tucker's call center employees operating at his Overland Park headquarters falsely told customers that they were located on tribal lands in Oklahoma or Nebraska. (*Id.* ¶ 26.) These false misrepresentations were made to deceive customers into believing that the payday loans were issued by tribes in order to obtain payments exceeding the amounts allowed under state law. (*Id.* ¶ 27.)

At trial, the Government expects to call, among other witnesses, employees of the Tucker Payday Lenders that facilitated the defendants' fraud, members of the tribes that purported to own the various lending businesses, and customers that received payday loans from the Tucker Payday Lenders and made interest payments on those loans far in excess of the amounts allowed under state law as a result of the defendants' misrepresentations.

## **ARGUMENT**

### I.    **Evidence of Tucker's Prior Investment and Bank Frauds and False Statements in a Bankruptcy Petition Are Admissible**

The Government seeks to admit evidence of two of Tucker's prior frauds pursuant to Rule 404(b). Specifically, the Government seeks to admit evidence of Tucker's investment fraud scheme for which he pleaded guilty in the Western District of Missouri on July 11, 1991 to mail fraud. In connection with that scheme, Tucker falsely represented himself to be the executive of an investment bank and to have access to financing (the "Investment Fraud"). In addition, the Government seeks to admit evidence of Tucker's false statement to a bank regarding his ownership of collateral for a loan, for which he pleaded guilty in the Western District of Missouri on September 28, 1990 (the "Bank Fraud").

Finally, the Government seeks to admit Tucker's false statements in a voluntary petition for Chapter 7 bankruptcy filed on October 28, 1997 in the U.S. Bankruptcy Court for the District of Kansas (the "Bankruptcy Petition"), both as direct evidence of the conspiracy charged in the S1 Indictment and, in the alternative, pursuant to Rule 404(b).

## A.    Relevant Facts

### 1.    The Investment Fraud

On December 5, 1990, Tucker was charged in a one-count indictment with mail fraud, in violation of 18 U.S.C. §§ 1341 and 2, in the United States District Court for the District of Kansas. *United States* v. *Tucker*, No. 90 Cr. 20086 (D. Kan. Dec. 5, 1990) (the "Investment Fraud Indictment"). As the Investment Fraud Indictment describes, on or about March 28, 1990, Tucker falsely represented to clients that he operated a loan brokerage known as "Chase, Morgan, Stearns and Lloyd," which was owned by Chase and Manhattan Bank, Lloyds of London, and J.P. Morgan, and required advance fees from clients in order to obtain loans or letters of credit from lending institutions. In actuality, however, "Chase, Morgan, Stearns and Lloyd" was owned by Tucker and he did not have access to the financing as represented to his clients.

On January 4, 1991, the case was transferred to the United States District Court for the Western District of Missouri pursuant to Rule 20 of the Federal Rules of Criminal Procedure. *United States* v. *Tucker*, No. 91 Cr. 1 (W.D. Mo. Jan. 4, 1991). On January 8, 1991, Tucker pleaded guilty to the mail fraud charge. On June 11, 1991, he was sentenced to twelve months' imprisonment to run concurrently with imprisonment ordered in the Bank Fraud case and a

Missouri state case that was pending appeal (the "Missouri Fraud Case")[1] as well as three years of supervised release.

At trial, the Government seeks to introduce evidence of the Investment Fraud, including portions of the Investment Fraud Indictment and Tucker's plea allocution, which the Government is in the process of obtaining. The Investment Fraud Indictment and the judgment entered in the case are attached hereto as Exhibit A.

### 2. The Bank Fraud

On August 13, 1990, Tucker was charged in a one-count indictment with making a false statement to a bank to acquire a loan, in violation of 18 U.S.C. § 1014, in the United States District Court for the Western District of Missouri. *United States* v. *Tucker*, No. 90 Cr. 163 (W.D. Mo. Aug. 13 1990) (the "Bank Fraud Indictment"). As the Bank Fraud Indictment describes, on or about April 11, 1988, Tucker, d/b/a "Hyline Motors," pledged a 1987 Porsche as collateral for a $50,000 loan and presented a duplicate title showing Hyline Motors as the owner of the vehicle, when in fact Tucker had previously sold the Porsche on January 27, 1988, approximately three months before he pledged the Porsche as collateral.

On September 28, 1990, Tucker pleaded guilty to the Section 1014 charge in the Bank Fraud Indictment pursuant to a plea agreement. On June 11, 1991, he was sentenced to twelve months' imprisonment to run concurrently with the six months of imprisonment ordered in the Missouri Fraud Case as well as one year of supervised release.

At trial, the Government seeks to introduce evidence of the Bank Fraud, including portions of the Bank Fraud Indictment, his plea agreement, and Tucker's plea allocution, which

---

[1] On July 24, 1990, after a bench trial in the Circuit Court of Buchanan County, Missouri, Tucker was sentenced to six months' imprisonment for passing a bad check with the intent to defraud.

the Government is in the process of obtaining. The Bank Fraud Indictment, Tucker's plea agreement, and the judgment entered in the case are attached hereto as Exhibit B.

### 3. The Bankruptcy Petition

On October 28, 1997, Tucker filed the Bankruptcy Petition in the United States Bankruptcy Court for the District of Kansas. On the second page of the Bankruptcy Petition, Tucker signed his name and declared "under penalty of perjury that the information provided in [the Bankruptcy Petition] is true and correct." In addition, Tucker signed his name again declaring "under penalty of perjury" that he had reviewed the answers contained in the Statement of Financial Affairs and the schedules accompanying the Bankruptcy Petition and that they are "true and correct."

Despite declaring that the information contained in the Bankruptcy Petition was "true and correct," Tucker made false statements related to his ownership of a company and debts he owed. Question 16 of the Statement of Financial Affairs asked the debtor to "list the names and addresses of all businesses in which the debtor was an officer, director, partner or managing executive of a corporation, partnership, [or] sole proprietorship . . . ." Tucker responded to this question with "None." This denial was false because, on September 17, 1997, approximately 40 days prior to the filing of the Bankruptcy Petition, Tucker submitted articles of incorporation with the State of Missouri for an entity named National Leasing Service, Inc. ("NLS"), which listed Tucker as the agent and one of the incorporators of NLS.

Notably, on September 19, 1997, two days after NLS was formed and within weeks of filing the Bankruptcy Petition, Tucker signed a revolving note of credit of up to $500,000 on behalf of NLS with Halinan Capital Corp. (the "NLS Credit Note"). In the NLS Credit Note, Tucker signed as the president of NLS and Blaine Tucker, Tucker's late brother, signed as the

7

secretary of NLS. Despite clearly being an officer of and having an ownership interest in NLS, Tucker never disclosed this in the Bankruptcy Petition. Tucker also did not disclose this line of credit or the security he was obligated to pay for NLS, which he owned, on any of the schedules to the Bankruptcy Petition listing creditors of Tucker.

NLS, which is described in incorporation documents as a "Financial Leasing Services" company, is believed to be one of Tucker's first payday lending businesses. The Halinan Capital Corp. was a corporation associated with CC-1, Tucker's partner in payday lending who is referenced in the S1 Indictment. Tucker drew $50,000 against the NLS Credit Note, and is believed to have used those funds as seed money for his then-developing payday lending businesses. Eventually, corporate documentation indicates that Tucker merged NLS out of existence and the surviving entity was National Money Services, which ultimately became one of the Tucker Payday Lenders.

At trial, the Government seeks to introduce the Bankruptcy Petition and the NLS Credit Note as well as evidence of Tucker's position as President of NLS, his ownership of NLS, and his pledge of security for the NLS Credit Note.

### B.    Applicable Law

#### 1.    Other Acts Admissible Under Rule 404(b)

Evidence of "a crime" is admissible under Rules 404(b) and 403 if it (1) is advanced for a proper purpose; (2) is relevant to a material issue at trial; (3) has probative value that is not substantially outweighed by any unfair prejudicial effect; and (4) is admitted subject to a limiting instruction, if one is requested. *See, e.g.*, *Huddleston* v. *United States*, 485 U.S. 681, 691-92 (1988); *United States* v. *Brand*, 467 F.3d 179, 196 (2d Cir. 2006). Permissible purposes for

introducing evidence of other acts include "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

The Second Circuit follows "an 'inclusionary' approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity." *United States* v. *LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004). The Court has broad latitude in determining whether to admit evidence pursuant to Rule 404(b), and its ruling will be reviewed only for abuse of discretion. *See, e.g.*, *United States* v. *Mercado*, 573 F.3d 138, 141 (2d Cir. 2009). Even prior bad acts that are remote in time may be admissible under Rule 404(b) if they are relevant and adequately probative to help a jury shed light on the issues before it. *United States* v. *Martino,* 759 F.2d 998, 1005 (2d Cir. 1985) (admitting eleven-year old conviction under Rule 404(b)).

The admission of extrinsic evidence concerning a defendant's prior conduct is particularly appropriate where the defendant's state of mind is at issue:

> Federal Rule of Evidence 404(b) . . . generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character, unless the evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge. Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.

*Huddleston*, 485 U.S. at 685. The Second Circuit repeatedly has held that "[w]here intent to commit the crime charged is clearly at issue, evidence of prior similar acts may be introduced to prove that intent." *United States* v. *Caputo*, 808 F.2d 963, 968 (2d Cir. 1987). The defendant's knowledge and intent is in issue unless the defendant has unequivocally conceded that element of the offense. *See, e.g.*, *United States* v. *McCallum*, 584 F.3d 471, 475-76 (2d Cir. 2009) ("Because [the defendant's] counsel did not make a statement to the court of sufficient clarity to

indicate that intent and knowledge would not be disputed, those issues remained sufficiently in dispute for the similar acts evidence to be relevant and hence admissible."); *United States* v. *Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged.").  With respect to the timing of the Government's presentation of the proffered evidence, the Second Circuit has made clear that where it is apparent that knowledge or intent will be in dispute, "evidence of prior or similar acts may be introduced during the government's case-in-chief, 'rather than waiting until the conclusion of the defendant's case.'"  *United States* v. *Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992).

Evidence of prior fraudulent activity and false statements under penalty of perjury has been routinely found to be admissible under Rule 404(b) in fraud cases.  *See United States* v. *Kalish*, 403 F. App'x 541, 546-47 (2d Cir. 2010) (finding admission of mail fraud conviction relevant to defendant's intent to defraud and knowledge in a fraud case); *United States* v. *Mahler*, 579 F.2d 730, 736 (2d Cir. 1978) (finding that a 12-year old conviction for conspiracy to lie to the SEC in a stock scheme and false testimony to the SEC were admissible to show knowledge and intent in a securities, mail, and wire fraud case); *United States* v. *Birrell*, 447 F.2d 1168, 1172 (2d Cir. 1971) ("Evidence of similar acts in fraud cases may be introduced where knowledge or intent is at issue, to give rise to an inference of knowledge or intent, or where the actual making of the misrepresentations is at issue, to establish the existence of a larger continuing plan or design.").

Where evidence is offered for a proper purpose under Rule 404(b), the Court may only exclude the evidence under Rule 403 if the probative value of the evidence is "substantially outweighed" by the danger of unfair prejudice.  *Zackson*, 12 F.3d at 1182.  With regard to the

prejudice prong, evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States* v. *Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Moreover, Rule 403 does not bar evidence of other bad acts that "did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged." *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). All relevant evidence is to some degree prejudicial; *unfair* prejudice means, however, an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Rule 403, Advisory Comm. Note. Traditional examples of unfair prejudice include evidence that appeals to the jury's sympathies, evidence that arouses jurors' sense of horror, and evidence that provokes a jury's instinct to punish. *See United States* v. *Herron*, No 10 Cr. 615 (NGG), 2014 U.S. Dist. LEXIS 63872, at *13-14 (E.D.N.Y. May 8, 2014). Thus when opposing the admission of evidence under Rule 404(b), a "[d]efendant must show some undue prejudice, apart from the prejudice implicit in Rule 404(b) evidence." *United States* v. *Vargas*, 702 F. Supp. 70, 72-73 (S.D.N.Y. 1988) (emphasis added).

### 2. Prior Crimes or Other Acts Admissible as Direct Evidence

The Second Circuit has repeatedly held that actions and statements are admissible as direct evidence of the crimes charged, and are "not considered other crimes evidence under" Federal Rule of Evidence 404(b), if (a) they "arose out of the same transaction or series of transactions as the charged offense," (b) they are "inextricably intertwined with the evidence regarding the charged offense," or (c) they are "necessary to complete the story of the crime on trial." *United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *see also United States* v. *Quinones*, 511 F.3d 289, 309 (2d Cir. 2007); *United States* v. *Baez*, 349 F.3d 90, 93-94 (2d Cir.

2003).  Evidence of uncharged criminal activity is thus admissible when it constitutes intrinsic or

direct proof of the charged conspiracy.  *See Baez*, 349 F.3d at 93 (upholding admission of sixteen

uncharged crimes in conspiracy prosecution because "where . . . a conspiracy is charged,

uncharged acts may be admissible as direct evidence of the conspiracy itself" (internal quotations

marks omitted)).

        In such circumstances, the uncharged crimes evidence is "appropriately treated as part

of the very act charged, or, at least, proof of that act."  *Quinones*, 511 F.3d at 309 (internal

citations and quotations marks omitted).  And direct evidence is "not confined to that which

directly establishes an element of the crime."  *United States* v. *Gonzalez*, 110 F.3d 941, 942 (2d

Cir. 1997).  As the Second Circuit has explained, "[t]o be relevant, evidence need only tend to

prove the government's case, and evidence that adds context and dimension to the government's

proof of the charges can have that tendency."  *Id.* at 941; *accord United States* v. *Coonan*, 938

F.2d 1553, 1561 (2d Cir. 1991); *United States* v. *Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) (evidence

of prior false statements admitted to provide the jury with the complete story of the crimes

charged, including defendant's knowledge and intent, and to demonstrate the context of certain

events relevant to the charged offense).  Such evidence is not subject to a Rule 404(b) analysis

because it is direct evidence of the charged crime.

### C.    Discussion

#### 1.    Evidence of the Investment Fraud and Bank Fraud Is Admissible Pursuant to Rule 404(b)

Given the nature of Tucker's likely defense, the Court should permit the Government to

introduce evidence of the Investment Fraud and the Bank Fraud in its case-in-chief.  Not only

has Tucker not conceded knowledge or intent with respect to any of the charged offenses,

Tucker's planned advice of counsel defense and other statements in court filings make clear that

he intends to argue that he believes that his lending practices were lawful and therefore that he did not knowingly or intentionally commit any crime. Tucker's likely focus on his knowledge and intent is not surprising given that there is likely to be no serious dispute that the Tucker Payday Lenders issued payday loans to customers, charged interest on those loans that exceeded the amounts allowed under state usury laws, and represented to customers that the loans were lawful because they were extended by tribes. Instead, the defendants are expected to take the position that they believed that their operation of the Tucker Payday Lenders and the nominal ownership of the Tucker Payday Lenders by tribal corporations lawfully permitted them to charge and collect interest in excess of the interest rates allowed under state usury laws. Because the defendants' knowledge and intent will likely be central to the trial, the Government is entitled to offer evidence under Rule 404(b) against Tucker in its case-in-chief to establish his knowledge, intent, plan, opportunity, and absence of mistake.

First, evidence of the Investment Fraud is admissible under Rule 404(b) to rebut any claim by the defendant that he lacked the requisite knowledge or intent to commit the charged crimes, or to prove his motive, opportunity, preparation, plan, or absence of mistake or accident with respect to the charged crimes. The Investment Fraud is highly probative of the defendant's knowledge and intent with respect to the scheme charged in the S1 Indictment. In this case, the defendant is charged with concealing his ownership and control of the payday lending businesses by falsely claiming that he was a mere employee of Indian tribes who were the true lenders and owners of the businesses. As part of the Investment Fraud, Tucker falsely represented to borrowers that he operated a loan brokerage owned by various well known financial institutions in order to convince others to pay him advance fees. Since the Investment Fraud and the instant scheme involve Tucker's fraudulent attempt to conceal his ownership and true role in lending

businesses, evidence of the Investment Fraud will be probative of Tucker's knowledge and intent to evade state laws by forming sham relationships with Indian tribes and using those sham relationships as a basis to make misrepresentations to borrowers in order to collect illegal interest, and the absence of any mistake by Tucker in doing so. *See United States* v. *Chestnut*, 533 F.2d 40, 49 (2d Cir. 1976) (Probative value of 404(b) evidence "is dependent on the existence of a 'close parallel' between the crime charged and the acts shown [under Rule 404(b)]."); *United States* v. *Gordon*, 987 F.2d 902, 908-09 (2d Cir. 1993) ("Evidence that the defendant had a prior conviction for nearly identical counterfeiting activity was admissible to rebut his claim that he had not known that he received counterfeit money.").

Second, evidence of the Bank Fraud should similarly be admissible under Rule 404(b) because it is yet another instance of Tucker making false representations about his ownership in the context of lending, this time being a vehicle that he pledged as collateral for a $50,000 loan. Tucker's false statement to the bank that he was the owner of a Porsche he sold months before is probative of his knowledge and intent to make false statements in order to illegally obtain money, whether that be access to financing or illegal interest. Further, Tucker's provision of a false title to corroborate his lie to the bank is probative of his knowledge and fraudulent intent, as well as his overall plan and absence of mistake here in making false representations to borrowers and using false documents to create the false impression of tribal ownership and control over the Tucker Payday Lenders.

The Second Circuit's decision in *Kalish* is particularly analogous. In that case, the defendant, in his capacity as a corporate officer, entered a plea of guilty to mail fraud on behalf of a corporation, and the district court admitted the transcript of the plea allocution, the criminal information charging the mail fraud, and the plea agreement signed by the defendant. *Kalish*,

403 F. App'x at 546. The Second Circuit agreed with the trial court that, since evidence of the mail fraud conviction demonstrated the defendant's "'knowledge that [he] had to be careful in making representations to borrowers [and] potential borrowers[] that would mislead them' and his 'knowledge of the unlawful nature of conduct which would mislead or tend to mislead the borrowers,'" and that "[d]emonstrating such knowledge is *clearly* a proper purpose." *Id.* at 546-47 (emphasis added). Further, the Second Circuit found that the evidence was "relevant to whether [the defendant] had the necessary intent to defraud" and that the jury could reasonably infer that the defendant's "awareness of the illegality of conduct tending to mislead potential borrowers . . . demonstrated an intent to defraud." *Id.* at 547. The Investment Fraud and Bank Fraud are admissible for precisely the same reasons set forth in *Kalish*, namely that they demonstrate Tucker's knowledge of the illegality of making false representations in the lending context and, together with evidence of the misrepresentations made by the Tucker Payday Lenders at the defendants' direction, evince an intent to defraud.

The Investment Fraud and Bank Fraud are also not too remote. The offense conduct alleged in the S1 Indictment began in or around 1997 when Tucker first became involved in payday lending, which is just seven years after the Investment Fraud took place and within ten years of the Bank Fraud. Importantly, throughout this entire time period, Tucker followed the same model of fraudulent conduct with respect to his payday lending businesses – entering into sham business relationships and making false statements in order to conceal his ownership and control of the businesses and evade applicable state laws that capped interest rates. Because the both the Investment Fraud and the Bank Fraud took place within ten years of the beginning of this offense conduct, and given the similarity between the underlying conduct of those frauds and the underlying conduct here, the Investment Fraud and the Bank Fraud are highly probative of

the defendant's knowledge and intent to defraud from the beginning of his involvement in

payday lending through the end.

> ## 2. The Bankruptcy Petition is Admissible Both as Direct Evidence and Pursuant to Rule 404(b)

Evidence of Tucker's false statements in the Bankruptcy Petition are admissible as direct

evidence of the charged offenses because they are necessary to complete the story of the

defendants' crimes at trial.  In filing for bankruptcy, Tucker sought to improve his financial

position by clearing his debts at a time he was launching his new payday lending businesses.  By

lying in the Bankruptcy Petition about his position in and ownership of NLS, Tucker sought to

protect his newly-formed payday lending entity and seed capital he had received for the purpose

of building that business.  Tucker's failure to disclose his ownership of NLS in the Bankruptcy

Petition was also one instance of Tucker's repeated efforts throughout the scheme to deny his

ownership and control over the payday lending businesses.  Therefore, Tucker's false statements

in the Bankruptcy Petition complete the story of defendant's scheme.  *United States* v. *Mercado*,

573 F.3d 138, 141 (2d Cir. 2009) (holding that prior bad acts were properly admitted to show

"background for the events alleged in the indictment and enabl[ing] the jury to understand the

complete story of the crimes charged" (quotation omitted)).

Alternatively, if not admitted as direct evidence, evidence of the false statements in the

Bankruptcy Petition are admissible under Rule 404(b) for largely the same reasons as the

Investment Fraud and the Bank Fraud.  Tucker's false statements under penalty of perjury about

his position in and ownership of NLS closely parallel Tucker's conduct in concealing his

ownership and control of the Tucker Payday Lenders and is highly probative of his knowledge

and intent to defraud, as well as any absence of mistake by Tucker.  The Bankruptcy Petition is

also not remote in that the material omissions therein were made in or around the beginning of

the offense conduct in 1997 and therefore probative of Tucker's state of mind at the inception of the fraud.

### 3. Evidence of the Investment Fraud, Bank Fraud, and the Bankruptcy Petition Is Not Unduly Prejudicial

Finally, evidence of the Investment Fraud, Bank Fraud, and the Bankruptcy Petition would not be unfairly prejudicial pursuant to Rule 403. Neither involves conduct "more sensational or disturbing" than the charged offense and any *unfair* prejudice is therefore minimal. *See Roldan-Zapata*, 916 F.2d at 804. Indeed, given the limited scope and duration of the conduct relevant to the Investment and Bank Frauds and the Bankruptcy Petition compared to the instant offense conduct, the former are significantly less sensational than the evidence the Government intends to introduce at trial. Moreover, the limited evidence the Government intends to introduce regarding the Investment and Bank Frauds and the Bankruptcy Petition minimizes any danger of unfair prejudice or confusion of the issues, which does not outweigh—let alone substantially so—the evidence's probative value. *See* Fed. R. Evid. 403. Finally, any prejudicial effect may be further reduced with a limiting instruction, *Huddleston*, 485 U.S. at 691-92, which would sufficiently mitigate the possibility that the jury might draw improper inferences from this evidence.

In light of the significant non-propensity purposes for which evidence of the Investment Fraud, Bank Fraud, and the Bankruptcy Petition is being offered, their unsensational nature, and the Second Circuit's approval in the Rule 404(b) context of limiting instructions to cure any possibility of unfair prejudice, there is no basis for contending that any "unfair prejudice"

"substantially outweighs" the probative value of the proffered evidence and the Court should

find that such evidence is admissible.[2]

## II. Defendants Should Be Precluded from Admitting Evidence of Court Decisions and Orders Involving the Defendants and the Tucker Payday Lenders

The Defendants have informed the Government that they may seek to introduce evidence

of various court decisions and orders in other proceedings brought against them and the Tucker

Payday Lenders.  While the existence of these proceedings and the submission of materially false

and misleading affidavits by the defendants in connection with those proceedings are highly

relevant to the offense conduct as alleged in the Indictment, any court decisions and orders in

those proceedings are of little probative value and must be precluded under Rule 403 because

their admission would unfairly prejudice both parties, significantly confuse and mislead the jury,

and be a waste of time.

### A. Relevant Facts

As alleged in the S1 Indictment, the Tucker Payday Lenders received complaints from

thousands of customers across the country, as well as numerous state regulators and consumer

protection groups, about their deceptive, misleading, and usurious practices.  (S1 Indictment ¶ 5.)

Beginning in 2003, several states filed lawsuits to stop the Tucker Payday Lenders from

extending usurious loans to their citizens in violation of state law.  (*Id.*)  In order to defeat the

state lawsuits, the defendants prepared and submitted materially false and misleading affidavits

about the relationships between Indian tribes and the Tucker Payday Lenders to create the false

_____

[2] Should the Court admit evidence of the Investment Fraud, Bank Fraud, and the false statements in the Bankruptcy Petition pursuant to Rule 404(b), the Government would also be able to cross-examine the defendant about them if he were to testify.  Should the Court deny the Government's motion *in limine*, however, the evidence is separately admissible if the defendant testifies at trial as impeachment evidence under Federal Rules of Evidence 608(b) and 609.  The Government will submit supplemental briefing on this issue if necessary.

impression that the tribes played a substantial role in the ownership and operation of the Tucker Payday Lenders (the "False Affidavits"). (*Id.* ¶ 6.) Relying in part on the False Affidavits, state courts in Colorado and, at least initially, in California, dismissed certain state lawsuits on "tribal sovereign immunity" grounds. (*Id.*); *see Colorado* v. *Cash Advance*, No. 05 Civ. 143, 2012 WL 3113527 (Colo. Dist. Ct. Feb. 18, 2012) (finding, after remand on appeal, that certain of the Tucker Payday Lenders were immune from state action because of tribal sovereign immunity); *People* v. *Ameriloan,* No. BC373536, 2012 WL 8969009, at *5 (Cal. Super. Ct. May 10, 2012) (same), *aff'd sub nom. People* v. *Miami National Enterprises*, 223 Cal. App. 4th 21 (Cal. Ct. App. 2014), *rev'd* 2016 Cal. LEXIS 9626 (Cal. Dec. 22, 2016).

The Colorado and California cases also involved multiple appeals discussing the standards for determining whether the Tucker Payday Lenders involved were entitled to tribal sovereign immunity. *See Cash Advance & Preferred Cash Loans* v. *Colo. ex rel. Suthers*, 242 P.3d 1099 (Colo. 2010) (remanding for determination whether the Tucker Payday Lenders are "arms" of the tribes and "therefore entitled to those federally recognized tribes' sovereign immunity"); *Ameriloan* v. *Superior Court*, 169 Cal. App. 4th 81, 98 (Cal. App. 2d Dist. 2008) (remanding for determination of whether the entities are sufficiently related to the tribe to benefit from the application of sovereign immunity). As noted above, the California trial court's determination that the Tucker Payday Lenders were entitled to tribal immunity was affirmed by the California Court of Appeals but reversed by the Supreme Court of California last month. *Miami National Enterprises*, 2016 Cal. LEXIS 9626 (holding that, on the record before it,

entities affiliated with certain Tucker Payday Lenders failed to show by a preponderance of the evidence that they are entitled to tribal immunity as an arm of an affiliated tribe).[3]

Finally, as the Court is aware, the Federal Trade Commission ("FTC") also filed suit against Tucker and certain of the Tucker Payday Lenders asserting that their "high-fee, short-term payday loans" violated the Federal Trade Commission Act of 1914, 15 § U.S.C. 45(a)(1), TILA, 15 U.S.C. § 1601(a), and Regulation Z, 12 C.F.R. § 226.1(a) (the "FTC Suit"). *FTC* v. *AMG Servs.*, No. 12 Civ. 536, 2016 U.S. Dist. LEXIS 135765, at *6 (D. Nev. Sept. 30, 2016); (*see* Timothy Muir Memorandum in Support of His Motion to Dismiss Counts 1-4 (ECF No. 39) (Muir Mem.) at 20 (stating that the FTC Case "is the only case in which all three of the federally recognized Indian tribes implicated with this indictment were involved in litigation together regarding the tribal loans they made nation-wide over the Internet."). In the FTC Suit, the District Court granted, among other things, summary judgment in favor of the FTC, permanent injunctive relief against Tucker and certain of the Tucker Payday Lenders banning them from consumer lending, and a monetary judgment consisting of more than $1.27 billion. *Id.* at *43-53.

---

[3] The Supreme Court of California found that there was "scant evidence that either tribe actually controls, oversees, or significantly benefits from the underlying business operations of the online lenders." *Miami National Enterprises*, 2016 Cal. LEXIS 9626, at *48. Specifically, among other things, the court explained that (1) "the bulk of AMG's operations are conducted in Kansas, outside the boundaries of the Miami Tribe," *id.* at *52; (2) the tribes are not "directly liable for any judgment against the online lenders under applicable tribal laws," *id.* at *53, and (3) "after 2008 revenues from the lending businesses were extensively commingled with revenues from other, unrelated commercial enterprises controlled by the Tuckers, and those commingled funds could be spent at the Tuckers' discretion . . . including a private residence in Aspen, Colorado, chartered flights to auto racing events, and several luxury automobiles," *id.* at *56. The Supreme Court of California expressed no view on whether the parties had an opportunity to litigate these issues under the legal standards that it set forth and remanded the case to the trial court for further proceedings consistent with its decision.

### B.    Applicable Law

Federal Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Federal Rule of Evidence 402, in turn, provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority." Fed. R. Evid. 402.  "Further, under Rule 403, the district court may exclude even relevant evidence if it finds that the 'probative value [of the evidence] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.'" *United States* v. *Crowley*, 318 F.3d 401, 417 (2d Cir. 2003) (quoting *United States* v. *Flaharty*, 295 F.3d 182, 191 (2d Cir. 2002) and citing Fed. R. Evid. 403).  Trial courts have "broad discretion" in conducting the balancing under Rule 403.  *See United States* v. *Awadallah*, 436 F.3d 125, 134 (2d Cir. 2006).

Hearsay is a declarant's out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement." *United States* v. *Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) (quoting Fed. R. Evid. 801(c)).  Hearsay is admissible only if it falls within an enumerated exception. *Id.*  However, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." *Id.* (quoting Fed. R. Evid. 801(c) advisory committee's note).

## C.    Discussion

The state court decisions discussed above as well as any court rulings in the FTC Suit, whether favorable or unfavorable to the Government, should not be admitted for several reasons. First, the court rulings are inadmissible hearsay unless the defendants are offering them for a non-hearsay purpose.  *See Blue Cross and Blue Shield of New Jersey, Inc.* v. *Philip Morris, Inc.*, 141 F. Supp. 2d 320, 323 (E.D.N.Y. 2001) ("Judicial findings in other cases proffered as evidence are generally characterized as inadmissible hearsay.").  It is unclear to the Government at this time for what such purpose the defendants will be seeking to admit the court rulings. Assuming that they seek to admit the court rulings for their effect on the state of mind of the defendants in operating the Tucker Payday Lenders, the court rulings have little relevance here. To begin with, as explained more fully in the Government's opposition to the defendants' motion to dismiss, the state court rulings in question had—by their own clear terms—little to do with the questions the jury in this case must decide.  (*See* Gov't Opp'n to Defs.' Mot. to Dismiss (ECF No. 103) at 11-13.)  Thus, the defendants cannot claim that these decisions on separate legal matters are relevant to their state of mind as to the charged crimes here.

Moreover, the rulings favorable to the defendants were issued many years after the offense conduct began, and several years after Muir joined the Tucker's payday lending organization.  Because those rulings considerably post-date much of the criminal activity alleged here, the defendants cannot claim that these rulings meaningfully affected their state of mind as to the legality of their conduct.  Put simply, Tucker and Muir cannot be claiming that when they were deeply involved in payday lending through nominally tribal entities in 2006 (to pick one year), they believed their actions were legal because of a 2012 state court ruling.

Even if under Rule 403 the court rulings had any probative value, any such probative value would be substantially outweighed by the substantial risk of unfair prejudice, confusion of the issues, misleading of the jury, and waste of time. The confusion to the jury caused from admission of court decisions is apparent from simply the nearly 10-page summary of these decisions in Muir's motion to dismiss. (*See* Muir Mem. at 15-23.) Further, the appellate history underlying these other cases is complicated, would mislead the jury, and would be both difficult for the jury to understand and an unnecessary distraction. Importantly, the decisions issued by the state courts as well as in the FTC Suit include findings of fact by judges regarding certain factual issues in dispute that will need to be determined by the jury at the trial of this case, namely the ownership of the Tucker Payday Lenders, their operation by the defendants, the involvement or lack of involvement by Indian tribes and whether the loan disclosures issued to customers by the Tucker Payday Lenders were false and misleading.

The risk of unfair prejudice to both the Government and the defendants from the introduction of judicial findings from different courts involving different parties – which are inconsistent with each other – on the issues in dispute in this case is very high, and will likely lead to jurors placing undue burden on fact-finding by judges as well as confusion. *See, e.g.*, *United States* v. *Miller*, 626 F.3d 682, 689-690 (2d Cir. 2010) (affirming decision to preclude any mention of a court order as irrelevant and confusing under Rule 403); *Highland Capital Mgmt., L.P.* v. *Schneider*, No. 02 Civ. 8098, 2008 U.S. Dist. LEXIS 63874, at *35-36 (S.D.N.Y. Aug. 20, 2008) (finding that a court "opinion from another jurisdiction, in a case between different parties, from many years prior" was inadmissible hearsay, not relevant under Rule 401, and excludable under Rule 403 because "the jury may have given undue weight to any reference by defendants to [the opinion]" and reference to the court opinion "was likely to cause juror

confusion."); *see also Nipper* v. *Snipes*, 7 F.3d 415, 418 (4th Cir. 1993) ("[J]udicial findings of fact present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, creating a serious danger of unfair prejudice." (citation and internal quotation marks omitted)).

In fact, the risk of unfair prejudice and confusion to the jury is even higher in this case because the court decisions the defendants seek to introduce were based at least in part on the False Affidavits. And, by virtue of the different standards applicable in civil cases, still more juror confusion will be caused by the fact that the court decisions were governed by a preponderance standard, which is significantly different than the criminal standard of guilty beyond a reasonable doubt applicable in the trial.

For the reasons set forth above, the Government respectfully requests that the Court preclude admission of any court decisions or orders at trial by the defendants. As noted above, the Government will seek to admit the fact of these other court cases and the submission of materially false and misleading affidavits in connection with these cases as relevant to the fraudulent scheme perpetrated by the defendants, their pattern of making false representations, and their state of mind. Those facts, however, form part of the story of the defendants' offense conduct, and are thus admissible even though the opinions of state courts and a federal agency on separate legal questions are not.

## III. The Government Should Be Permitted to Introduce Statements by a Coconspirator in Furtherance of Defendants' Conspiracy

During the conspiracy charged in the S1 Indictment, the tribal official who was the nominal head of several Tucker Payday Lenders made statements to other tribal employees in order to convince those employees not to disrupt the existing arrangement with Tucker despite their increasing concerns about the legality of these business. The Government intends to admit

these statements, which were in furtherance of the charged conspiracy, by playing relevant portions of the recordings and providing transcriptions to the jury.

A.      **Relevant Facts**

As the Government will establish at trial, during most of the conspiracy charged in the S1 Indictment, Don Brady, a Miami tribal official, served as the nominal chief executive of certain Tucker Payday Lenders and related businesses.  In that capacity, Brady signed several documents on behalf of these businesses that falsely asserted that the tribe owned and operated the businesses and that he was their bona fide chief executive, including declarations signed by Brady that the Miami tribe has admitted in connection with its non-prosecution agreement with the Government were "false, in part, because they overstated the involvement of such former representative and that of the Miami and/or entities controlled by the Miami in the operations of the loan business."  Brady signed these documents despite knowing that neither he nor the tribe had any actual authority over the businesses which, in reality, Tucker both owned and operated with Muir's assistance.

In 2012, after the Federal Trade Commission announced charges against the Tucker Payday Lenders and during the charged conspiracy, Brady made certain statements to other tribal officers and employees that were recorded.  Many of these statements were made during meetings of the boards of certain tribal entities to tribal officers who had previously been uninvolved in and unaware of many aspects of how the business had been run, but had grown concerned by recent legal developments and their possible implications for the tribe.  In these conversations, Brady sought to persuade the other tribal employees not to disrupt the tribe's existing business relationship with Tucker by, among other things, demanding additional financial records or access to additional funds that they had discovered were in nominally tribal

accounts.  During these statements, Brady also assured these officials that any legal consequences from the conduct would be imposed on Tucker and not the Tribe.

For example, during one recorded conversation with another tribal employee regarding bank accounts in the names of nominally tribal entities, Brady stated[4] that "that's all their money"—referring to Tucker and other  non-tribal entities and individuals—"and [] always has been and so us laying claim to that because of the business model that we've used is not correct." Brady further elaborated "in the real world they're Scott's [referring to Tucker] portfolios.  They may be worth $80 million, but they're not ours to sell. . . .  Everybody's assuming we have all these rights here and there, and only thing that we have even been involved in is giving our sovereign immunity to help protect all of Scott's money and all of his enterprise and all of the, everything.  That's our extent of our participation.  For us to start claiming that we have this coming or this coming, or it's not fair unless we get so many millions and so forth, I mean, this is all crazy."  After reiterating that "[i]t's still not our money, and it's not our portfolio" the other employee responds "Well, but we've represented that it is.  We've represented that we owned 100% of the business" and "that's a very dangerous position for us to be in though, and I think that's what everybody's concerned about . . . .  I would hate to see you go away to, you know, on a state-paid vacation."  Ultimately, Brady responds that "the only one that's . . . going to be unhappy here is the IRS, but they'll be happy if they get their big pot of money, which would come from Scott one way or the other.  It won't be from us."

---

[4] The quotations included herein are based on transcriptions of the conversations that the Government obtained as part of its investigation and has produced in discovery.  The Government will review and verify the accuracy of the transcriptions, and correct them as appropriate, prior to offering them as evidence at trial.

### B.  Applicable Law

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy."   To admit a statement under Rule 801(d)(2)(E), the Court must find only by a preponderance of the evidence "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy."  *United States* v. *Coppola*, 671 F.3d 220, 246 (2d Cir. 2012).

To be in furtherance of a conspiracy, the statement must in some way have been designed to promote or facilitate achievement of a goal of the ongoing conspiracy.  Thus, statements are in furtherance of the conspiracy if they (1) inform or provide an update as to the status or progress of the conspiracy, *see United States* v. *Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990); (3) "seek to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158 (internal quotations omitted); (4) "provide reassurance," *id*.; (5) "serve to foster trust and cohesiveness," *id*.; (6) "facilitate and protect" the conspiratorial activities, *United States* v. *Diaz*, 176 F.3d 52, 87 (2d Cir. 1999); or (7) inform a co-conspirator of "the identity and activities of his co-conspirators," *United States* v. *Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989).  A narrative description of a past event is admissible as long as it serves "some current purpose in the conspiracy."  *United States* v. *Thai*, 29 F.3d 785, 813 (2d Cir. 1994); *see also United States* v. *Lozano-Reyes*, No. 95-1707, 1996 U.S. App. LEXIS 14182, at *5 (2d Cir. June 12, 1996) (affirming the trial court's admission of co-conspirator statements relating to past events because the statements served a current purpose in the conspiracy, namely, "to engender trust, to increase [the witness's] familiarity with the

conspiracy's modus operandi, and to outline future conspiratorial actions and the anticipated profits.").

Under Rule 104 of the Federal Rules of Evidence, a District Court may consider a statement itself in assessing the existence of a conspiracy and whether the defendant and the declarant were members therein. *See* Fed. R. Evid. 104(a); *Bourjaily* v. *United States*, 483 U.S. 171, 180-81 (1987); *United States* v. *Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). In addition, while "there must be some independent corroborating evidence of the defendant's participation in the conspiracy," *Gigante*, 166 F.3d at 82, that independent evidence need not itself be admissible. *See* Fed. R. Evid. 104(a); *Bourjaily*, 483 U.S. at 178. The Second Circuit has also made clear that "statements proffered as co-conspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence" establishing that a conspiracy involving the defendant existed. *United States* v. *Tracy,* 12 F.3d 1186, 1199 (2d Cir. 1993) (citing *United States* v. *Geaney,* 417 F.2d 116, 1120 (2d Cir. 1969)).

### C. Discussion

Here, the Government expects to introduce evidence that the conspiracy charged in the S1 Indictment existed, and that, in addition to Tucker and Muir, certain tribal officials including Brady, who helped create a false appearance about the nature of the tribe's role and involvement, were members of that conspiracy.

The statements described above were also in furtherance of the charged conspiracy. During these conversations, Brady sought to promote and facilitate the conspiracy by seeking to convince tribal officers not to disrupt the tribe's preexisting relationship with Tucker by, among other things, demanding financial information that Tucker had not typically provided or staking claims over money in nominally tribal accounts that was understood by the coconspirators to belong to Tucker. Brady also sought to reassure tribal officers who were concerned about the

tribe's legal exposure. As such, these statements informed the listeners about how the conspiracy had been working, updated them on recent developments and sought to persuade them to act – and avoid acting – in ways that would harm the ongoing viability of the conspiracy. In light of the foregoing, the Court can and should find by a preponderance, after submission of the Government evidence, "(a) that there was a conspiracy," "(b) that its members included" Brady "and the part[ies] against whom the statement is offered," the defendants, and "(c) that the statement(s) w[ere] made during the course of and in furtherance of the conspiracy." *Coppola*, 671 F.3d at 246.

## IV. Defendants Should Be Prohibited From Offering or Eliciting Evidence Concerning Advice of Counsel

Tucker has indicated to the Government that he intends to raise an advice of counsel defense at trial. Muir has indicated to the Government that although he cannot raise an advice-of-counsel defense (because he was himself counsel to the payday lending operation in question), he intends to rely in his defense on the opinions of other attorneys as to the legality of the payday lending operation. This Court should (1) direct Tucker to produce to the Government all advice he received concerning the legality of payday lending operation, including the advice on which he intends to rely, so that it can assess whether his advice of counsel defense fails as a matter of law; and (2) prohibit Muir from introducing or eliciting evidence concerning the legal opinions of non-parties.

### A. Applicable Law

To benefit from an advice of counsel defense, a defendant must show that she (1) honestly and in good faith sought the advice of counsel; (2) fully and honestly laid all the facts before his counsel; and (3) in good faith and honestly followed counsel's advice, believing it to be correct and intending that her acts be lawful. *United States* v. *Colasuomo*, 697 F.3d 164, 181

(2d Cir. 2012).  Where a defendant cannot make such a showing, argument and evidence of advice of counsel may be precluded.  To be sure, "[u]pon a proper request, a defendant is entitled to a jury instruction on any defense theory for which there is a foundation in the evidence, even if the trial court determines that the evidentiary foundation of the defense theory is only tenuous."  *United States* v. *Paul,* 110 F.3d 869, 871 (2d Cir. 1997) (citations omitted).  It is equally well-established, however, that a court may conduct a pre-trial evidentiary hearing "to determine whether a defense fails as a matter of law."  *Id.*; *see also United States* v. *Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990) (approving pre-trial hearing to determine whether evidence of duress or coercion failed as a matter of law).  "If, after the hearing, the court finds that the defendant's evidence is insufficient as a matter of law to establish the defense, the court is under no duty to give the requested jury charge or to allow the defendant to present the evidence to the jury."  *Paul*, 110 F.3d at 871.

Raising an advice of counsel defense also triggers practical consequences as to discovery.  By asserting an advice of counsel defense, and thereby relying on otherwise privileged attorney-client communications, a defendant waives privilege over all other attorney-client communications about the same subject matter.  "[A] party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party."  *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000); *see also id.* at 183 n.4 ("The client's offer of his own or the attorney's testimony as to a specific communication to the attorney is a waiver as to all other communications to the attorney on the same matter." (citation and quotation marks omitted)); Fed. R. Evid. 502(a).

### B. Discussion

#### 1. Tucker's Advice of Counsel Defense May Fail as a Matter of Law

There is good reason to believe that any attempt by Tucker to suggest he relied on the advice of counsel would fail as a matter of law. Among other things, as another court examining this same scheme recently noted, "no applicable law or precedent" supports the theory that defendants now claim rendered their actions legal. *United States* v. *Hallinan et al.*, No. 16 Cr. 130 (E.D. Pa. Dec. 29, 2016). Moreover, even assuming this theory—that Indian tribes can ignore state law when extending loans over the Internet—had any legal support, Tucker does not appear to have followed what legal advice he received. In part because Tucker disclosed some of the legal advice he received to third parties including the tribes he partnered with, the Government is already privy to some (but likely not all) of the legal advice Tucker received concerning his payday lending operations. Contrary to the manner in which Tucker actually operated his businesses, that advice posited, among other things, that the lending businesses in question would be located on tribal land and the tribes would actually serve as the lenders. *See* Preston Gates Letter dated July 28, 2003, at 7-8 (attached as Exhibit C).

If, as appears to be the case, Tucker's advice of counsel defense fails as a matter of law, then he should not be able to present evidence supporting it to the jury. *Paul*, 110 F.3d at 871. That is especially true here, because presenting evidence that attorneys were involved in an illegal transaction may lead a jury to believe that a lawyer "'blessed' the legality of" a transaction, which "misunderstanding would give the defendant all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense." *S.E.C.* v. *Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y. 2013).

This Court should therefore require Tucker to disclose to the Government, no later than the date of his response to the Government's motions *in limine* (due February 17, 2017), all advice he received concerning the legality of payday lending operation, including the advice of counsel on which he intends to rely and advice Tucker received that would tend to undermine his asserted defense. *See In re Grand Jury Proceedings*, 219 F.3d at 182 (attorney-client privilege waived upon assertion of advice of counsel defense); *see, e.g.*, *United States* v. *Hatfield*, 2010 WL 183522, *13 (E.D.N.Y. Jan. 8, 2010) (ordering defendants "to disclose all documents concerning their intended advice of counsel defense" including "also all documents (including attorney-client and attorney work product documents) that might impeach or undermine such a defense"). If after this disclosure the Government continues to believe any advice of counsel defense would fail as a matter of law, the Government will then move in or before its reply brief (due March 17, 2017) for an evidentiary hearing to resolve that question. *See Paul*, 110 F.3d at 871.

## 2. Muir Should Not Be Permitted to Introduce Evidence Concerning the Legal Opinions of Non-Parties

As the Government understands Muir's position, while acknowledging that he cannot raise an advice of counsel defense, he nonetheless intends to introduce evidence showing that lawyers (other than himself) provided advice concerning the charged conduct. That proposition refutes itself: If a defendant cannot meet the requirements of an advice of counsel defense, then he cannot offer the advice of counsel in his defense.

"It is well settled that ignorance of the law or mistake as to the law's requirements is no defense to criminal conduct." *United States* v. *Durrani*, 835 F.2d 410, 422 (2d Cir. 1987). The advice of counsel defense represents a rare exception to that rule. *See id.* (noting similar exception for reliance on official interpretation of law); *Spirt* v. *Bechtel*, 232 F.2d 241 (2d Cir.

1956) (describing "advice of counsel exception"). But as discussed above, the defense requires specific showings, and if a defendant cannot make those showings as a matter of law, he cannot offer that defense to the jury.

Muir wishes to present evidence of the advice of counsel even while acknowledging that he cannot present an advice of counsel defense, thereby obtaining "all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense," *Tourre*, 950 F. Supp. 2d at 684. Such evidence would be both irrelevant under Rule 401, and prejudicial and confusing under Rule 403. Specifically, the evidence would be irrelevant because outside a proper advice of counsel defense, any evidence that Muir made mistakes of law has no bearing given that mistake of law is no defense. And it would be prejudicial and confusing because drawing attention to the presence or involvement of lawyers in an illegal transaction may suggest to a jury that these lawyers somehow "blessed" the crime and rendered defendants' participation in it lawful. *Id.* This Court should therefore prohibit Muir from offering evidence or argument about, or otherwise emphasizing, the presence of lawyers and any advice they offered him during his involvement in the charged conduct. *Id.*

## V.     This Court Should Instruct the Jury on the Relevant Elements of State Law

To prove an unlawful debt charge under RICO the Government must establish a debt "which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury[]" and "which was incurred in connection with . . . the business of lending money . . . at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6)(A), (B). The jury will therefore need to be instructed on the usury laws of the states in which Tucker's borrowers resided. *See, e.g.*, *United States* v. *Biasucci*, 786 F.2d 504, 512 (2d Cir. 1986) ("since the usurious loans charged in the indictment took place in New York, we look to New York usury law"); *see also*

Hon. Leonard B. Sand, *Modern Federal Jury Instructions*, Instr. 6.18.1962C-9 ("If it is alleged that the debt was unenforceable because of the laws relating to usury, the trial judge should consider defining usury and telling the jury the usury rate that applies."). For that reason, in its separately submitted request to charge, the Government has proposed jury instructions on the provisions of state law applicable in the various states where the Government intends to prove the defendants extended loans.

The defendants, however, have indicated to the Government that they believe some evidence concerning state law should be presented to the jury by the parties, or at least through means other than a jury instruction. It is unclear why that would be so. Instructing the jury on the law is plainly the Court's province. *See F.A.A.* v. *Landy*, 705 F.2d 624, 632 (2d Cir. 1983) (affirming exclusion of evidence concerning legal provisions, because admitting such evidence "would invade the province of the court to determine the applicable law and to instruct the jury as to that law"). And the courts in this District routinely instruct juries on state law provisions relevant to RICO charges. *See, e.g.*, *United States* v. *Carillo*, 229 F.3d 177, 182 (2d Cir. 2000) ("district judges conventionally instruct juries on the elements of the state law offenses charged as predicate acts" in RICO cases). There is no reason to depart from long-standing precedent in this case.[5]

---

[5]   To be sure, various Government witness will likely refer to their understanding that state usury laws existed. But such testimony would not be for the truth of the matter asserted; it would be to explain actions taken by the defendants that were taken because they knew such laws existed. Nor would that testimony describe the state law in detail—such as the precise interest rates allowable under state laws—sufficient for the jury to assess the lawfulness of the defendants' actions.

**VI.     The Defendants Should Be Precluded from Offering Evidence or Argument Concerning the Legality of or Policy Arguments Regarding Payday Lending**

Defense counsel has informed the Government that they intend to offer, in some form, argument or evidence concerning the general legality of, or policy arguments in favor of, payday lending.  Any such attempt by the defendants would be an irrelevant and inappropriate diversion to the trial, which is not the appropriate venue for the defendants to raise any policy arguments about the legality or propriety of payday lending or the payday lending industry generally.  The question in this case is whether the defendants' actions *were* legal; not whether payday lending in general *should be* legal, much less whether payday lending is socially pernicious.  Any arguments on the latter, irrelevant topics could only mislead or confuse the jury.

Such improper policy arguments may include, but are not limited to:  the public good or need served by payday lending; whether and under what circumstances payday should be legal; whether federal and state legislatures overreached in enacting consumer lending and consumer protection statutes; whether the federal government or Congress overreached in investigating, regulating, criminalizing, and prosecuting payday lenders; whether payday lending should be regulated or restricted in any way; whether federally recognized Indian Tribes engaged in payday lending should be permitted to use their sovereignty to evade state regulation; whether state usury laws are improper and should be amended or retracted; whether regulations or prosecutions against payday lenders are unfair or inappropriate; whether the Consumer Financial Protection Bureau ("CFPB"), the FTC, or any other government entity or agency unfairly regulates and/or targets the payday lending industry/business community; and whether the Department of Justice's "Operation Choke Point" was inappropriate and/or unfairly targeted the payday lending industry.

Indeed, Muir spent the first six pages of his memorandum in support of his motion to dismiss the RICO Counts by raising many of these policy issues. (*See* Muir Mem. at 1-6 ("[T]his indictment is about much more than Scott Tucker and Timothy Muir: it's about the executive branch usurping Congress' Constitutional authority over Indian tribes; it's about the current administration deciding it doesn't need Congress to weigh in on policy debates; and it's about the Department attempting to settle civil questions of law and enact federal policy through criminal indictments.").) It is also expected that the defendants may introduce evidence, in some form, of the more than 200-year history behind federal preemption of state usury laws, tribal law and sovereign immunity, and payday lending. (*See id.* at 6-13.) These sorts of policy arguments, any evidence in support of the same, and any lengthy history underlying these issues are entirely improper in a criminal jury trial, and the Government respectfully asks the Court to preclude any and all of it.

As discussed throughout, the Federal Rules of Evidence permit the introduction of evidence only if relevant to questions properly before the jury. Evidence and argument on policy and what the law should be does not qualify. *See, e.g.*, *United States* v. *Batista*, 684 F.3d 333, 342 (2d Cir. 2012) (discussing curative jury instruction reminding "jurors that their role was not to make a public policy determination, but to decide whether the government had met its burden of proving beyond a reasonable doubt each and every element of the charged crimes"). Further, evidence or argument that might encourage jury nullification has no place at trial. *United States* v. *Carr*, 424 F.3d 213, 220 (2d Cir. 2005) ("categorically reject[ing] the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur").

In the present case, any policy arguments or evidence pertaining to the payday lending industry or the history of payday lending are wholly inadmissible. First, under Rule 401, such argument or evidence is irrelevant, because it has no tendency to make the existence of any fact of consequence more or less probable. As an example, any witness testimony, or any argument by counsel (even by implication), that this case is "about the executive branch usurping Congress' Constitutional authority over Indian tribes" or that the Government "overreaches" when it prosecutes payday lenders has no import on any aspect of any disputed fact of consequence in this case; such arguments or evidence are entirely irrelevant to a criminal jury trial, and to the jury's determination of guilt. Second, under Rule 403, even if such arguments or evidence had any slight probative value – which there is not – any such slight probative value would be substantially outweighed by the obviously severe risk of unfair prejudice, confusion of the issues, and misleading the jury. Indeed, in a drug case, a heroin dealer may not present evidence or argument at a trial that the narcotics laws are unfair or improper; it would be the jury's duty only to apply the laws that exist, and not be confused or misled by such arguments or evidence. The same holds true here, where any such policy arguments or evidence must be precluded from use at trial. *See, e.g.*, *Batista*, 684 F.3d at 342. Finally, any evidence or argument regarding the policy debates surrounding payday lending would be a complete waste of the jury's time. Simply put, the defendants should not be able to distract the jury from their criminal conduct and the determination of their guilt beyond a reasonable doubt by engaging the jury in a policy debate that has no relevance whatsoever and distracts the juror's from their role in this case.

For the foregoing reasons, the Court should preclude any policy arguments and evidence regarding payday lending and the payday lending industry generally that are not relevant to the specific facts at issue in the trial.

## VII. Defendants Should Be Precluded from Introducing Evidence of Subjective Belief of Witnesses as to Legal Ownership

The Government has raised with defense counsel its position that the subjective beliefs of witnesses as to the legal ownership of the Tucker Payday Lenders is irrelevant and should not be elicited during trial because such evidence would confuse the jury and likely be given undue weight.

As discussed above, the S1 Indictment alleges that the defendants formed relationships with tribes which nominally owned the Tucker Payday Lenders to create the sham appearance of tribal ownership and control of the lenders so that the defendants could claim the protection of the tribes' sovereign immunity. In doing so, the defendants concealed their own ownership and control of the Tucker Payday Lenders. Given the nature of this scheme, testimony by witnesses regarding who they subjectively believed "owned" the Tucker Payday Lenders is not probative of who actually owned and controlled them and is likely to mislead and confuse the jury. Rather, the jury should make any determinations as to legal ownership and control based on, among other things, facts establishing who actually exercised control of the Tucker Payday Lenders, *e.g.,* who formed the corporate entities, who managed the lenders on a day-to-day basis, who controlled the finances of the Tucker Payday Lenders, and who made strategic decisions for the lenders. These topics are entirely appropriate areas of inquiry on both direct and cross-examination because they provide relevant information to the jury on ownership and control of the Tucker Payday Lenders.

The Government has discussed its position with the defendants, who have indicated that they do not necessarily oppose the Government but are not in a position to respond without information as to which witnesses the Government will be calling at trial and wish to consider this issue on a witness-by-witness basis. Accordingly, the Government will continue its discussions with the defendants regarding this issue and to the extent there is any disagreement that requires intervention by the Court, the Government will promptly advise the Court and provide any necessary briefing.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully requests that the Court (1) permit the Government to introduce evidence of the Investment Fraud, Bank Fraud, and false statements in the Bankruptcy Petition under Rule 404(b) and/or as direct evidence; (2) preclude the defendants under Rule 403 from admitting evidence of court decisions and orders in proceedings brought against Tucker and his payday lending businesses; (3) permit the Government pursuant to Rule 801 to introduce certain statements of a coconspirator in furtherance of the defendants' conspiracy; (4) direct Tucker to produce to the Government all advice he received concerning the legality of payday lending operation, including the advice on which he intends to rely as part of a planned advice of counsel defense, and prohibit Muir from introducing evidence concerning the legal advice of non-parties; (5) have the Court issue instructions to the jury on the relevant elements of state law; (6) preclude the defendant from offering evidence or argument to the jury concerning the legality of or policy arguments in favor of payday lending; and (7) preclude the

defendant from introducing evidence of the subjective belief of witnesses as to the ownership of various legal entities.

Dated:      New York, New York
             January 18, 2017

                               Respectfully submitted,

                               PREET BHARARA
                               United States Attorney for the
                               Southern District of New York

by: _____
                               Sagar K. Ravi / Hagan Scotten / Niketh Velamoor
                               Assistant United States Attorneys
                               (212) 637-2195 / 2410 / 1076

# EXHIBIT A

TIME STUDY CASE

Record Time Spent by Judge or Magistrate

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(KANSAS CITY DOCKET)

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
      v.                           )    No. 90-20086-01
                                   )
SCOTT ALAN TUCKER,                 )    90-00001-01-CR-W-5
                                   )
            Defendant.             )


I N D I C T M E N T

The Grand Jury charges that:

Count 1

That on or about the 28th day of March, 1990, at Overland
Park, in the District of Kansas,

SCOTT ALAN TUCKER,

having devised a scheme or artifice to defraud, or for obtaining
money or property by means of false or fraudulent pretenses,
representations, or promises, that is, by representing that he
operated a loan brokerage business known as Chase, Morgan, Stearns
and Lloyd, which was owned by Chase and Manhattan Bank, Lloyds of
London, and J. P. Morgan, and requiring advance fees from clients
in order to obtain either loans or letters of credit from lending
institutions, for the purpose of executing such scheme or artifice
or attempting so to do, did unlawfully and knowingly cause to be
delivered by mail according to the direction thereon, a letter
addressed to Chase, Morgan, Stearns and Lloyd, Building 35,
Corporate Woods, Overland Park, Kansas 66210, from Elastomer Seals,
Inc., Mario R. Trieste, 5 Ditomas Court, Copique, New York 11726,

ORIGINAL

Document # 3

when, in truth and fact, Chase, Morgan, Stearns and Lloyd was owned
by the defendant SCOTT ALAN TUCKER and he did not have access to
financing as represented to his clients, but made said false
representations for the purpose of obtaining money or property, in
violation of Title 18, United States Code, Sections 1341 and 2.

A TRUE BILL.

_____
FOREMAN

Dated: 12/5/90
_____
United States Attorney
District of Kansas

Bond Fixed At: $ 5,000.00 O/R
_____
JUDGE

(It is requested that trial of the above captioned case be held in
Kansas City, Kansas.)

2

AO 245 S (Rev. 4/90) Sheet 1 - Judgment in a ___nal Case

FILED

JUN 1 3 1991

R. F. O'CONNOR, JR.
U. S. DISTRICT COURT
WEST DISTRICT
OF MISSOURI

# United States District Court

_____ WESTERN _____ District of _____ MISSOURI _____

UNITED STATES OF AMERICA

v.

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 198?

SCOTT A. TUCKER

# 0035 445

Case Number:  91-00001-01-CR-W-5

(Name of Defendant)

Charles Atwell

Defendant's Attorney

RETURN TO
U. S. MARSHAL _____ after
KANSAS CITY MO.,

THE DEFENDANT:

☒ pleaded guilty to count(s) _____ 1 _____
☐ was found guilty on count(s) _____ after
plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offenses:

| Title & Section | Nature of Offense | | | Date Offense Concluded | Count Number(s) |
|---|---|---|---|---|---|
| 18:1341 and 2 | Use of mail in a scheme to defraud. | | | 03/28/90 | 1 |

The defendant is sentenced as provided in pages 2 through _____ 5 _____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____
and is discharged as to such count(s).
☐ Count(s) _____ (is)(are) dismissed on the motion of the United State
☒ It is ordered that the defendant shall pay a special assessment of $ _____ 50.00 _____, for count(
_____ 1 _____, which shall be due ☒ immediately  ☐ as follows:

IT IS FURTHER ORDERED that the defendant shall notify the United States attorney for this district withi 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Defendant's Soc. Sec. No.: _____

Defendant's Date of Birth: _____

Defendant's Mailing Address:

6810 Antioch - Apt. 252

Merriam, KS  66210

Defendant's Residence Address:

same as above

June 13, 1991

Date of Imposition of Sentence

Signature of Judicial Officer

SCOTT O. WRIGHT, Judge
Name & Title of Judicial Officer

June 13, 1991
Date

Defendant:        SCOTT A. TUCKER                     Judgment—Page __2__ of __5__
Case Number:     91-00001-01-CR-W-5

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of _____ twelve (12) months, said sentence of imprisonment is to _____. run concurrently with imprisonment ordered in Criminal Case Number 90-00163-01-CR-W-5 and to run concurrently with the state sentence currently under appeal.

THE COST OF IMPRISONMENT IS WAIVED.

☐ The Court makes the following recommendations to the Bureau of Prisons:

☐ The defendant is remanded to the custody of the United States Marshal.
☐ The defendant shall surrender to the United States Marshal for this district,

                a.m.
☐ at _____ p.m. on _____ .

☐ as notified by the Marshal.

☒ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons

☒ before 2 p.m. on ___July 02, 1991___.
☐ as notified by the United States Marshal.
☐ as notified by the Probation Office.

## RETURN

I have executed this Judgment as follows:

_____
_____
_____

Defendant delivered on _11-5-91_ to _Dismus House_ _____ at
_Kansas City, MO_ _____, with a certified copy of this Judgment.

                        _LARRY JOINES_
                        United States Marshal

                By _B. Powell_
                        Deputy Marshal

AO 245 S (Rev. 4/90) Sheet 3 - Supervised Release

Defendant:   SCOTT A. TUCKER                          Judgment—Page ____3____ of ___5___
Case Number: 91-00001-01-CR-W-5

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of _____

three (3) years, said term of supervised release is to run concurrently with
term of supervised release imposed this date on 90-00163-01-CR-W-5.

While on supervised release, the defendant shall not commit another federal, state, or local crime and shall not illegally possess a controlled substance. The defendant shall comply with the standard conditions that have been adopted by this court (set forth below). If this judgment imposes a restitution obligation, it shall be a condition of supervised release that the defendant pay any such restitution that remains unpaid at the commencement of the term of supervised release. The defendant shall comply with the following additional conditions:

☒ The defendant shall report in person to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

☐ The defendant shall pay any fines that remain unpaid at the commencement of the term of supervised release.

☒ The defendant shall not possess a firearm or destructive device.

The defendant shall make payments on the restitution during the period of incarcera-
tion and pay the balance during the period of supervised release.


COST OF SUPERVISED RELEASE IS WAIVED.


## STANDARD CONDITIONS OF SUPERVISION

While the defendant is on supervised release pursuant to this judgment, the defendant shall not commit another federal, state or local crime.   In addition

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer within 72 hours of any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement

AO 245 S (Rev. 4/90) Sheet 6 - Restitution and Forfeiture

Defendant:      SCOTT A. TUCKER
Case Number:    91-00001-01-CR-W-5

Judgment—Page   4   of   5

## RESTITUTION AND FORFEITURE

### RESTITUTION

☒ The defendant shall make restitution to the following persons in the following amounts:

| Name of Payee | Amount of Restitution |
|---|---|
| Mario R. Trieste | $2,500.00 |

Payments of restitution are to be made to:

☒ the United States Attorney for transfer to the payee(s).

☐ the payee(s).

Restitution shall be paid:

☐ in full immediately

☒ in full not later than _the completion of the term of supervised release._

☐ in equal monthly installments over a period of _____ months . The first payment is due on the date of this judgment. Subsequent payments are due monthly thereafter.

☒ in installments according to the following schedule of payments:  $1,617.00 per month during the term of supervised release.

   Payments on the restitution are to begin during the term of incarceration.

   Total restitution of $58,234.25 includes restitution ordered in 91-00163-01-CR-W-5 in the amount of $55,734.25.

Any payment shall be divided proportionately among the payees named unless otherwise specified here.

### FORFEITURE
☐ The defendant is ordered to forfeit the following property to the United States:

AO 245 S (Rev. 4/90) Sheet 7   Statement of Rea.

Defendant:        SCOTT A. TUCKER                    Judgment—Page __5__ of __5__
Case Number:      91-00001-01-CR-W-5

## STATEMENT OF REASONS

☒ The court adopts the factual findings and guideline application in the presentence report.

OR

☐ The court adopts the factual findings and guideline application in the presentence report except (see attachment, if necessary):

## Guideline Range Determined by the Court:

Total Offense Level: _____16_____

Criminal History Category: _____II_____

Imprisonment Range: __24__ to __30__ months

Supervised Release Range: __2__ to __3__ years

Fine Range: $ 90,850 _____ to $ 500,000 _____

    ☒ Fine is waived or is below the guideline range, because of the defendant's inability to pay

Restitution: $ 2,500 _____

    ☐ Full restitution is not ordered for the following reason(s):

☐ The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by application of the guidelines.

OR

☐ The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reason(s):

OR

The sentence departs from the guideline range

    ☒ upon motion of the government, as a result of defendant's substantial assistance.

    ☐ for the following reason(s):

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )   NO. 90-00163-01-CR-W-5
             Plaintiff,         )
                                )   18 U.S.C. § 1014
      v.                        )   NMT:  2 years and $250,000
                                )   NLT:  1 year supervised release
SCOTT A. TUCKER,                )   Class E Felony
[DOB: 05-29-62]                 )
                                )   $50 Mandatory Special Assessment
             Defendant.         )

                        I N D I C T M E N T

     THE GRAND JURY CHARGES THAT:

     On or about April 11, 1988, in the Western District of
Missouri, SCOTT A. TUCKER did knowingly and willfully make a
false report and statement of material fact for the purpose of
influencing the actions of American Bank of Kansas City,
Missouri, the deposits of which were insured by the Federal
Deposit Insurance Corporation, on a loan, that is, SCOTT A.
TUCKER, d/b/a Hyline Motors, in pledging a 1987 Porsche, V.I.N.
WPOJB092XHS860703, as collateral for a $50,000 loan, presented a
duplicate title showing Hyline Motors as the owner of the 1987
Porsche, when in truth and fact, as SCOTT A. TUCKER well knew, he
had sold the same 1987 Porsche on January 27, 1988, to Bramos
Porsche of Smyrna, Georgia; all in violation of Title 18, United
States Code, Section 1014.

                                    A TRUE BILL.

                                    Sheila C. Palmer
                                    FOREPERSON OF THE GRAND JURY

Matt J. Whitworth
MATT J. WHITWORTH   #33322
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

FILED
SEP. 28 1992
A. F. CONNOR, CM,
U.S. DISTRICT COURT
WEST DISTRICT
OF MISSOURI

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
      v.                        )    No. 90-00163-01-CR-W-5
                                )
SCOTT TUCKER,                   )
                                )
            Defendant.          )

## PLEA AGREEMENT

1. The parties to this agreement are the defendant, Scott Tucker, by and through his attorney Ron Wood, and Matt J. Whitworth, Assistant United States Attorney on behalf of the United States. This agreement is made pursuant to Rule 11, Federal Rules of Criminal Procedure.

2. Defendant agrees to enter a plea of guilty to the one-count indictment charging the defendant with making false statements for the purpose of influencing the action of an institution insured by the Federal Deposit Insurance Corporation, in violation of Title 18, United States Code, Section 1014.

3. The defendant understands that the maximum possible penalties as a result of his guilty plea are:

       a. Incarceration: not more than 2 years

       b. Fine: not more than $250,000

       c. Mandatory Special Assessment: $50

       d. Supervised Release: not more than 1 year

       e. Costs of incarceration and community supervision as ordered by the Court.

4. The parties agree and stipulate that sentencing is

ORIGINAL

Document # 12

controlled by the Sentencing Guidelines. There are no agreements whatsoever between the parties as to what sentence may be imposed in this case and sentencing shall be left to the discretion of the Court, except to the extent that the parties further agree and stipulate:

a.   Sentencing guidelines §2F1.1 is the applicable section for a violation of Title 18, United States Code, Section 1014, and provides for a base offense level of 6, with an additional five-level increase for the $50,000 loss, resulting in an offense level of 11.

b.   The defendant agrees to make restitution to American Bank of Kansas City, Missouri, in the amount of $50,000, which reflects the loss to the victim.

c.   The parties agree that defendant has demonstrated an acceptance of responsibility and should be entitled to a two-level reduction.

5.   In exchange for defendant's plea, the Government agrees to recommend a sentence at the low-end of the Guidelines at the time of sentencing.

6.   The defendant reserves the right to argue for a sentence of probation if the Guideline calculations, as determined by the United States Probation Office and the Court, allow for the possibility of probation.

7.   The Government has no objections to the defendant remaining on his current bond pending sentencing.

8.   The defendant has read this agreement, discussed it with

2

his attorney, and understands it. By his signature, he agrees that it is correct and that he enters into it freely and voluntarily and not because of any threats, force, or promises other than the promises set forth herein.

9. At the time of sentencing, defendant shall deliver to the United States Attorney's Debt Collection Unit, 549 United States Courthouse, 811 Grand Avenue, Kansas City, Missouri 64106, a check payable to the Department of Justice or other sufficient payment in the amount of $50, which constitutes the mandatory special assessment the Court must impose for a felony conviction.

JEAN PAUL BRADSHAW II
United States Attorney

BY

_____9/28/96_____
DATE

MATT J. WHITWORTH #33322
Assistant United States Attorney

_____9/28/90_____
DATE

RON WOOD
Attorney for Defendant

_____9-28-90_____
DATE

SCOTT TUCKER
Defendant

3

AO 245 S (Rev. 4/90) Sheet 1 - Judgment in a Criminal Case

# United States District Court

_____WESTERN_____ District of _____MISSOURI_____

FILED
JUN 1 3 1991
R. F. CONNOR, CLK.
U. S. DISTRICT COURT
WEST DISTRICT
OF MISSOURI

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>V.<br><br>SCOTT A. TUCKER<br># 00133 045<br><br>(Name of Defendant) | **JUDGMENT IN A CRIMINAL CASE**<br>(For Offenses Committed On or After November 1, 1987)<br><br>Case Number: 90-00163-01-CR-W-5<br><br>Charles Atwell<br>Defendant's Attorney |

RETURN TO
U. S. MARSHAL
KANSAS CITY MO

THE DEFENDANT:

☒ pleaded guilty to count(s) _____1_____
☐ was found guilty on count(s) _____ after a
plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18:1014 | False statement to a bank to acquire a loan | 04/11/88 | 1 |

The defendant is sentenced as provided in pages 2 through ___5___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____
and is discharged as to such count(s).
☐ Count(s) _____ (is)(are) dismissed on the motion of the United States.
☒ It is ordered that the defendant shall pay a special assessment of $ _50.00_ , for count(s)
_1_ , which shall be due ☒ immediately ☐ as follows:

IT IS FURTHER ORDERED that the defendant shall notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Defendant's Soc. Sec. No.: ▮▮▮▮▮▮▮

Defendant's Date of Birth: _____

Defendant's Mailing Address:

  6810 Antioch - Apt. 252

  Merriam, KS  66204

Defendant's Residence Address:

  same as above

I HEREBY ATTEST AND CERTIFY ON _____ THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE AND IN MY LEGAL CUSTODY.
R. F. CONNOR
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

June 11, 1991
Date of Imposition of Sentence

_____
Signature of Judicial Officer

SCOTT O. WRIGHT, Judge
Name & Title of Judicial Officer

June 13, 1991
Date

AO 245 S (3/88) Sheet 2 - Imprisonment

Defendant:      SCOTT A. TUCKER                                  Judgment—Page ___2___ of ___5___
Case Number:    90-00163-01-CR-W-5

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of _____ twelve (12) months, said sentence is to run concurrently .
with state sentence currently under appeal.

THE COST OF IMPRISONMENT IS WAIVED.

☐ The Court makes the following recommendations to the Bureau of Prisons:

☐ The defendant is remanded to the custody of the United States Marshal.
☐ The defendant shall surrender to the United States Marshal for this district,

　　　　　　　a.m.
☐ at _____ p.m. on _____ .

☐ as notified by the Marshal.

☒ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons

☒ before 2 p.m. on _July 02, 1991_____.

☐ as notified by the United States Marshal.

☐ as notified by the Probation Office.

## RETURN

I have executed this Judgment as follows:

_____

_____

_____

Defendant delivered on _11-5-91___ to _DISMISS HOUSE_____ at
KANSAS CITY MO.                        , with a certified copy of this Judgment.

　　　　　　　　　　　　　　　　　LARRY JOINER_____
　　　　　　　　　　　　　　　　　　　　　United States Marshal

　　　　　　　　　　　　　By _____
　　　　　　　　　　　　　　　　　Deputy Marshal

AO 245 S (Rev. 4/90) Sheet 3 - Supervised Release

| | | |
|---|---|---|
| Defendant: | SCOTT A. TUCKER | Judgment—Page ___3___ of ___5___ |
| Case Number: | 90-00163-01-CR-W-5 | |

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of _____

one (1) year.

While on supervised release, the defendant shall not commit another federal, state, or local crime and shall not illegally possess a controlled substance. The defendant shall comply with the standard conditions that have been adopted by this court (set forth below). If this judgment imposes a restitution obligation, it shall be a condition of supervised release that the defendant pay any such restitution that remains unpaid at the commencement of the term of supervised release. The defendant shall comply with the following additional conditions:

☒ The defendant shall report in person to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

☐ The defendant shall pay any fines that remain unpaid at the commencement of the term of supervised release.

☒ The defendant shall not possess a firearm or destructive device.

The defendant shall make payments on the restitution during the period of incarceration and pay the balance during the period of supervised release.

THE COST OF SUPERVISION IS WAIVED.

## STANDARD CONDITIONS OF SUPERVISION

While the defendant is on supervised release pursuant to this judgment, the defendant shall not commit another federal, state or local crime. In addition:

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer within 72 hours of any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245 S (Rev. 4/90) Sheet 5 - Restitution and Forfeiture

Defendant:        SCOTT A. TUCKER                          Judgment — Page __4__ of __5__
Case Number:      90-00163-01-CR-W-5

## RESTITUTION AND FORFEITURE

### RESTITUTION

X The defendant shall make restitution to the following persons in the following amounts:

**Name of Payee**                              **Amount of Restitution**

The American Bank of                               $55,734.25
Kansas City, Missouri

Payments of restitution are to be made to:

☒ the United States Attorney for transfer to the payee(s).

☐ the payee(s).

Restitution shall be paid:

☐ in full immediately

☒ in full not later than __the completion__ of the term of supervised release.

☐ in equal monthly installments over a period of ............... months . The first payment is due on the date of this judgment. Subsequent payments are due monthly thereafter.

☒ in installments according to the following schedule of payments:    $1,617.00 per month during the term of supervised release.

      Payments on the restitution are to begin during the term of incarceration.

    Total restitution of $58,234.25 includes restitution for case 91-00001-01-CR-W-5 in the amount of $2,500.00.

Any payment shall be divided proportionately among the payees named unless otherwise specified here.

### FORFEITURE

☐ The defendant is ordered to forfeit the following property to the United States:

AO 245 S (Rev. 4/90) Sheet 7 - Statement of Reasons

Defendant: SCOTT A. TUCKER
Case Number: 90-00163-01-CR-W-5

Judgment—Page ___5___ of ___5___

## STATEMENT OF REASONS

☒ The court adopts the factual findings and guideline application in the presentence report.

OR

☐ The court adopts the factual findings and guideline application in the presentence report except (see attachment, if necessary):

## Guideline Range Determined by the Court:

Total Offense Level: _____16_____

Criminal History Category: ___II___

Imprisonment Range: __24__ to __30__ months

Supervised Release Range: __2__ to __3__ years

Fine Range: $ 90,850 to $ 500,000

    ☒ Fine is waived or is below the guideline range, because of the defendant's inability to pay.

Restitution: $ 55,734.25

    ☐ Full restitution is not ordered for the following reason(s):

☐ The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by application of the guidelines.

OR

☐ The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reason(s):

OR

The sentence departs from the guideline range

    ☒ upon motion of the government, as a result of defendant's substantial assistance.

    ☐ for the following reason(s):

# Preston|Gates|Ellis LLP

July 28, 2003

Scott Tucker, President
National Money Service, Inc.
5700 Broadmoor, 6th Floor
Mission, KS 66202

Re:   National Money Service, Inc. – Tribal Consumer Finance Business

Dear Scott:

You asked us to provide National Money Service, Inc. ("National") with advice regarding the following. National anticipates working with one or more Indian Tribes (a "Tribe" or "Tribes") in connection with a consumer finance business to be established by a Tribe's subsidiary tribal entity (the "Consumer Finance Tribal Enterprise"). The Consumer Finance Tribal Enterprise would make unsecured consumer loans over the internet to approved applicants, who may or may not be Tribal members. You contemplate that National would enter into an agreement with the Consumer Finance Tribal Enterprise to service these consumer loans. You have asked our advice regarding the extent to which the Consumer Finance Tribal Enterprise and the loans made by the Consumer Finance Tribal Enterprise would be considered to have sovereign immunity and therefore be exempt from state and federal laws and regulations. This letter supersedes our preliminary letter dated July 25, 2003.

We want to provide you with the following brief description of the current law on Tribal sovereign immunity, as that forms the basis for our advice below.

## Sovereign Immunity – Federal Law

The essential element of sovereign immunity is that the sovereign cannot be sued except with its consent. The Supreme Court, early in this country's history, ruled that Indian tribes were "domestic dependent nations" (*Cherokee Nation v. Georgia*, 30 US (5 pet.) 1 (1831)) and that an Indian Tribe's immunity as a sovereign is similar to, but narrower than that of the United States because Congress has authority to waive aspects of the sovereign immunity of Indian Tribes (*Santa Clara Pueblo v. Martinez*, 436 US 49 (1979)). However, the Supreme Court has also held that Tribes possess all aspects of sovereignty which have not been withdrawn by treaty, federal statute or necessary implication (*United States v. Wheeler*, 435 US 313 (1978)).

In the leading case of *Federal Power Commission v. Tuscarora Indian Nation*, (352 US 99 (1960)) the Supreme Court held that "general acts of Congress apply to Indians as well as all others in the absence of clear expression to the contrary" (362 US 99, 120 (1960)).

A LAW FIRM | A LIMITED LIABILITY PARTNERSHIP INCLUDING OTHER LIMITED LIABILITY ENTITIES

222 SW COLUMBIA STREET, SUITE 1400  PORTLAND, OR 97201-6632  TEL: (503) 228-3200  FAX: (503) 248-9085  www.prestongates.com
Anchorage   Coeur d'Alene   Hong Kong   Orange County   Portland   San Francisco   Seattle   Spokane   Washington, D.C.

Confidential Treatment Requested

However, subsequent court decisions have modified this general rule to embrace the following principles:

A federal statute of general applicability that does not specifically identify its validity as to Indians or Indian Tribes will apply to them unless:

(1) the law touches "exclusive rights of self-governance in purely intramural matters;"

(2) the application of the law to the tribe would "abrogate rights guaranteed by Indian treaties"; or

(3) there is proof "by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations."

If any of these factors exist, Congress must expressly recognize that the statute applies to Indians before courts will employ the statute against Indians or Indian Tribes.[1]

Therefore, federal laws of general applicability, such as the Truth in Lending Act (15 USC § 1601 et seq.), Equal Credit Opportunity Act (15 USC § 1691 –1691(f)) and Electronic Funds Transfer Act (15 USC § 1693 – 1693 (r)) would apply to any consumer finance business created by a Tribe or by the Consumer Finance Tribal Enterprise. These statutes are silent as to their applicability to Tribes. Further, the Tribal self-government exception referred to in clause (1) above is limited to matters such as Tribal membership, inheritance rules and domestic relations. There does not appear to be a basis to argue that these laws would abrogate rights guaranteed by Indian treaties (exception (2) above) or that there is any indication that Congress intended these statutes not to apply to Indians on the reservation (exception (3) above).

We also note that there are, from time to time, proposals to regulate internet lending and "payday" loans. The Tribal Consumer Finance Enterprise would be subject to any such federal laws, absent a specific Tribal exemption in the law.

We also note that any protection afforded by sovereign immunity applies only to those Indian tribes that are recognized as eligible for funding and services from the Bureau of Indian Affairs by virtue of their status as Indian Tribes,[2] that is, "federally recognized tribes." For

---

[1] *Donovan v. Couer d'Alene Tribal Farm*, 751 F2d 1113, 1116 (9th Cir 1985) (finding that OSHA applies to Tribal business operation); *US Dept of Labor v. Occupational Safety & Health Review* Commission, 935 F2d 182 (9th Cir 1991) (OSHA applies to Warm Springs sawmill); *Florida Paraplegic Association, Inc. v. Miccosukee Tribe of Indians of Florida*, 166 F3d 1126 (11th Cir 1999) (ADA applied to tribe); *Nero v. Cherokee Nation of Oklahoma*, 892 F2d 1457 (10th Cir 1989) (application of 42 USC § 1981 would affect purely internal matter); *Smart v. State Farm Ins. Co.*, 868 F2d 929 (7th Cir 1989) (ERISA applied to Indian tribe); *Reich v. Mashantucket*, 95 F2d 174 (2nd Cir 1996) (OSHA applies to Tribal construction business); *Equal Employment Opportunity Commission*, 986 F2d 246 (8th Cir 1993) (ADEA did not apply to narrow facts involving Tribal member on the reservation).

[2] 25 USC § 2, 9; 25 CFR § 83

Confidential Treatment Requested

purposes of this letter, all subsequent references to a Tribe or Tribes means a federally recognized Tribe or Tribes. We enclose a copy of the current listing of federally recognized Indian Tribes from the July 12, 2002 Federal Register.

## Sovereign Immunity -- State Law

State authority over Tribes and Tribal members living on Tribal reservations is limited by two principles: federal preemption and infringement on Tribal autonomy.

First, state law will not apply if federal law preempts a state's authority to regulate activities on Tribal lands, either expressly or, if in balancing the federal, state and Tribal interests, the exercise of state authority will violate federal law.[3] The preemption analysis is employed where the application of state law "interferes or is incompatible with federal or tribal interests reflected in federal law."[4] Important federal and Tribal interests applicable to the Consumer Finance Tribal Enterprise here include the need to support Tribal economic development and encourage Tribal self-sufficiency.[5]

Second, if the state law infringes on the Tribe's "right to make laws and be ruled by them," and their power to regulate their internal and social relations, the state will not be entitled to exercise its authority.[6] However, if a state has a substantial interest in off reservation activities (such as ability to impose taxes on off reservation business activity not devoted exclusively to Tribal members), then some courts have held that states may assert their regulatory authority over that conduct. The issue of whether the state's interest is sufficiently substantial, in the absence of specific federal preemption is generally fact specific. Further, as described below, simply because a state has regulatory authority over a Tribe does not mean it may enforce compliance with state law.[7]

The Supreme Court has held that while a state could demand a Tribe collect a cigarette sales tax based on its sales to non-Indians, the state could not sue that Tribe in state court to enforce its regulatory authority.[8] Similarly, a wholly-owned and managed tribal enterprise, with its place of business on the reservation, could not be brought within the bankruptcy court's jurisdiction for actions it took off-reservation.[9] "[T]ribal immunity does not disappear at the

---

[3] *White Mountain Apache Tribe v. Bracker*, 448 US 136 (1980).

[4] *New Mexico v. Mescalero Apache Tribe*, 462 US 324, 333 (1983).

[5] 25 USC § 1451.

[6] *New Mexico v. Mescalero Apache Tribe*, 462 US 324, 336 (1983); *Nevada v. Hicks*, 533 US 353 (2001).

[7] *Kiowa Tribe v. Manufacturing Technologies, Inc.*, 523 US 751, 755 (1998).

[8] *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 US 505, 514 (1991).

[9] *In re Greene v. Mt. Adams Furniture*, 980 F.2d 590 (1992); see also *Sac and Fox Nation v. Hanson*, 47 F3d 1061 (10th Cir 1995) (tribe not liable for violations of the Fair Labor Standards Act for activities in manufacturing plants, even though tribe employed non-Indians);

RCS00000110

boundaries of the reservation."[10] (See further discussion of *In Re Greene* case in the following section).

Although the Supreme Court recognized that upholding a Tribe's immunity in an economic context might "harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter," it did not undermine the doctrine in any way.[11] It held that Tribes may have immunity from suits on contracts, whether the contracts involved governmental or commercial activities, and whether they were made on or off the reservation.[12]

### Sovereign Immunity – Tribal Enterprises

The courts have also held that tribally chartered corporations may also be afforded sovereign immunity under the circumstances below. Tribally chartered corporations under Section 17 of the Federal Indian Reorganization Act (25 USC § 477), often referred to as "Section 17 corporations," are entitled to sovereign immunity to the same extent as is the parent tribe except to the extent that the charter creating the Section 17 corporation has provisions waiving sovereign immunity.

However, the process for creating a Section 17 corporation is cumbersome. That process includes the following:

> The Secretary of the Interior may, upon petition by any tribe, issue a charter of incorporation to such tribe: *Provided,* That such charter shall not become operative until ratified by the governing body of such tribe. Such charter may convey to the incorporated tribe the power to purchase, take by gift, or bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description, real and personal, including the power to purchase restricted Indian lands and to issue in exchange therefor interests in corporate property, and such further powers as may be incidental to the conduct of corporate business, not inconsistent with law, but no authority shall be granted to sell, mortgage, or lease for a period exceeding twenty-five years any trust or restricted lands included in the limits of the reservation. Any charter so issued shall not be revoked or surrendered except by Act of Congress.[13]

To initiate the process, the Secretary of the Interior must call an election upon receiving a

---

[10] *Id.* at 592.

[11] *Kiowa Tribe of Oklahoma v. Manufacturing Technologies,* 523 US 751, 758 (1998).

[12] *Id.* at 760 (Tribal entity defaulted on promissory note, executed off-reservation; note said, "nothing in this Note subjects or limits the sovereign rights of the Kiowa Tribe of Oklahoma").

[13] 25 USC § 477.

Confidential Treatment Requested

RCS00000111

petition containing the signatures of at least one-third of the adult members of the tribe.[14] The election will be held after thirty days' written notice of the date.[15] A vote at a special election by a majority of the adult Indians in favor of ratifying a charter for the Tribal corporation will render it effective.[16] The total vote cast must be at least 30 percent of those entitled to vote.[17] If the constitution provides that the charter is not subject to approval by the Secretary, the charter does not need to be approved by the Secretary.[18] To ratify a charter, any adult member who has duly registered is entitled to vote, but if the tribe is of a reservation, only duly registered members physically residing on the reservation are entitled to vote.[19]

A Tribe is not, however, limited to creating a Section 17 corporation in order for a Tribal subsidiary corporation to enjoy sovereign immunity. If the Tribal Constitution (or other governing documents) so permits, a Tribe may charter a corporation that is wholly owned by the Tribe, is created to conduct activities on behalf of the Tribe and for which the Tribe has specifically conferred sovereign immunity. If those conditions are met, courts have held that the tribally chartered corporation is equivalent to the Tribe and enjoys the same sovereign immunity that the Tribe enjoys.

A leading case establishing this principle is *In Re Greene, Richardson v. Mt. Adams Furniture* (980 F2d 590 (1992)). In the *Greene* case, the Yakama Nation created Mt. Adams Furniture, a wholly owned and operated business of the Confederated Tribes and Bands of the Yakama Indian Nation (the "Yakama Nation"). Mt. Adams Furniture's place of business was on the Yakama reservation. Mt. Adams Furniture sold some furniture to Richard and Donna Greene who did not live on the reservation. The Greenes did not pay for the furniture they purchased so Mt. Adams Furniture repossessed that furniture. The Greenes filed a bankruptcy petition within 90 days after the furniture had been repossessed. Under bankruptcy law, the bankruptcy trustee claimed that the repossessed furniture was a preferential transfer in favor of Mt. Adams Furniture. Mt. Adams Furniture claimed that as a wholly owned Tribal entity, it was immune from suit by the bankruptcy trustee. The Ninth Circuit Court of Appeals held that Mt. Adams Furniture as a wholly owned business entity of a Tribe was entitled to sovereign immunity even for such a commercial enterprise. The *Greene* court, quoted with approval from *Oklahoma Tax Commission v. Potawatomi Tribe*, 498 US 505 (1991) as follows "Congress has always been at liberty to dispense with such Tribal immunity or to limit it. Although Congress has occasionally authorized limited classes of suits against Indian Tribes, it has never authorized suits to enforce tax assessments. Instead, Congress has consistently reiterated its approval of the immunity

---

14 25 CFR § 81.5.

15 *Id.*

16 25 USC § 478.

17 25 USC § 478a; 25 CFR § 81.7.

18 25 CFR § 81.7.

19 25 CFR § 81.6(f).

Confidential Treatment Requested

doctrine. . . these acts reflect Congress' desire to promote the 'goal of Indian self government, including its overriding goal of encouraging Tribal self sufficiency and economic development . . . Under these circumstances we are not disposed to modify the long established principle of Tribal sovereign immunity'".[20]

The *Greene* case is important for the proposed Consumer Finance Tribal Enterprise. There, as is proposed here, the Tribe created a subsidiary corporation to run a purely commercial venture and in connection with that venture to extend credit. Yet, because the venture helped economic development and self sufficiency of the Yakama Nation, the Ninth Circuit held even a bankruptcy trustee could not defeat the tribal enterprise sovereign immunity. The proposed Consumer Finance Tribal Enterprise should help promote economic development and self determination by, among other things, making unsecured loans available to Tribal members (as well as non-members), and the revenues from the consumer finance business could help the Tribe's economy.

## Sovereign Immunity – Consumer Finance Tribal Enterprise

Based on the foregoing state of the law, the following are the steps we suggest be taken in the creation and operation of the Consumer Finance Tribal Enterprise. The goal is to have the Consumer Finance Tribal Enterprise be a means of helping the Tribe's own economic development and self sufficiency and minimizing the potential for allegations that the Consumer Finance Tribal Enterprise is only as a conduit for National.

As indicated above, it appears less cumbersome for a Tribe to charter the Consumer Finance Tribal Enterprise as a corporation pursuant to its Constitution (or other governing documents) and not as a Section 17 corporation. The Consumer Finance Tribal Enterprise must be formed in accordance with the requirements for formation of business entities that are contained in the Tribal Constitution and its Bylaws (or other governing documents of the Tribe). This likely would require approval of the Tribal governing council and, depending on the terms of the Tribal Constitution (or other governing documents), may require approval of a specified percentage of all adult Tribal members.

The Consumer Finance Tribal Enterprise should be located on Tribal land, its board of directors and officers should be Tribal members, and the Tribe should authorize the board of directors of the Consumer Finance Tribal Enterprise to set the requirements for the consumer loans, including amount, payment terms and interest rate.

The Tribe will also need to enact laws that govern these loans (including laws relating to negotiable instruments, enforcement of obligations, and usury). If the Tribe does not have its own Tribal code relating to negotiable instruments, enforcement of obligations and usury it

---

[20] 980 F2d 590, 596.

Confidential Treatment Requested

should adapt the laws of the state in which it is located, if that state has lender favorable laws. For example, South Dakota, where several Sioux Tribal reservations are located, has lender favorable laws. In creating the Consumer Finance Tribal Enterprise, the Tribe will also need to specify the forum for hearing any disputes between borrowers and the Consumer Finance Tribal Enterprise and between the Consumer Finance Tribal Enterprise and National. If the Tribe has a Tribal court system, then the Tribe should adopt a limited waiver of sovereign immunity authorizing disputes between the Consumer Finance Tribal Enterprise and borrowers to be heard in the Tribal court. If the Tribe does not have a Tribal court system, then the Tribe should adopt a limited waiver of sovereign immunity to allow for mandatory arbitration of any disputes or enforcement actions between the Consumer Finance Tribal Enterprise and the borrowers, with appeal only to the federal courts to the extent the federal courts have jurisdiction. Any disputes between the Tribe or the Consumer Finance Tribal Enterprise and National should be subject to mandatory arbitration and the Tribe should approve a limited waiver of sovereign immunity authorizing that arbitration.

The Tribe will also need to approve a servicing agreement between the Consumer Finance Tribal Enterprise and National pursuant to which the Consumer Finance Tribal Enterprise would determine the amount, payment terms and interest rates for the loans, make all the credit decisions and all the enforcement decisions and make the loans. However, the servicing agreement would authorize National, as the servicing agent of the Consumer Finance Tribal Enterprise, to make recommendations to the Consumer Finance Tribal Enterprise and service the loans.

The loans will need to be payable to the order of the Consumer Finance Tribal Enterprise although it appears the servicing agreement could authorize National to complete loan documents as directed by the Consumer Finance Tribal Enterprise. The servicing agreement should also require that the Consumer Finance Tribal Enterprise be provided with status reports on the loans at specified intervals.

National should also enter into a licensing agreement with Consumer Finance Tribal Enterprise pursuant to which the Consumer Finance Tribal Enterprise would be given a license to use computer hardware and/or software and servers (which should be located on the reservation) to, for example, review applications and make final credit determinations.

If National is going to make loans to the Consumer Finance Tribal Enterprise in order to fund the Consumer Finance Tribal Enterprise, then the terms of those loans should be documented in a separate credit agreement which, again, would need to be approved, depending on the terms of the Tribal Constitution (or other governing documents), by either the Tribal governing council or a specified percentage of members of the Tribe. We suggest that National not be the sole source of funds for the Consumer Finance Tribal Enterprise to minimize the risk of allegations that the Consumer Finance Tribal Enterprise is simply acting as a conduit for

Confidential Treatment Requested

National, which, of course, would destroy the sovereign immunity exemption from becoming subject to state law and regulations.

The servicing agreement and licensing agreement should also describe the fee arrangements between National and the Tribal Consumer Finance Enterprise.

It should be noted that the U.S. Department of the Interior has adopted regulations with respect to consumer finance businesses located on the Navajo, Hopi and Zuni reservations. 25 CFR § 141.45 *et seq.* requires among other things, disclosures similar to the federal Truth in Lending law and imposes a maximum interest rate of 24% per year. We have not been able to find any similar Department of the Interior regulations with respect to any other Tribes, however.

Nevertheless, it is possible that a Tribe will use those requirements as a guide to determine maximum interest rate applicable to any loans made by the Consumer Finance Tribal Enterprise.

It also should be noted that while loans from the Consumer Finance Tribal Enterprise do not need to be limited to Tribal members, likely many loans will be made to Tribal members. In fact, that may be a selling point in negotiations with the Tribe. Making loans to Tribal members also helps improve the economic well being of Tribal members. Based on our experience, however, the Tribe may want to impose a maximum interest rate for loans made by the Consumer Finance Tribal Enterprise because of concern about the interest rate Tribal members may be required to pay.

We also note that unless a contract for services performed on Tribal lands encumbers the Tribal lands for seven or more years or creates a proprietary or near proprietary control of Tribal land for seven or more years, no approval of the Secretary of the Interior is required. (25 USC § 81). As the servicing and licensing arrangements National contemplates should not involve either encumbering Tribal lands (except to the extent computer servers may be affixed to Tribal lands) or exercising proprietary or near proprietary control over Tribal lands, the approval of the Secretary of the Interior should not be required. We do suggest, however, that, as an abundance of caution, the servicing agreement and licensing agreement be for a term of less than seven years.

We call to your attention that 25 USC § 261 specifies "the Commissioner of Indian Affairs shall have the sole power and authority to appoint traders to the Indian tribes and to make such rules and regulations as he may deem just and proper specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians." The regulations promulgated under that statute[21] describe the requirements for traders, including obtaining a

---

[21] 25 CFR § 140

Confidential Treatment Requested                                        RCS00000115

license, but those regulations, except to the extent they apply to BIA employees, appear to apply only with respect to trading in goods not services.

Nevertheless, there is a case suggesting that the cited statute and the regulations promulgated under it also apply to those who provide services to Indian Tribes. That case appears to be an aberration and, as long as National does not have any ownership interest in the Consumer Finance Tribal Enterprise, it does not appear that National will need any license to enter into the servicing or licensing agreement or to make loans to the Tribe or Consumer Finance Tribal Enterprise. However, in an abundance of caution, we are obtaining a copy of the form that traders who do need licenses must submit to the Bureau of Indian Affairs. We will promptly let you know after obtaining that form should our conclusion regarding the need to obtain a license change.

## Conclusion

If the conditions for creating and operating the Consumer Finance Tribal Enterprise described above are complied with, then a state or federal court of competent jurisdiction, if it follows the existing judicial precedent, including that described in this letter, should find that the Consumer Finance Tribal Enterprise, the loans made by the Consumer Finance Tribal Enterprise and National's servicing of the loans made by the Consumer Finance Tribal Enterprise are not subject to state law or regulations. However, the loans made by the Consumer Finance Tribal Enterprise and the servicing of those loans would be subject to federal law and regulations.

Please call Kevin Brannon or me with questions. Carra Sahler also provided much of the research that formed the basis for the advice in this letter. Please feel free also to contact her.

Very truly yours,

PRESTON GATES & ELLIS LLP

By _Ellen C. Bachman_
Ellen C. Bachman

ECB:ll
Encl
cc:    Kevin Brannon
       Carra Sahler

K:\49094\00001\ecb\ecb_L22HA=ltr to Scott Tucker 7-24-03.doc

Confidential Treatment Requested