# FREEMAN, NOOTER & GINSBERG
## ATTORNEYS AT LAW

| | |
|---|---|
| LOUIS M. FREEMAN | 75 MAIDEN LANE |
| THOMAS H. NOOTER | SUITE 503 |
| LEE A. GINSBERG | NEW YORK, N.Y. 10038 |
| _____ | _____ |
| NADJIA LIMANI | (212) 608-0808 |
| OF COUNSEL | TELECOPIER (212) 962-9696 |
| | E-MAIL: FNGLAW@AOL.COM |
| _____ | WWW.FNGLAW.COM |
| CHARLENE RAMOS | |
| OFFICE MANAGER | |

March 8, 2017

BY ECF
Honorable P. Kevin Castel
United States District Judge
500 Pearl Street
New York, NY 10007

Re: United States v. Tucker
16 CR 91 (PKC)

Dear Judge Castel:

We write in advance of tomorrow's conference and to respond to the Government's letter of last night. Although the Government concludes that Mr. Tucker is "launching" a fishing expedition or attempting to delay the trial, the Government's letter does not reference the fact that AUSA Velamoor had two phone conversations with undersigned counsel on Monday where it was explained that the need for these documents was triggered by the retention of our forensic accounting expert. It was only in these phone conversations that the Government first requested the subpoenas that were submitted to the Court and they were e-mailed on Monday night but for some technical reason did not go through until Tuesday morning.

Documents Sought

Contrary to the Government's assertion that we have "requested blanket subpoenas of vast scope but unidentified relevance," the subpoenas at issue seek specific categories of information directly relevant to the defense of Mr. Tucker.

First, for the subpoenas addressed to the following financial institutions, we specifically requested bank account records from January 1, 2012 to December 31, 2016 noting the bank account name and account number:

1) Arvest Bank
2) Bay Cities/Centennial Bank
3) Central States Capital Markets
4) Fidelity Bank
5) First National Bank & Trust of North Dakota
6) TD Ameritrade/TD Bank
7) US Bank National Association
8) Welch State Bank

1

Second, for the subpoenas addressed to Advantage Cash Services, Ameriloan, Star Cash Processing, United Cash Loans, US Fastcash,[1] and AMG we specifically requested the following documents:

1. All internal financial statements;
2. All financial statements prepared by independent CPA('s) or accounting firms;
3. All CPA workpapers including report combinations and permanent files;
4. Detailed General Ledgers and Year End Trial Balances;
5. All tax filings, including papers relied upon to prepare tax filings;
6. Loan database reports and summaries used to update and reconcile G/L;
7. Any agreement relating to or regarding servicing of the loan portfolio;
8. Other agreements relating to or regarding the operation of the loan portfolio, including, but not limited to, lead generation, marketing agreements, ACH processing, debit processing, agreements for banking services, or purchase and sale agreements;
9. All bank account signatory authorization cards;
10. Monthly management reports including management reports for loan transactions and updates to G/L;
11. Organization Chart and management organization by job function chart;
12. Articles of incorporation;
13. Listing of all bank accounts;
14. Board of Directors Resolutions and Minutes;
15. All policies and procedures manuals relating to or regarding the operation of the loan portfolio and
16. Accounting policies and procedures manual.

Lastly, we addressed an additional subpoena to the Miami Tribe of Oklahoma for any and all resolutions of the Board of Directors of AMG Services, Inc. and MNE Services, Inc. and minutes of any board meetings commenced in advance and for the purpose of discussing the Non-Prosecution Agreement entered into on 2/10/16 by Douglas Lankford and Donya Williams with the U.S. Attorney's office for the Southern District of New York. The Government did not respond to this subpoena in their 3/7/17 letter.

As illustrated by the above listing of documents, Mr. Tucker is not "requesting 'all financial documents' related to a billion-dollar enterprise that operated through numerous entities over 15 years." D.E. 152, 2. Rather, we are requesting documents that our forensic accounting expert has stated are necessary for him to review in order to analyze these entities. It should be noted that a forensic investigation of this information may lead to other requests

Attempts to Locate Documents

As the Court is aware, on December 19, 2016, after the filing of a superseding indictment on December 1, 2017 including three money-laundering counts, undersigned counsel requested the use of CJA funds for the retention of a forensic accounting expert, Harry Steinmetz, in this matter. This request was approved on December 21, 2016. Given the timing of the trial and

---

[1] These subpoenas were addressed to either the Miami Tribe of Oklahoma or both The Miami Tribe of Oklahoma and MNE Services, Inc. The years requested were either January 1, 2008 to December 31, 2015 or January 1, 2003 to December 1, 2015 depending on the formation date of the entity.

desire to expedite matters, on December 5 and 6, 2017, our paralegal, Eli Salamon-Abrams sent Mr. Steinmetz various files from discovery, including the reports prepared by Squar Milner, the accounting firm who evaluated the "intercompany balances maintained between all Business Services entities (AMG Services Inc., CLK Management), Portfolio entities (Advantage Cash Services, Star Cash, Red Cedar Services, OneClickCash, Ameriloan, United Cash Loans, and US Fast Cash) and Nominee entities (CB Services Corp, Executive Global Management, NM Services Corp, Silverstate Business Administrators, and Universal Management Services), collectively referred to as the Companies, for the period November 9, 2006 through December 31, 2011." Squar Milner Report, Bates Stamp AMG-SDNY 03700552. On December 19, 2017, my associate, Nadjia Limani, e-mailed Mr. Steinmetz requesting a list of the types of documents he would need to perform the forensic accounting analysis. In early January 2017, Mr. Steinmetz provided Ms. Limani with a memo with questions regarding the types of documents needed and whether these items were located in the discovery database. In turn, we had Mr. Abrams begin to search the discovery database to locate some specific items. We also provided Mr. Steinmetz and his staff with access to the discovery database with their own passwords so that they may search as well. It wasn't until approximately 4 weeks ago that Mr. Steinmetz received authorization allowing more than one person access to the discovery database.

However, due to the nature of the production of discovery in this matter, locating specific documents is extremely time-consuming and difficult. The majority of the documents that the Government claims they have already disclosed ("the financial and business records of the entities") are located in the Bates stamp range of AMG-SDNY, which has 2,129,342 pages or MNE-SDNY, which has 48,692 pages. So, when we asked Mr. Abrams to locate the names, account numbers and dates of formation of bank accounts, this search took approximately a week. When we then asked Mr. Abrams to locate the actual bank statements for the Miami Tribe bank accounts, he searched for two full weeks and located approximately 25% of the records. The reason for this inefficiency is that when you search for specific documents, you have to sort through all of the search results, which may contain bundles of documents containing only one or two relevant pages in a 1000 page document.

It was at this point that the decision was made to focus on documents we could more efficiently locate by file type, such as QuickBooks files and to reach out to Mr. Tucker to determine alternative sources for any of the documents. We also put Mr. Steinmetz in contact with Craig Weaver from Squar Milner to determine which documents were in the possession of his firm. On February 3, 2017, we received a spreadsheet from Mr. Steinmetz detailing the documents he had received and the documents he still needed to review for each entity and each year. We again consulted with Mr. Tucker to determine where these documents might be located and for Advantage Cash Services, Ameriloan, Star Cash Processing, United Cash Loans, US Fastcash, and AMG, and we were advised that the Miami Tribe is in control of the servers and the hard copy documents concerning these entities. We then drafted the subpoenas at issue here based on the spreadsheet received from Mr. Steinmetz. We have been in contact with counsel for the Modoc and Santee tribes to obtain similar documents for the payday lending entities controlled by those

In its March 7, 2017 letter, the Government claims that they have produced most of the requested materials, including financial statements and bank records, all financial statements for the payday lending entities, tax returns, all agreements relating to the loan portfolios, corporate documents including articles of incorporation, board meeting minutes and resolutions relating to the payday lending business and policy and procedure manuals**.** As described supra, we have not

3

been able to locate such materials and if the Government can produce such items separate from the vast "AMG" and "MNE" productions, we would be satisfied with such a production. We do not wish to subpoena documents that have already been produced to the Government by grand jury subpoena.

The Government, however, admits that they are not in possession of every item requested via these subpoenas: "[t]o be sure, the Government does not possess, and thus has not provided the defendants, every document that would fall within Tucker's sweeping subpoenas." Id. at 2. The Government claims that we have not demonstrated how the additional documents would constitute relevant evidence. To put it simply, all of the requested documents are relevant to Mr. Tucker's defense and the analysis being performed by Mr. Steinmetz and his staff. They are relevant to the following components of Mr. Tucker's defense: 1) Payments to Mr. Tucker are within the terms agreed to by the parties to those agreements, 2) The Miami Tribe, the Modoc Tribe and the Santee tribe were in control of the relevant bank accounts related to the payday lending entities and 3) the accounting work done by Squar Milner was reasonably accurate and complete.

Clearly, the bank account records from 2012 to 2016 are relevant to all three of these components. These records would show 1) the transfer of funds to Mr. Tucker and his entities, 2) any payments made to the Miami tribe or for the benefit of the Miami tribe, 3) any expenses paid by the entities and 4) funding of the loans during various time periods. These records also provide our expert with the ability to check the numbers in Squar Milner's reports. In addition, the bank account records past the date of the conspiracy alleged in the indictment (2013-2016) are highly relevant to the control and ownership of the money generated from the payday lending business. Even the Government does not seem to know how much money the Miami Tribe had in its bank accounts, as of the day they cut their ties with Mr. Tucker, or continue to have until present day.

The financial records/business records requested are also relevant to all three components described supra in addition to being necessary for our expert to understand the inner workings of the business, including the relationships between entities and how that affects ownership and control. As the Court stated in its March 1, 2017 order denying the defendants' motions, "[t]he tribes' interests and the resources that they invested in the lending business must be considered based on the evidence at trial, and cannot be decided based on defendants' arguments in motion to dismiss." D.E. 143, 7. Contrary to the Government's assertions, these are not conclusory statements that the documents sought will benefit our defense, but rather these are the specific components of Mr. Tucker's defense that can only be supported by the documents referenced in the subpoenas. The Government cannot assert in the indictment that Mr. Tucker controlled the businesses and personally funded the loans and then oppose our requests to obtain any information that would show the opposite.

Delay of Trial

The Government claims that contrary to the third prong of United States v. Nixon, these subpoenas would delay the trial date. The test in Nixon is whether the non-issuance of a subpoena would delay the trial- a different point altogether. Because a party may not willingly abide by a court-issued subpoena is not a reason to deny the issuance of that valid subpoena. Further, the Government's comments about Mr. Tucker's former counsel and counsel for Mr.

4

Muir are out of place where as described supra, these issues relate to Mr. Tucker and his entities and arose primarily after the filing of the superseding indictment on December 1, 2016, six months after undersigned counsel's entry into the case.

Conclusion

      For the foregoing reasons, the Court should order the Government to produce discovery that is responsive to the subpoenas for bank account records and financial/business records. Counsel for Mr. Tucker will submit revised subpoenas for the records not in the Government's possession and we would ask that those subpoenas be so-ordered by the Court as the requirements of Nixon would be satisfied.

      Respectfully Submitted,

      /s/ Lee A. Ginsberg

      _____

      Lee A. Ginsberg